```
            IN THE UNITED STATES DISTRICT COURT FOR THE
                  WESTERN DISTRICT OF VIRGINIA
                      Abingdon Division

-------------------------x
                         :
UNITED STATES OF AMERICA, :
                         :
     Plaintiff,          :
                         :
v.                       :   1:16CR34
                         :
SITESH BANSI PATEL,      :
                         :
          Defendant.     :   Abingdon, Virginia
                         :   March 8, 2017
-------------------------x   9:01 a.m.


           JURY TRIAL – TESTIMONY OF SITESH PATEL
             BEFORE THE HONORABLE JAMES P. JONES
            UNITED STATES DISTRICT JUDGE, and a jury
```

<u>APPEARANCES:</u>

     S. RANDALL RAMSEYER, Esquire
     Assistant U.S. Attorney
     P.O. Box 1098
     Abingdon, Virginia 24212
        For the United States of America.

     PATRICK Q. HALL, Esquire
     1350 Columbia Street, Suite 601
     San Diego, California  92101
     and
     CHRISTOPHER K. KOWALCZUK, Esquire
     P.O. Box 11971
     Roanoke, Virginia  24022
        Counsel for the Defendant.


Proceedings recorded by Stenography, transcript
produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628–5116**

Patel - Direct

1       (Proceedings commenced at 9:01 a.m.)

2       (Proceedings were had and reported, but not transcribed.)

3           MR. HALL:  Your Honor, the defense would call Sitesh

4  Patel.

5           THE COURT:  Mr. Patel, if you'll come forward and be

6  sworn, please.

7               SITESH BANSI PATEL, DEFENDANT, SWORN

8                       DIRECT EXAMINATION

9  BY MR. HALL:

10  Q     Sir, could you please state your full name and spell your

11  name for the record?

12  A     Sitesh Bansi Patel, S-I-T-E-S-H, B-A-N-S-I, P-A-T-E-L.

13  Q     Mr. Patel, you heard the testimony that S.K. Labs assembled

14  H-Drol, M-Drol capsules for Competitive Edge Labs back in 2008,

15  2009.  Did S.K. do that?

16  A     Yes, sir.

17  Q     Were you involved with that?

18  A     Yes, sir.

19  Q     Did that stop at some time?

20  A     It did.

21  Q     When did it stop?

22  A     In 2009.

23  Q     Do you remember specifically?

24  A     It was some time in May or June of 2009.

25  Q     You've also heard the testimony, Mr. Wood, that he

Patel – Direct

```
 1   approached you, or he spoke with you in December of 2010 about

 2   assembling H-Drol and M-Drol, and that you introduced him to

 3   Willy Ramos.  Did you do that?

 4   A    I did.

 5   Q    And it was more than just an introduction, wasn't it?

 6   A    It was.  It was an introduction, and I set them up, as

 7   well.

 8   Q    And did there come a time -- well, when you say set them up,

 9   did you do things to help them?

10   A    I did.  I delivered the raw materials and the checks.

11   Q    And checks, right?

12   A    And checks.

13   Q    Did there come a time when you stopped?

14   A    There was.

15   Q    When was that?

16   A    It was in April of 2011.

17   Q    Why did you stop?

18   A    Because I no longer wanted to be involved.

19   Q    Let me slow down a little bit.  Let's talk a little bit

20   about your background.  Where were you born?

21   A    I was born in Anaheim, California.

22   Q    Where were you raised?

23   A    Up and down Orange County, Tustin, California.

24   Q    Where did you go to high school?

25   A    Foothill High School.
```

Patel – Direct

1   Q    And what year did you graduate?

2   A    In 2001.

3   Q    When, after you graduated from high school did you have some

4   kind of plan or dream that you wanted to pursue?

5   A    I did.

6   Q    What was that?

7   A    I wanted to become a pharmacist.

8   Q    And how long had you wanted to be a pharmacist?

9   A    As far back as I can remember.  I even had a sixth grade

10  photo where I had a picture of myself where everyone else was

11  saying I want to become an astronaut, fire fighter, I put, "I

12  want to become a pharmacist when I grow up."

13  Q    Why did you want to become a pharmacist?

14  A    I had family that was also a pharmacist, I had cousins and

15  friends going to pharmacy school, and at the end of the

16  profession I saw they were helping people, and that's really

17  the reason I wanted to do it.

18  Q    Did you attend college?

19  A    I did.

20  Q    Where?

21  A    I went to Rutgers University in New Jersey.

22  Q    Did you get a degree?

23  A    I did.

24  Q    What was the degree?

25  A    It was a doctorate of pharmacy.

Patel – Direct

```
 1   Q    And when did you get that?

 2   A    In 2007.

 3        MR. HALL:  Mark this as Defendant's 20, please.

 4   BY MR. HALL:

 5   Q    Mr. Patel, is that your degree?

 6   A    That is.

 7   Q    And I'm sorry, when did you get that?

 8   A    This was in May of 2007.

 9   Q    All right.  How long did it take you, how long did it take

10   you to get that degree?

11   A    The program, itself, it was straight out of high school,

12   so it was somewhat of an accelerated program, six years, and

13   encompassed the undergraduate and graduate portion.

14   Q    Did you get a bachelor's degree as part of it?

15   A    I did not.  It was, it was a compressed program, so I

16   ended up with just a doctorate of pharmacy.

17   Q    And so, so it was May of 2007 that you graduated, correct?

18   A    That's correct.

19   Q    After you graduated from college, what was your plan?

20   A    Well, I moved back home to California, and I had to study

21   for my boards, so I spent a lot of time studying, and I was

22   planning to work initially at a retail pharmacy, so I was

23   applying to pharmacies such as CVS, I applied to Walgreens.

24   Q    And did you get a job at those?

25   A    I did not.  They all required that I obtain my license
```

Patel - Direct

```
 1    first.  So, I had my degree, but I didn't have my actual
 2    license from the State Board of California.
 3    Q     When did you take -- well, first of all, what's that, what's
 4    that test called?
 5    A     There are two tests.  One is called the NAPLEX --
 6    Q     Is that initials?
 7    A     It is.  I don't know what it stands for, but it's
 8    N-A-P-L-E-X.  The other test is called the CPJE.
 9    Q     When did you first take those tests?
10    A     I took the NAPLEX in August of 2007, and I took the
11    CPJE -- I took the NAPLEX in July of 2007 and I took the CPJE
12    in August of 2007.
13    Q     Did you pass the NAPLEX?
14    A     I did pass the NAPLEX.
15    Q     What about the CPJE?  In California is there a limitation on
16    how many times you can take the CPJE?
17    A     There is.  You can take it a total of four times.  If you
18    don't pass it after your fourth time you have to go back and
19    attend classes again.
20    Q     Did you take, did you take the exam multiple times?
21    A     I did.
22    Q     When was it that you -- did you finally pass?
23    A     I passed.
24    Q     When was that?
25    A     It was in May of 2009.
```

Patel – Direct

1   Q    2009?

2   A    2009.

3   Q    How many times did you end up taking it?

4   A    I ended up taking it all four times.

5   Q    So, three fails and one pass?

6   A    Yeah.

7   Q    In that time, and in the time frame -- so, I think the first

8   time you took it was July of 2007, and it wasn't until almost two

9   years later that you got your -- did you ultimately get your

10  pharmacy license?

11  A    I did.  I received the actual license in July of 2009.

12         MR. HALL:  Mark this as Defendant's 21.

13  BY MR. HALL:

14  Q    Is that your California State Board of Pharmacy license?

15  A    Yes, that is.

16         MR. HALL:  I would move admissions of One and Two,

17  Your Honor.  Or, excuse me, 20 and 21.

18         THE COURT:  They will be admitted.

19         MR. HALL:  Thank you.

20      (Defendant's Exhibit Nos. 20 and 21 were received in

21  evidence.)

22  BY MR. HALL:

23  Q    Let's go back a little bit.  After you had, you know, not

24  passed the CPJE a couple of times, how were you doing?

25  A    I was pretty depressed.  It was, it was tough to deal

Patel – Direct

1   with.  I went to school for six years, graduated in 2007, and

2   there I was in 2008 still couldn't pass it, all my friends had

3   moved on to their careers, and it took me two years before I

4   actually got my license.

5   Q    What were you doing while -- were you just studying during

6   this time, or did you start doing something else?

7   A    I was studying for the most part.  I was doing a balanced

8   life of studying, as well as working part time.

9   Q    Where were you working?

10  A    I was working for my dad's company, which was S.K. Labs.

11  Q    When was -- I assume you know this.  When was S.K. Labs

12  started?

13  A    1991.

14  Q    By the way, how old are you now?

15  A    I'm 33.

16  Q    And in 1991 how old were you?

17  A    Nine, ten.

18  Q    And what about in, say, 2008 when you first started working

19  there?  How old were you?

20  A    In 2008 I was 24.

21  Q    What did you do when you first started working there?

22  A    It was really part time work, so whenever my dad had

23  projects he gave them to me -- I was actually sitting at the

24  front desk, answering phone calls, forwarding phone calls,

25  working on documents, and that was really it.  You described it

Patel - Direct

```
 1  pretty well earlier where you said I was kind of a gofer, which

 2  was kind of true.

 3  Q    Not very flattering, but I apologize for that?

 4  A    Yeah, six years in school.

 5  Q    In what time frame was it that you first started doing that?

 6  A    It was in 2007.

 7  Q    Do you remember when in 2007?

 8  A    July, 2007.

 9  Q    And then did you continue working there up through the end

10  of 2011?

11  A    I did.

12  Q    You're still working there now?

13  A    Still working there.

14  Q    In June of 2008 -- I want to focus on that -- in June of

15  2008 what were you doing at S.K.?

16  A    It was still a mix, I was still working at the front desk,

17  kind of just taking care of random projects.  I was still

18  studying for my boards, as well, so I'd go home, work on my

19  boards, work on studying and reviewing information.  But at

20  S.K., for the most part I was just taking on daily tasks my dad

21  would give me.

22  Q    Can you estimate how much time you were studying every day,

23  or were you part studying --

24  A    I would say studying every day.

25  Q    You got a percentage of how much studying, how much working?
```

Patel – Direct

1    A    Half and half.

2    Q    In June of 2008, I think you've seen these e-mails, so to go

3    to June, say, 23rd of 2008, did you have contact with somebody

4    named Bryan?

5    A    I did.

6    Q    Tell me what happened.

7    A    I had a phone call that came in from an individual

8    describing himself as Bryan, and he told me he wanted to quote

9    on placing an order.

10   Q    Did he give you a last name at that time?

11   A    I don't remember.

12   Q    Did you later learn a name?

13   A    I did later on.  It was Riddle.

14   Q    So, let's go back to the first phone call.  So, when he

15   wanted to place an order, what did he say?

16   A    He didn't really give me much information; he only gave me

17   the specs of the project.  He wanted me to assemble the product

18   for him, so he told me he was going to need 25 milligrams per

19   capsule, 60 count per bottle, and that was really it.

20   Q    Okay.  Are those numbers what you call specs?

21   A    Those are specs.

22   Q    And did he tell you how many bottles he wanted?

23   A    It was around 5,000.

24   Q    When you first had this conversation did he identify what

25   the product was that he wanted you to market?

Patel – Direct

```
 1   A     He did not.

 2   Q     Did, did you have some discussion about -- well, at that

 3   point in time, June 23rd of 2008, did you, were you able to,

 4   like, quote something off the top of your head for what the job

 5   would be?

 6   A     It wasn't off the top of my head.  My dad had, as part of

 7   what I was doing at S.K. I was learning some of the processes,

 8   and one of the things I was being trained on was how to

 9   establish a quotation.  He was showing me the math of how to

10   basically create a product, quote out what it is going to cost

11   labor-wise, what it is going to cost part-wise, and how to add

12   a margin to that.

13   Q     And so when you first received that phone call were you able

14   to tell him a price over the phone?

15   A     Not right off the bat.

16   Q     So, what did you do?

17   A     I sent him a follow up e-mail.

18   Q     And, and how did you know what his e-mail address was?

19   A     When we had the phone call he gave me his name and his

20   e-mail.

21   Q     And he gave you -- what was the name in the e-mail?

22   A     It was Bryan at Competitive Edge Labs dot com.

23   Q     I think we saw the e-mail before during the questioning of

24   Mr. Wood.  Do you remember seeing that e-mail?

25   A     I do.
```

Patel – Direct

1    Q    And just to try and make this go a little bit quickly here,

2    at, you quoted some kind of price for the job?

3    A    I did.

4    Q    Do you remember what it was that you said?

5    A    I told him, I believe it was $1.30 a bottle.

6    Q    Okay.  And did you then continue communicating with him by

7    e-mail?

8    A    We did.  We had e-mail conversations regarding the

9    assembly of it.

10   Q    Did you, you ultimately come to some kind of agreement about

11   what that was all going to be?

12   A    We did.

13   Q    And at some point in that process did you learn the name of

14   the product?

15   A    I did.

16   Q    Now this, did you know anything about Competitive Edge

17   Laboratories at the time he made this first phone call?

18   A    I knew a little bit about them.  Part of what I was doing

19   was I was trying to drum up some new business for S.K. Labs, so

20   I was going on line, I was looking at retailers, and I was

21   looking for companies that were kind of in the middle, so not

22   necessarily the biggest companies because we couldn't handle

23   production for the biggest companies, and not necessarily the

24   smallest guys because, you know, a lot of them are just fly by

25   night companies.  So, one of the companies I came across was

Patel – Direct

1    Competitive Edge Labs.  So, I Googled them, I saw the website,

2    I saw several retailers that carried their products, and from

3    what I saw they appeared to be a pretty legitimate company.

4    Q    Did you have an opportunity to research the product H-Drol

5    at that time?

6    A    I did.  After Bryan sent me the name of it, I did look it

7    up.

8    Q    And what did you find out when you looked at it?

9              MR. RAMSEYER:  Objection.  Based on hearsay, Your

10   Honor.

11             MR. HALL:  Let me rephrase so it doesn't call for

12   hearsay.

13   BY MR. HALL:

14   Q    Did you do a little bit of investigation about it?

15   A    It wasn't so much, I mean, my investigation was basically

16   going on line.  I went to Google, typed in the --

17             MR. RAMSEYER:  Objection, Your Honor, again.  He's

18   going to mention what he saw.

19             MR. HALL:  I think it's not, it goes to his state of

20   mind, Your Honor.

21             THE COURT:  I'm going to overrule the objection.  Go

22   ahead.

23   BY MR. HALL:

24   Q    All right.  So, Mr. Patel, I was asking you about what you,

25   what you initially did when you learned the name of the product.

Patel - Direct

1   You said you had gone on line.  What else did you do besides go

2   on line?

3   A    That was it for the most part.  I went on line and found

4   retailers, websites.  It was being sold, talked about on

5   message boards.

6   Q    Now, did you ultimately -- what is -- you've been in the

7   industry now for a number of years.  What is a certificate of

8   analysis?

9   A    A certificate of analysis is basically a test report.

10  It's going to say here's what our parameters are, and here's

11  how it tested out.

12  Q    And did you get a certificate of analysis for this stuff

13  for, it was H-Drol first, right?

14  A    It was H-Drol first, and yes, Bryan sent me a certificate

15  of analysis.

16  Q    All right.  So, did you ultimately enter into some type of

17  agreement with Bryan about manufacturing it?

18  A    We did.  He sent us a purchase order.

19  Q    And did S.K. Labs manufacture it?

20  A    We did manufacture it.

21  Q    Can you tell me when that first manufacture started?

22  A    The first production run was in June of 2008.

23  Q    Did you also make other products for Bryan at Competitive

24  Edge?

25  A    We did.  Bryan sent several quote opportunities, so he

Patel – Direct

1   sent us quite a few lists of products he wanted made.

2   Q    Was one of them M-Drol?

3   A    It was.

4   Q    And did S.K. make M-Drol?

5   A    We did.

6   Q    Now, can you tell the ladies and gentlemen of the jury, do

7   you remember the time frame that S.K. made this stuff?

8   A    Yeah.  M-Drol and H-Drol was produced between 2008 and

9   2009.

10   Q    Do you know, do you know the date of the last production of

11   the H-Drol?

12   A    It was April of 2009.

13   Q    And in, and you're doing that based on your memory, or have

14   you looked at some documents?

15   A    Both.

16   Q    All right.  Would it help you to -- I mean, CEL was paying

17   S.K. by check during that time frame, correct?

18   A    That's correct.

19   Q    And so would S.K. submit invoices for the, for the H-Drol

20   and the M-Drol?

21   A    They would.

22   Q    And then in response to that you'd get paid back with checks

23   with invoice numbers on them, correct?

24   A    Correct.

25   Q    And prior to coming here today did you look at some checks

Patel - Direct

1   and some invoices and try and match those up?

2   A    I did.

3   Q    I'm going to show you 22 and 23.  All right.  I'll ask you

4   if you recognize these documents?

5   A    I do.

6   Q    What's 22?

7   A    Twenty-two is an invoice for M-Drol.  It's made out to

8   Competitive Edge Labs for a total of $15,627.

9   Q    And that's, and that's an invoice from S.K. Laboratories?

10  A    From S.K. Laboratories.

11  Q    What's the product?

12  A    M-Drol.

13  Q    And then 23, do you see 23?

14  A    Yup.  Twenty-three is the payment that Competitive Edge

15  Labs sent for the $15,627 for the M-Drol.

16  Q    Those, did you go through some documents to look and see

17  what the last M-Drol production by S.K. Laboratories was?

18  A    I did.

19  Q    Do those represent the invoice and the last payment for it

20  to S.K.?

21  A    It does.

22  Q    Okay.  There, there were also some payments for H-Drol,

23  correct?

24  A    Correct.

25  Q    And was there a time that you stopped, there was an invoice,

Patel – Direct

1    and a last payment for H-Drol?

2    A    There was.

3            MR. HALL:  I'll have these marked as 24 and 25.

4    BY MR. HALL:

5    Q    Mr. Patel, take a look at those.

6    A    Okay.

7    Q    What is 24?

8    A    Twenty-four is an invoice from S.K. Labs to Competitive

9    Edge Labs for H-Drol capsules it's dated May 8, 2009, for a

10   total of $4,915.

11   Q    All right.  And is that a copy of, a true and correct copy

12   of the invoice with S.K.?

13   A    That is.

14   Q    And what is 25?

15   A    Twenty-five is the check from Competitive Edge Labs, and

16   it's paid on May 20, 2009 for a total of $4,915.20.

17   Q    What does that invoice represent?

18   A    This invoice represents the last production run S.K. Labs

19   had for H-Drol.

20   Q    All right.  So, of those two the last date would have been

21   May of 2009 for the last production of M-Drol?

22   A    May of 2009.

23   Q    That's the later date of both the H-Drol and M-Drol

24   exhibits?

25   A    Yes, sir.

Patel - Direct

```
 1  Q    What happened after you submitted that invoice?

 2  A    On the May invoice, this was paid by Competitive Edge

 3  Labs, and this actually was the last production run we did for

 4  them for their M-Drol and H-Drol product line.

 5  Q    All right.  And how do you know that's the last production

 6  run?

 7  A    Because we had told them we were no longer going to make

 8  it for them.

 9  Q    Who had you told?

10  A    I told that to Bryan.

11  Q    Now, in the time frame of, say, from June 23rd of 2008

12  through that last invoice, May 8th of 2009, who were you dealing

13  with at Competitive Edge regarding these things?

14  A    I was dealing with Bryan.

15  Q    Did -- now, in the course of that time frame did you ever

16  have any discussions with Bryan about somebody named Steve Wood?

17  A    I did.

18  Q    Was that at the beginning or was that somewhat later?

19  A    It was later on once we started billing the relationship,

20  he did mention Steve Wood.

21  Q    What did he tell you about Steve Wood?

22  A    The way Bryan had described Competitive Edge Labs and SNS

23  to me was that they were all friends.  Competitive Edge Labs

24  was owned by a gentleman by the name of Rick, and Bryan was an

25  employee there.  Now, Rick and Steve had all grown up together,
```

1    they were all friends, so what Bryan had told me they operated

2    out of the same building, and because they had no staff, Bryan

3    would actually purchase products on behalf of Steve at SNS, and

4    Steve would do, as well.

5    Q    At some point you learned that Steve Wood was the same

6    person as Bryan?

7    A    I did.

8    Q    When was that?

9    A    Once the indictment was issued.

10   Q    Before that time, I mean at some point you began talking by

11   telephone to Steve Wood, right?

12   A    I did.

13   Q    And you had talked in the past to Bryan Riddle.  Did you

14   recognize it as the same voice?

15   A    I did not.  Bryan was very aggressive, very pushy, he was

16   the kind of person you didn't want to take phone calls from.

17   Steve Wood, on the other side, was very calm, very mellow, very

18   patient, very understanding.  So, while the voices may have

19   been similar, they had two completely different personalities.

20   Q    When you say you didn't want to take phone calls from, what

21   do you mean by that?

22   A    The way his tone and demeanor was, was just Bryan was very

23   nasty.  He wasn't someone you wanted to talk to; he wasn't

24   someone that you're happy to see that he was calling.

25   Q    So, some time in, there was another product also called

Patel – Direct

1    E-Stane that you manufactured for CEL, correct?

2    A    Yes, sir.

3    Q    What was, what was E-Stane?

4    A    E-Stane was another pro-hormone product that Competitive

5    Edge Labs had.

6    Q    At the time you're making H-Drol and M-Drol and E-Stane,

7    these are all pro-hormones, correct?

8    A    Correct.

9    Q    I guess the question is why, why were you making it?

10   A    In 2008 I had the impression that they were legal.  I

11   thought they were legal dietary ingredients.

12   Q    Did that change some time?

13   A    That did change.

14   Q    How did it change?

15   A    I started learning more in the industry, I started reading

16   more, and I started to realize these weren't dietary

17   ingredients; they were, in fact, they were, in fact, drugs.

18   Q    And, and so at some point during this process did you think

19   that, that manufacturing H-Drol was okay to do as a dietary

20   ingredient?

21   A    Initially I did.

22   Q    But that changed?

23   A    That changed.  I realized that these are not legitimate

24   dietary ingredients, and they shouldn't be manufactured or

25   labeled as dietary supplements.

Patel - Direct

```
 1   Q    Did you form the same opinion with respect M-Drol?

 2   A    I did.

 3   Q    What about E-Stane?

 4   A    I did the same, as well.

 5   Q    And we heard yesterday about this Noopept.  Is that a

 6   dietary ingredient?

 7   A    That's not a dietary ingredient.  It falls under the same

 8   category as M-Drol and H-Drol.  It's a drug that's

 9   synthetically produced by a pharmaceutical company.

10   Q    So, how did it come about that S.K. stopped manufacturing

11   H-Drol and M-Drol?

12   A    Well, we received a shipment one day, and the shipment was

13   labeled to S.K. Labs, but inside there was a check, and the

14   check was actually for AOE International.  AOE International is

15   another manufacturer.  I called Bryan and asked, "Hey, we got

16   the shipment in but it's not for S.K."

17   Q    Did you have some e-mail contact with Bryan about this?

18   A    I did.

19            MR. HALL:  Ask that this be marked as Defendant's 26.

20   BY MR. HALL:

21   Q    Let me show you what we've marked as 26.  Do you recognize

22   that?

23   A    I do.  It's an e-mail from Bryan to myself.  The subject

24   line is AOE's Info, and he's supplying the shipping address for

25   AOE International.  He also gives his UPS account number so we
```

Patel - Direct

```
 1   can freight it out and Competitive Edge Labs would pay for it.
 2   Q    All right.  So, explain to me again, you know, why, why are
 3   you communicating with him about AOE?  I'm not sure I understood
 4   that correctly.
 5   A    So, the shipment that came in, it was some time in April
 6   in 2008 or 2009.  It had a package and check in there.  Inside
 7   the package was basically little packets of M-Drol material,
 8   and the check was written out for AOE International.  So, it
 9   was brought to my attention that, hey, this is not meant for
10   us; it's meant for AOE.
11   Q    All right.  What was the material in that package?
12   A    It was for M-Drol.
13   Q    So, did you communicate with Mr. Wood about it at that
14   point?
15   A    I communicated with Bryan.
16   Q    Excuse me -- well, you now know Bryan and Mr. Wood are the
17   same.  But thank you for -- at that point you still believed he
18   was still Bryan, correct?
19   A    Yeah.
20   Q    Now, prior to that had you communicated with Bryan that S.K.
21   was no longer going to be involved with pro-hormones?
22   A    Not at that time.  It was later on that I did.
23   Q    Do you remember when that was?
24   A    I think it was the summer of 2009.
25   Q    There came a time when you were looking for a sample of
```

Patel – Direct

1   something from Bryan regarding E-Stane, do you remember that?

2   A    I do.

3          MR. HALL:  I'll have this marked as Defendant's 27.

4   BY MR. HALL:

5   Q    I ask you if you recognize this e-mail?

6   A    Yes.  This is an e-mail from myself to Bryan at

7   Competitive Edge Labs.  The message says, "Any possibility you

8   can send us one gram of E-Stane raws?  We want to add it into

9   our library on our FTIR so we can do more QC testing in house."

10  Q    What's an FTIR machine?

11  A    FTIR is a Fourier Transform Infrared spectroscopy.  What

12  it does is it identifies a raw material.

13  Q    I think we'll get back to that in a second, but in this time

14  frame were there changes going on at S.K. about how they were

15  dealing with these types, these products, and every product?

16  A    There were.

17  Q    Tell me a little bit about what the changes were.

18  A    One of the things that we were doing was we were

19  implementing more quality control testing in house, so there

20  were new regulations coming into play that were called good

21  manufacturing practices.  We were implementing these into the

22  company.

23  Q    Were those good manufacturing practices, were those

24  regulatory in nature?

25  A    Those were regulatory.  They were set by the FDA, and it

1  was pretty much the guidelines on how a dietary supplement

2  manufacturer needs to operate.

3  Q    Was there a deadline, or were there deadlines imposed as to

4  when companies had to become compliant with those practices?

5  A    There were.  It was split on three different tiers based

6  on the number of employees that you had.  For companies with 20

7  or less employees, they had until June of 2010 to become

8  compliant.

9  Q    How many employees did S.K. have at that time?

10  A    At that time we were definitely under 20.

11  Q    Do you remember how many?

12  A    Maybe ten to 12.

13  Q    So, relatively small in size in comparison to today?

14  A    Correct.

15  Q    Were you taking actions to -- well, let's go back to June of

16  2008.  Was there some type of requirement in existence to test a

17  substance when it first came in the door at S.K.?

18  A    There was not.  In June of 2008 the, the companies were

19  operating under food, and food is a different section in the

20  FDA guidelines.  So, the testing requirements became for

21  dietary supplements, so it was based on the number of employees

22  you had.  That's when you had to become compliant for the

23  dietary supplement test.

24  Q    These new regulations weren't in effect in June of 2008.  I

25  think you said June of 2010 they became effective?

1    A    Correct.  In 2008 they were only in effect if you had 500

2    or more employees.

3    Q    So, was S.K. changing during that time in anticipation of

4    some of these changes?

5    A    We were.  It was several, it was a big undertaking.  There

6    were a lot of new regulations within the GMP guidelines, and

7    within those guidelines there was a lot of work we had to do.

8    Q    The work included standard operating procedures, correct?

9    A    Correct.  We had standard operating procedures, we hired

10   consultants, both me and my dad we were going to classes, so it

11   was, it was, a lot of it was new, so we were taking a lot of

12   steps to insure that we were taking the right steps so that we

13   would become compliant.

14   Q    Now, can you estimate that in this time frame, from June of

15   2008 through May of 2009, can you estimate what percentage of

16   S.K.'s, you know, gross profits your dealings with Bryan

17   represented?

18   A    Well, with M-Drol and H-Drol it was less than one percent.

19   Q    If you added in E-Stane, would that change?

20   A    Probably not by much.

21   Q    So, how many clients do you think S.K. had back in 2008,

22   2009?

23   A    During that time frame I'd probably say ten clients.

24   Q    How was it communicated to Bryan that S.K. was going to stop

25   manufacturing pro-hormones?

Patel – Direct

1    A    It was over a phone conversation.

2    Q    And was it with the, I call it the persona of Bryan, or was

3    it with Steve Wood?

4    A    It was initially with Bryan, and later on it was Steve.

5    Q    The later on was much later, correct?

6    A    Much later.

7    Q    So, back in 2009 how did you communicate with them that you

8    weren't going to be involved with pro-hormones anymore?

9    A    I was having a phone conversation with Bryan, and he was

10   asking about more pro-hormone products, and I told him we're no

11   longer manufacture H-Drol M-Drol.

12   Q    Who made the decision you were not going to be manufacturing

13   pro-hormone products anymore?

14   A    It was a combination, but it was both between me and my

15   dad.

16   Q    Why did you decide that?

17   A    We wanted to become compliant.  We don't want to deal with

18   problems of, you know, products.  Then we have legal problems.

19   Q    By May of 2009 did you think M-Drol was a dietary

20   supplement?

21   A    I did not.  I thought it was an illegal dietary

22   ingredient.

23   Q    What about H-Drol?

24   A    Same.  I didn't think it was legal.

25   Q    From the summer of 2009 were you introduced, or did you

Patel – Direct

```
 1   begin to have some discussions with Steve at Serious Nutrition

 2   Solutions?

 3   A    Steve did.  Initially all the conversations were with

 4   Bryan, and Steve started to interject himself, and he started

 5   contacting me directly.

 6   Q    And, and do you, when he would interject himself -- we went

 7   through some of these e-mails with Mr. Wood -- did you receive

 8   e-mails from Bryan that appeared to be forwarded e-mails from

 9   Steve?

10   A    There were.  There were quite a few where Steve was having

11   a conversation with Bryan, and then Steve would forward that

12   conversation to Bryan, and then Bryan would send that

13   conversation to me.

14   Q    Did you think you were dealing with the same person at that

15   time?

16   A    I did not.

17   Q    And in the, say, the summer of 2009 did there come a point

18   in time where you were dealing with both Bryan and Steve?

19   A    There were.  There were e-mails that were coming from

20   Bryan, and then there were e-mails also coming from Steve.

21   Q    In -- we went through some of these exhibits with Mr. Wood,

22   but maybe I can try and do a batch summary here for you about

23   e-mails.

24        I'm going to show you what's marked as Defendant's next in

25   order.  It looks like it's a long e-mail chain.
```

Patel – Direct

```
 1              MR. HALL:  It would be 26?

 2              THE CLERK:  No, you're at 28.

 3              MR. HALL:  Twenty-eight, I'm sorry.

 4   BY MR. HALL:

 5   Q    I'll show you what we're going to mark as Defendant's 28.

 6   Take a look at that e-mail chain.  That's a summary of -- well,

 7   what is that?

 8   A    It's a summary of a lab test that Bryan was having

 9   performed with RTP Labs.

10   Q    And that's in the first, the very first time frame of your

11   first contact with Bryan, correct?

12   A    It is.

13   Q    And that's an e-mail that you received from Bryan?

14   A    Correct.  Bryan had sent it to me.

15   Q    And it has a lot of discussion back and forth about testing,

16   correct?

17   A    Correct.

18   Q    And there's also attached to that, if I can, at the very

19   beginning it starts with an e-mail forwarded from a Matthew

20   Daniel, correct?

21   A    Yes, sir, that's correct.

22   Q    Let me grab that from you and put that up on the screen.

23   This is, that's the last page of what we've marked as Exhibit 28.

24   That's an e-mail from Matthew Daniel to Bryan at Competitive

25   Edge, and that has -- would you call that a certificate of
```

Patel - Direct

```
 1   analysis?

 2   A    Yeah, that was a lab assay that they performed.

 3   Q    All right.  And then the rest of this, I'm not going to have

 4   you go through and read it all, but the rest of this exhibit is

 5   all discussion you had about making H-Drol with, with Bryan,

 6   correct?

 7   A    Correct.

 8   Q    And then in the beginning of that there's a reference on

 9   that first page there where Bryan is talking about forwarding or,

10   "Thanks, Steve had forwarded me the e-mail from him," correct?

11   A    Yeah, it's at the top.

12   Q    Did you get, I mean, can you estimate for the jury how many

13   times you got e-mails where Bryan and Steve were forwarding

14   things between them?

15   A    It was in the dozens.

16   Q    What was the effect of you seeing all those?

17   A    I thought Bryan and Steve were two completely different

18   people.

19         MR. HALL:  Before I forget, Your Honor, can we move

20   admission of Defendant's One through 28 at this time?

21         THE COURT:  One?

22         THE CLERK:  Twenty-two.

23         MR. HALL:  I'm sorry, 22 through 28.

24         MR. RAMSEYER:  May I have a moment, Your Honor?

25         THE COURT:  Yes, sir.
```

Patel – Direct

1           MR. RAMSEYER:  Your Honor, counsel has represented

2     these are all documents that are in A4, which was the

3     production of e-mails.  They're already in, but I understand he

4     wants to make them a separate exhibit.

5           MR. HALL:  I think they're printed in a little

6     different format.

7                THE COURT:  All right.  Tell me again the numbers.

8                MR. HALL:  Twenty-two through 28.

9                THE COURT:  All right.  They will be admitted.

10         (Defendant's Exhibit Nos. 22 through 28 were received in

11    evidence.)

12    BY MR. HALL:

13    Q     Just to be clear, 22 includes your degree?

14    A     Twenty-two is an M-Drol invoice.

15    Q     What is your degree number and license number?

16    A     Degree number is 20; license is 21.

17                MR. HALL:  Could we also move in 20 and 21 at this

18    time?

19                THE COURT:  I think they have been admitted.

20                MR. HALL:  They have been.

21    BY MR. HALL:

22    Q     In 2010 did you begin to have contact more with the person

23    you believed to be Steve Wood or a separate person?

24    A     I did.

25    Q     And in, say, 2010 you still thought they were two different

Patel – Direct

1  people, right?

2  A    Yes, sir.

3  Q    Did there come a time when Bryan at Competitive Edge kind of

4  fell out, or stopped communicating with you?

5  A    In early 2010, it was actually toward the end of 2009 the

6  transition started, Bryan started to fade away, Steve started

7  to come in more, and by early 2010 it was entirely Steve Wood

8  that was communicating with me.

9  Q    By 2010?

10  A    Yeah.

11  Q    Did Steve ever communicate to you that he was, in fact,

12  Bryan?

13  A    He never did.

14  Q    So, so from the time frame of May 8th of 2009, and let's

15  jump forward to 2010, Bryan is out of the picture?

16  A    That's correct.

17  Q    Are you having any phone conversation or e-mail

18  communication with anybody known as Bryan?

19  A    I was not.

20  Q    That stopped around the beginning of 2010?

21  A    Yeah, it was around the beginning of 2010 that I

22  transitioned entirely to Steve Wood.

23  Q    In your transition with Steve Wood, what was Steve Wood

24  doing with you in 2010, doing with you and S.K.?

25  A    Steve was giving us quite a bit of work, he was sending a

Patel - Direct

```
 1   lot of his legitimate products to us, so he was not only

 2   running SNS with us, but he was also having us make some of the

 3   legitimate products for Competitive Edge Labs, as well.  He

 4   explained to me that Steve was taking over the purchasing of

 5   Competitive Edge Labs.

 6   Q    Who explained that to you, Steve or Bryan?

 7   A    Steve Wood.

 8   Q    And so what type of products were you making -- so, at this

 9   point you were dealing with Serious Nutrition Solutions; is that

10   right?

11   A    That's correct.

12   Q    What type of products are you making with Serious Nutrition

13   Solutions?

14   A    They have quite a few products, I would say at least a

15   dozen, anything from a product called Focus XT, which was a

16   flavored kind of energy drink.  We had different amino acid

17   products.  He had quite a range of different products.

18   Q    And were you still making some products for Competitive Edge

19   Lab, say, in that time frame, 2010?

20   A    We were.  Competitive Edge Labs -- well, Steve was

21   purchasing on behalf of Competitive Edge Labs, and he was

22   sending us two products.  One was called Cycle Assist and one

23   was called PCT Assist.  Both were blends of herbals, amino

24   acids and vitamins.

25   Q    Yesterday were you able to see the Cycle Assist invoice and
```

Patel – Direct

1   check in 2010 that we were presenting to Mr. Wood?

2   A    I did.

3   Q    Was that an invoice that S.K. had submitted to Competitive

4   Edge for Cycle Assist?

5   A    It was.

6   Q    And do you remember what that check amount was?

7   A    I believe it was for $64,000.

8   Q    Was that a pretty significant number to you at the time?

9   A    That was.

10  Q    I think I also showed Mr. Wood an e-mail about some quotes,

11  and some master quotes where he was doing something both for SNS,

12  company one, and company two.  Do you remember seeing that

13  e-mail?

14  A    I do.

15  Q    And was, was that the type of thing that Steve Wood would do

16  with you at S.K.?

17  A    Yeah, he would constantly contact me for new quoting

18  opportunities, so he would send different product names with

19  different formulas, and ask me to put together a pricing quote

20  for him.

21  Q    Do you have an estimate in, say, December of 2010 as to how

22  many products you were making for SNS?  You, meaning S.K.?

23  A    S.K. was probably producing, S.K. was producing at least a

24  dozen.

25  Q    And percentage-wise do you have a sense as to what the gross

```
 1    sales were for SNS in comparison to S.K.'s client base?

 2    A    I don't.  But SNS's business was starting to become a good

 3    volume of business for us.

 4    Q    Did you consider him a good customer?

 5    A    I did.

 6    Q    Did you, did you call them customers or clients?

 7    A    I called him client.

 8    Q    During this time frame were you talking to him on the

 9    telephone, meaning Steve Wood?

10    A    I was.  He would call me quite often.

11    Q    Would you also have a lot of e-mails?

12    A    We did.

13    Q    Was it more e-mails or more phone calls, or --

14    A    I would say it was probably half and half.

15    Q    So, in December of 2010, let's talk about what happens in

16    December of 2010.  How was this pro-hormone subject first brought

17    up?  Is it in an e-mail or phone call?

18    A    First Steve Wood had actually called me not too far before

19    December, 2010 asking us if we could produce pro-hormones for

20    them.

21    Q    What did you say?

22    A    I told him no.

23    Q    Why not?

24    A    I, I knew they weren't legitimate dietary ingredients, so

25    I didn't want them sent to S.K. Labs.
```

Patel – Direct

1   Q    In that same phone call was there any discussion you, about
2   finding somebody for him?
3   A    He had mentioned it, but it didn't sound like it was
4   really a task that he wanted me to start doing at the time, but
5   he did mention it.
6   Q    Did you, as a result of that phone call did you reach out to
7   anybody or start looking for somebody to help him manufacture
8   pro-hormones?
9   A    No, but I did have a company in mind, and that company was
10  Human Tech.
11  Q    Now, you saw some of these e-mails in December, I think
12  December of 2007, December 7th of 2010.  Now, there was, I think,
13  the subject name was DAA.  What's DAA?
14  A    DAA is D-aspartic acid.  It's an amino acid.
15  Q    Is that a legitimate dietary ingredient?
16  A    It is a legitimate dietary ingredient.
17  Q    Of all the business you were doing with Steve Wood, say the
18  whole year of 2010, were there any pro-hormones that you were
19  making?
20  A    There were none.
21  Q    Were you doing anything that you thought was not a dietary
22  ingredient with SNS?
23  A    There was not.
24  Q    When he calls you up and asks you about pro-hormones, and
25  doing pro-hormones, what was your reaction to that?

```
 1   A    Well, at first I didn't know SNS made pro-hormones.  I
 2   knew Competitive Edge Labs did, but I had no idea SNS was doing
 3   pro-hormones.  I thought it was kind of odd.  Second, I knew
 4   that's not something I want S.K. running.
 5   Q    So, how was the phone call concluded?  Did you follow up
 6   with him?  Is it, "We'll talk soon"?  How did you end that
 7   conversation?
 8   A    It was more or less me saying, "I'll see if I can find
 9   somebody for you," and he was saying, "Okay, I appreciate it."
10   Q    And now, on December 8th, I think December 8, 2010 there's
11   this e-mail about DAA counts.  That started out as something
12   different, right?
13   A    It did.  We were actually talking about his, when I say
14   his, SNS's D-aspartic acid product.
15   Q    And Mr. Wood e-mails you, and then asks about somebody that
16   can make PHs, correct?
17   A    Correct.
18   Q    You understood that to be pro-hormones?
19   A    Pro-hormones.
20   Q    Then he said not the banned kind.  What did that mean to
21   you?
22   A    Well, the FDA and DEA had done several things on
23   pro-hormones, so they had these lists where they banned them,
24   and the ones he was referring to were items not banned by the
25   FDA.
```

Patel – Direct

1    Q    Meaning H-Drol and M-Drol?

2    A    Correct, H-Drol and M-Drol.

3    Q    But did you think they were okay just because they weren't

4    banned?

5    A    No, I knew that they weren't banned, but at the same time

6    I knew that the FDA didn't consider them as dietary

7    ingredients.

8    Q    Now, what you know today, there's a standard that FDA --

9              MR. RAMSEYER:  Objection to leading, Your Honor.

10             THE COURT:  Yes, sir.  I'll -- don't lead the

11   witness.

12             MR. HALL:  I'm sorry.  I was going to ask him about

13   what, based on what he knows today what his understanding of

14   the definition of a dietary ingredient is.  Is that all right?

15             THE COURT:  Yes, sir.

16   BY MR. HALL:

17   Q    Did you hear that?

18   A    I did.  Dietary ingredients are defined by DSHA.  DSHA

19   stands for Dietary Supplement Health and Education Act.  First

20   to be a dietary ingredient it has to be a vitamin, mineral,

21   herbal compound, amino acid or one of the derivatives of one of

22   the top items.  There are --

23   Q    When you say one of the top items, what do you mean by that?

24   A    I mean, it could be a derivative of a mineral, vitamin,

25   amino acid or herbal compound.

Patel - Direct

1   Q    Is that the full definition of a dietary ingredient?

2   A    It encompasses the majority of it, a dietary ingredient

3   can also be a chemical compound as long as it has grass, which

4   you mentioned earlier, which is generally regarded as safe, or

5   if it has a NDI file, which is a New Dietary Ingredient

6   application.

7   Q    What is that?

8   A    That's when a company has a new ingredient that it is

9   trying to bring to the market that does not meet the definition

10  of a dietary ingredient, then they file an application with the

11  FDA for them to review it.

12  Q    Okay.  So, in light of those definitions did you, you

13  know -- let's go back to December of 2010.  Did you think that

14  H-Drol or M-Drol qualified as a dietary supplement?

15  A    I don't think that fit the definition.

16  Q    So, when you subsequently get an e-mail, what do you do?

17  A    I refer them over to the place I was thinking of, which

18  was Human Tech.

19  Q    And had you been dealing with Human Tech before?

20  A    I have.  I knew Willy Ramos.

21  Q    How long had you known Willy Ramos?

22  A    Probably since 2008.

23  Q    How is it that you met Willy Ramos?

24  A    He was actually referred over to me by someone else in the

25  industry, and Willy Ramos started purchasing ingredients and

Patel – Direct

```
 1    flavors from us.
 2    Q    When he purchased ingredients and flavors from you, would he
 3    use company checks?
 4    A    No.
 5    Q    How would he pay for them?
 6    A    He would either pay in cashier's check or cash.
 7    Q    You saw some checks earlier today that were made payable to
 8    Bansi Patel.  Who is Bansi Patel?
 9    A    Bansi Patel is my father.
10    Q    It's also your middle name, but did you fill in those
11    portions of the checks?
12    A    I had given the checks to him, and he had filled it out.
13    Q    All right.  And what did those checks represent that
14    Mr. Ramos was talking about today?  What were those all about?
15    A    They were for flavors.
16    Q    Now, from 2008 -- you first met him in 2010.  How many times
17    do you think you had dealings with Willy Ramos?
18    A    Maybe four or five.
19    Q    And on those occasions had he given you checks or cash?
20    A    No, he always paid in cash.
21    Q    Did you, on those occasions did you become, did you talk
22    with Willy Ramos about his background?
23    A    I did.
24    Q    What did you know of his background from him?
25    A    I knew that he was in the same industry that we were.  He
```

Patel – Direct

1  was also a manufacturer, he had told me that he primarily dealt

2  with Mexico, so he produced products and would ship them to

3  Mexico.

4  Q    And he also discussed with you some other contracts that he

5  had with other companies?

6  A    He did.  He told me he produced products for a company

7  called I-Force, which was a relatively large company at the

8  time.

9  Q    What was the product he told you being made for I-Force?

10  A    He told me he was making pro-hormones for them.

11  Q    Did he use the word pro-hormones or something else?

12  A    He called them pro-hormones.

13  Q    Was that the only company, or were there others?

14  A    There were others.  I didn't catch the names of them.  I

15  wasn't familiar with the company.

16            THE COURT:  Let me ask you a question.  You've

17  mentioned several times your industry.  What is your industry?

18            THE WITNESS:  The dietary supplement industry.

19  BY MR. HALL:

20  Q    What does that mean, the dietary supplement industry?

21  A    The dietary supplement industry is pretty much any product

22  that's out on the market that's labeled as a dietary

23  supplement, so it encompasses things from vitamins, to

24  minerals, to multi-vitamins, to proteins, amino acid products.

25  It's a wide range, and within the range there's different

Patel – Direct

1    segments; there's fitness or just general health.

2    Q    Give us an idea what kind of things you were making?  What

3    would we know of that S.K. was assembling and producing for

4    people.

5    A    We were doing quite a bit of protein powders.

6    Q    For what types of companies?

7    A    For other, basically other sports companies.  So, sports

8    companies would contact us and request a protein product, and

9    we would make that.

10   Q    That would be blended there at the facility?

11   A    Correct.  We would, we would purchase the ingredients, we

12   would weigh it, blend it, and we would manufacture it, assemble

13   it.  So, basically we were taking the customer's purchase order

14   and turning that into a finished group.

15   Q    At the time of this phone call and this e-mail in, say,

16   December 8th of 2010, did you have other information about Willy

17   Ramos's background?

18   A    There were some industry rumors.  I knew his dad was a

19   body builder, and that their whole family used to do steroids.

20   So, I knew their family had some involvement in steroids.  I

21   also knew that he was doing a lot of stuff for Mexico, like I

22   said.  So, I kind of had an idea what kind of areas he was

23   involved in.

24   Q    In the e-mail, you made a reference in the e-mail to the, to

25   the other side of the, I think it was the other side of the

Patel – Direct

1    industry, and you said in parentheses, "hint hint."  What were

2    you talking about when you said that?

3    A    The other side of the industry meant steroids.  He was,

4    his family was in steroids.  I knew that.  He was involved in

5    that.

6    Q    Did, when -- so after you get the e-mail from Mr. Wood about

7    locating somebody, what do you do?

8    A    I sent him an e-mail, and I told him, "Yeah, you know, we

9    have a company that might do it for you.  It's called Human

10   Tech, and I can introduce the two of you."

11   Q    Had you spoken to Willy about this particular job at that

12   time?

13   A    I did.  After Steve Wood had contacted me, I wanted to

14   make sure before I introduced them so I contacted Willy, I

15   said, "Hey, I have a customer that is looking for pro-hormone

16   products.  Can you do it?"

17   Q    What was Willy's response?

18   A    He said, "Yeah, sure."

19   Q    In relation to the e-mail was that on the same day as you

20   got the e-mail about the PHs?

21   A    It was the same thing.

22   Q    And did you have a discussion with Willy about, you know,

23   what he would charge, and the specs, so to speak, for making

24   something?

25   A    I did.  Steve Wood gave me the number of milligrams per

Patel - Direct

1   capsule, how many capsules per bottle, so I relayed that back

2   to Willy, and Willy gave me a price, which I relayed back to

3   Steve.

4   Q    What was the price Willy gave you?

5   A    It was $2.15 for a 60 count product.

6   Q    You've seen this contract that we had up of Mr. Ramos about

7   $3.25.  Is that an accurate price?

8   A    No, that wasn't accurate at all.

9   Q    So, after you got that, after you had that contact what did

10  you do?

11  A    The very first -- well, Wood responded he wanted an

12  introduction.  So, I sent an e-mail to both Willy, and CCed

13  Steve on there, and I introduced the two of them.

14  Q    What were you expecting to happen after you introduced them?

15  A    I thought Steve and Willy would take it from there.

16  Q    Is that what happened?

17  A    That's not what happened.

18  Q    After you did this introductory e-mail, I mean, we saw it.

19  I'm not going to put it up there again, but it's introducing, you

20  know, Steve to Willy, and asking questions of Steve.  And what

21  happened after you sent that e-mail?

22  A    Well, I sent the introduction e-mail, and Steve Wood calls

23  me, he basically calls me at the company, asking me questions

24  about Willy Ramos and Human Tech.

25  Q    What kind of questions is he asking?

Patel - Direct

```
 1   A    He was just asking me if they're legitimate in terms of,
 2   you know, are they going to meet label claims, and his main
 3   concern was he didn't know Willy Ramos, and because he didn't
 4   know him he didn't feel that comfortable sending him raw
 5   material.  I guess the raw material was real expensive for
 6   Steve, and if he sent the material to Human Tech, and what
 7   would happen if Willy Ramos just ran off with it, or
 8   disappeared without Steve getting his product back.
 9   Q    Is that what you were talking about on a phone call?
10   A    It was on a phone call.
11   Q    So, what was your response to that?
12   A    Well, we had discussed it a little bit, and ultimately I
13   agreed, he could send it to me.
14   Q    Now, did, did you ask him to send it to the company or to
15   your home address?
16   A    No, I gave him my home address.
17   Q    Now, why did you do that?
18   A    The company was my dad's company.  I didn't want, you
19   know, products that might have, products that are not
20   legitimate dietary ingredients or dietary supplements going to
21   my dad's company.
22   Q    What about, what about what would happen if something came
23   to the company?  Was there some kind of procedure set in place by
24   that time?
25   A    There were procedures.  If we're talking -- it was in
```

1    December, 2010, so by that time we were, were complying with

2    the GMPs which were starting in June of 2010, so when we were

3    receiving raw materials it was a pretty complex process I had

4    to go through.

5    Q    Explain that.  What do you mean by complex process?

6    A    Well, first, we receive a box at the company, the box

7    comes into a shipping dock.  One of the employees will take it

8    from the receiving department, they'll open it up, they'll go

9    through it, they'll assign tracking numbers or what we call lot

10   numbers.  The package then gets shifted from that platform to

11   another platform where it goes for sampling.  Quality control

12   technicians will take the package, they'll open it up, they'll

13   sample it, they'll label it with the lot numbers, and it gets

14   entered into our system.

15   Q    And if, what would happen if a box from Steve Wood arrived

16   there that wasn't going to be manufactured?  What would happen?

17   A    It would come in, and it would go through that entire

18   process.  First we would get stuck with bags that got opened,

19   we'd get stuck with bags that got sampled, and then we'd have

20   to reject it and reverse it through the entire process.

21   Q    And did that process, did that influence your thoughts about

22   whether you wanted that at your company or at your house?

23   A    It did.

24   Q    Do you remember when you got a box?

25   A    It was some time in December of 2010.

Patel - Direct

1   Q    Let me back up.  Did you negotiate the prices between Willy

2   and Steve Wood?

3   A    Oh, no.

4   Q    Explain to me why it is that you didn't negotiate those

5   prices.

6   A    I wasn't the manufacturer of the product.  All I did was

7   Willy had given me the price, so I relayed that back over to

8   Steve.

9   Q    Were you influencing it, adding numbers to it at all?

10  A    I was not.

11  Q    Did you, did you think that you were negotiating?

12  A    No.

13  Q    So, so, now the box, the box comes to your house.  When is

14  that that you get the box?

15  A    It's -- well, I get home one evening, and it was some time

16  in December, and there was a box at my front porch.  It was

17  shipped from UPS, so it was just sitting there waiting.

18  Q    What did you do with it?

19  A    I opened it up.

20  Q    What was in it?

21  A    Inside were packets of raw materials for H-Drol, H-Drol

22  labels, and a check that was for Human Tech that was made out

23  to a down payment that Steve and Willy had discussed.

24  Q    Do you remember how much the check was?

25  A    I don't.

Patel – Direct

1   Q     When you say labels for it, when labels would come in how

2   would they -- are those on a roll, or are those all individually

3   stacked, or are they in boxes?  How would the labels come?

4   A     The labels were sent along with the raw material.  They

5   are on a roll, so you have basically a large roll that had

6   maybe 1,000, 2,000 labels spun on that roll.

7   Q     And the materials, how were the raw materials packaged?

8   A     The raw materials were in silver bags, and it said,

9   there's a handwritten note that said the compound on there.  It

10  says one, four H-Drol.

11  Q     That is what it said, one, four H-Drol, or was that

12  different from the compound?

13  A     It would say something similar to what the raw material

14  was that was labeled on the product.

15  Q     You remember this, you remember the first product as being

16  H-Drol or M-Drol?

17  A     It was H-Drol.

18  Q     What did you do with it once you got it?

19  A     I called Willy, I said, "I got the materials from Steve

20  for your production run.  What, when do you want to meet to get

21  them?"

22  Q     What did he say?

23  A     We discussed, and we planned to meet over the weekend.  I

24  was actually going out for Christmas shopping, so we decided to

25  meet at the mall, which is where I was headed anyway, and we

Patel - Direct

```
 1   met there and I handed him the box.
 2   Q    Where was Willy's factory or facility at that time?
 3   A    It was in Ocean Side.
 4   Q    Have you ever been there?
 5   A    I have not been.
 6   Q    Where was S.K. at that time frame?
 7   A    S.K, we were operating at, at our North Grove location
 8   which was also in Anaheim.
 9   Q    Do you remember the address?
10   A    It was 1173 North Grove Street.
11   Q    Did you later move to a different address?
12   A    We did.
13   Q    What was the address you moved to?
14   A    It was 5420 East La Palma Avenue.
15   Q    And when did you move?
16   A    It was in April of 2011.
17   Q    So, when there's -- I think you saw the contract with
18   Mr. Ramos.  At that time you weren't at, the time he prepared
19   that contract, or the address he filled in, you weren't at that
20   address, correct?
21   A    No.
22   Q    So -- all right.  So, this, did you end up meeting Willy at,
23   at the mall?
24   A    I did.
25   Q    What happened?
```

Patel – Direct

```
 1   A     I gave him the box, and that was it.

 2   Q     And the box had, the box had the raw materials, a check,

 3   and --

 4   A     Raw materials, a check and labels.

 5   Q     And labels.  Who was the check made payable to?

 6   A     Human Tech.

 7   Q     And do you remember when in December this was?

 8   A     It was some time in the, I'd say some time in the middle,

 9   I was doing my Christmas shopping so it had to be before

10   Christmas, some time around there, December.

11   Q     Did Willy give you any money at that time?

12   A     No, he did not.

13   Q     All right.  And so you gave the raw materials to Willy.

14   What happens after, the raw materials, labels, and the box, the

15   check and everything, what happened after that?

16   A     Willy takes the raw materials back to his facility and

17   starts to produce the product.

18   Q     Now, were you consulting with him about how to make the

19   product, or giving him advice or overseeing things?

20   A     No.  He had, he had instructions from Steve Wood, and as

21   far as I knew it was pretty simple, so I wasn't really

22   consulting with him.  I did have him send me a sample as he was

23   running, and I did check the weights of the capsules to make

24   sure that there was no inconsistencies.

25   Q     Now, before -- well, at some point did he approach you again
```

Patel - Direct

1   about bottles?

2   A    He did.

3   Q    Tell us about that.

4   A    Those bottles that you guys saw before for H-Drol, they

5   were bottles that he was using to manufacture the product, and

6   he had ran out of stock.  So, he had called me and said, "Do

7   you have roughly 1,000 bottles on hand that I can buy off you?"

8   Q    What did you do?

9   A    I checked inventory and we had them, so I told him yes.

10  Q    Did, how did you get them to him?

11  A    He came by, picked them up, and paid for them.

12  Q    He paid cash --

13  A    He paid cash.

14  Q    Do you remember how much he gave you?

15  A    $200 cash.

16  Q    How much does a bottle cost?

17  A    Probably around 15 cents a bottle.

18  Q    So, did you consider any of that money, you know, as a

19  referral fee or finder's fee at that point?

20  A    I did.

21  Q    Did he say it was a finder's fee or referral?

22  A    Probably not.

23  Q    Prior to that had you had discussions with Willy Ramos about

24  getting 25 cents per bottle?

25  A    No, that never happened.

Patel - Direct

1   Q    Never happened?

2   A    Never happened.

3   Q    Did you ever have any discussion with him about it, though?

4   A    No.

5   Q    So, so, after he buys the bottle what happens?

6   A    He buys the bottle, he pays for them, and then I think he

7   finished the production run.

8   Q    And after he finishes the production run what's his main

9   communication with you?

10  A    When he does finish it, for some reason he sent me an

11  invoice, sent me how many bottles he had ready.

12  Q    Was it invoiced to S.K. Labs or Sitesh Patel?

13  A    No, it was Competitive Edge Labs.

14  Q    How did he send you that invoice?

15  A    He e-mailed it.

16  Q    Is that an e-mail that you have seen in production by S.K.?

17  A    I have.

18  Q    Did, and so what did you do with that, what did you do with

19  that invoice?

20  A    I forwarded it to Steve Riddle.

21  Q    Did you do that by e-mail or real mail?

22  A    E-mail.

23  Q    What happened after you sent the invoice out?

24  A    I sent the invoice out, and he also sent me the pick up

25  information and location.  So, I called UPS and I arranged UPS

Patel - Direct

```
 1   to go pick it up, drop it off to Danville, Virginia.
 2   Q    When you said he had arranged, who is the he?
 3   A    Willy had sent me information on the pick up, so I had
 4   arranged for the pick up.
 5   Q    When you arranged it what did you do?
 6   A    I called UPS, gave them the pick up address and info, and
 7   gave them the shipping location.
 8   Q    What was the next communication that you had?
 9   A    During that time frame Steve Wood had contacted me and
10   said, "Hey, can I send you the next set of raw materials?"
11   Q    Did he send you the next set of raw materials?
12   A    He did.
13   Q    How did he contact you?
14   A    By phone or by e-mail.
15   Q    And then that set of raw materials was what?
16   A    The next set was H-Drol.
17   Q    In the e-mail chain we saw references to M-Drol and H-Drol.
18   Do you remember seeing those references?
19   A    Yes, I remember seeing that.
20   Q    Do you, as you sit here today, are you certain about whether
21   it was H-Drol or M-Drol that was the second?
22   A    I'm certain it was H-Drol.
23   Q    How are you certain?
24   A    The e-mails had said, by the time we reached the
25   conclusion Wood agreed and I agreed, yes, this is H-Drol.  In
```

Patel - Direct

```
 1    the e-mailings it also said, "I verify that the raw material
 2    named" -- I know you guys have written on the back -- "matches
 3    the label."  So, this was, in fact, a --
 4    Q    You had familiarity with M-Drol and H-Drol.  Were they the
 5    same sized milligrams, or were they different?
 6    A    They were different.
 7    Q    What was H-Drol?
 8    A    H-Drol was 25.
 9    Q    Twenty-five what?
10    A    Milligrams.
11    Q    And what was M-Drol?
12    A    M-Drol was ten milligrams.
13    Q    Now, in the e-mails what had the specs covered?
14    A    In the e-mails the spec said how much was coming, here's
15    how many milligrams I want per capsule, and how many capsules
16    per bottle.
17    Q    Do you remember what the milligrams were?
18    A    For the H-Drol it was 25 milligrams.
19    Q    The e-mail where he was talking about the second delivery,
20    do you remember if he said ten or 25 milligrams?
21    A    He initially said ten milligrams, and I received the
22    product, and I went through it, yeah, it is the H-Drol, which
23    is 25 milligrams.
24    Q    So, after that product was -- so, so what happens after you
25    get the second delivery?  By the way, where did it go?  Did it go
```

Patel - Direct

1    to your house?

2    A    It went to my house, again.

3    Q    What did you do with it?

4    A    That time I held on to it because you're sending one more

5    delivery, as well.

6    Q    Was there some confusion about this?  What was it?

7    A    There was.  There was definitely some confusion, back and

8    forth, so it delayed things by a few days.  When he did -- he

9    was sending another raw material, it was only a couple days

10   apart, and I just held on and waited for the third set.

11   Q    What was the third set?

12   A    The third set was a product called Alpha 1.

13   Q    What is Alpha 1?

14   A    It's another pro-hormone.

15   Q    Similar to H-Drol and M-Drol?

16   A    Yeah, similar --

17   Q    Do a body building type thing?

18   A    Yes, it's a muscle building pro-hormone.

19   Q    Do you recall how long it was until you got the Alpha 1 raw

20   materials?

21   A    Probably just a few days.

22   Q    So, then after you get the Alpha 1, what do you do with

23   that?

24   A    So, I had in my possession both the H-Drol and Alpha 1

25   materials.  I called Willy, I said, "Hey, would you like to

Patel - Direct

 1   meet again?"  He said, "Yeah."  I told him, "You're the next

 2   step of Steve Wood's raw materials."  So, we met at the same

 3   place, same mall, and I gave him raw materials for H-Drol, and

 4   the other was for Alpha 1.

 5          MR. HALL:  Your Honor, is it an appropriate time to

 6   take a break?

 7          THE COURT:  Ladies and gentlemen, we're going to end

 8   at this time.  It will be necessary for you to come back

 9   tomorrow, and if you could, we're going to have a little

10   different schedule tomorrow because of obligations that I have

11   in other matters.  So, it will not be necessary for you to be

12   here until 10:00 a.m. tomorrow.  And we'll probably, or we will

13   take a little longer lunch break tomorrow, also.  So, but we're

14   moving along, and hopefully we'll continue to move along

15   quickly and, and get the matter to conclusion.  So, thank you

16   for your attention.  If you'll take your notebooks and put them

17   in the jury room, and remember my instructions to you, and

18   we'll see you tomorrow morning at 10:100 a.m.

19      (The jury retired to the jury room, after which the

20   following occurred:)

21          MR. HALL:  Have I moved in all through 28?

22          THE CLERK:  Yes.

23          THE COURT:  All right.  Counsel, is there anything

24   we need to take up?

25          MR. HALL:  I don't believe so at this time, Your

Patel – Direct

1    Honor.

2           MR. RAMSEYER:  No, Your Honor.

3           THE COURT:  We discussed the jury charge, and what

4    I'm going to do is try to give you, first thing in the morning

5    tomorrow, a suggested jury charge so that you'll have some

6    opportunity to look at it.

7           MR. HALL:  Your Honor, I would, I think I can get you

8    a jury instruction tonight, e-file a proposed instruction we

9    would have with respect to withdrawal from the conspiracy.

10          THE COURT:  That would be fine.  That would be great.

11   Anything else?  Thank you, counsel.  And we will adjourn court.

12      (Proceedings concluded at 4:20 p.m.)

13

14                       CERTIFICATE

15

16       I certify the foregoing is an accurate transcript

17   from the record of proceedings in the above-entitled

18   matter.

19

20

21   3/18/17                 /s/ Bridget A. Dickert
     Date                    U.S. Court Reporter
22

23

24

25