```
            IN THE UNITED STATES DISTRICT COURT FOR THE
                  WESTERN DISTRICT OF VIRGINIA
                       Abingdon Division


--------------------------x
                          :
UNITED STATES OF AMERICA, :
                          :
     Plaintiff,           :
                          :
v.                        :  1:16CR34
                          :
SITESH BANSI PATEL,       :
                          :
          Defendant.      :  Abingdon, Virginia
                          :  March 9, 2017
--------------------------x  1:38 p.m.


            JURY TRIAL – TESTIMONY OF SITESH PATEL
              BEFORE THE HONORABLE JAMES P. JONES
             UNITED STATES DISTRICT JUDGE, and a jury
```

APPEARANCES:

     S. RANDALL RAMSEYER, Esquire
     Assistant U.S. Attorney
     P.O. Box 1098
     Abingdon, Virginia 24212
          For the United States of America.

     PATRICK Q. HALL, Esquire
     1350 Columbia Street, Suite 601
     San Diego, California  92101
     and
     CHRISTOPHER K. KOWALCZUK, Esquire
     P.O. Box 11971
     Roanoke, Virginia  24022
          Counsel for the Defendant.


Proceedings recorded by Stenography, transcript
produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628−5116**

Patel – Direct

```
 1        (Proceedings commenced at 1:38 p.m.)

 2            THE COURT:  Good afternoon, ladies and gentlemen.  Are

 3   we ready to proceed again?

 4            MR. HALL:  Your Honor, I am.  But before I would

 5   conclude my direct examination, I wanted to bring up the issue

 6   regarding the scope of cross examination that would be permitted

 7   of Mr. Patel.  In particular, regarding, you know, areas of why

 8   was Ajay Patel picked, because I think that would provoke the

 9   response of, of the invocation of the Fifth, and so I'd ask that

10   the Government not be permitted to go into that area.

11        And secondly, as to questions regarding why there were

12   limitations on the three productions and why there were three

13   productions, because once again I believe the response to that

14   is there was an e-mail from Mr. Ramseyer limiting the first

15   production, and then there were phone conversations limiting

16   the second and the third production which then makes him the

17   witness as to those limitations.

18            THE COURT:  Well, why does it make Mr. Ramseyer the

19   witness?

20            MR. HALL:  Well, first, he needs to authenticate the

21   e-mail, and secondly, the telephone conversation he would have

22   had --

23            THE COURT:  Well, no, but if your client answers

24   because it was permitted, because there was an understanding with

25   the lawyers that's the way it could be done, so how does that --
```

Patel - Direct

```
 1              MR. HALL:  Well, as long as there's no hearsay
 2   objection, I honestly think that's hearsay, but it relates to his
 3   state of mind as to why he did things, and so if that's no
 4   objection, I think, I think he can say those things.  But as to
 5   the why Mr. Witness Patel was picked, I would ask the court not
 6   to permit examination of that.
 7              THE COURT:  But why was somebody else not picked?  I
 8   mean, it's not necessarily Witness Patel.  I mean, there were
 9   other people -- I mean, how many I don't know at the time we've
10   determined, but there were other people who could have gone to
11   produce the records.
12              MR. HALL:  But I believe the full explanation of that
13   is that there was Fifth Amendment discussions, and that's why --
14              THE COURT:  No, no.  Wait a minute.  Why was, why was,
15   why was Mr. Patel, Witness Patel, himself, picked?
16              MR. HALL:  Because Sitesh Patel had a Fifth Amendment
17   right --
18              THE COURT:  No, no.  That wasn't the reason, though.
19   There were other people who could have gone.  His father could
20   have gone, you know, the IT person could have gone.  There were
21   other people who could have gone, as I understand.  I mean, I
22   understand what you don't want to get into, and I've already
23   ruled that's right, but I still don't understand why it's Witness
24   Patel, himself, why he was chosen, if that's the problem, rather
25   than some other person at the company.
```

Patel – Direct

1          MR. HALL:  But the sequence, Your Honor, I don't mean,

2    I understand what you're saying, but the sequence of events is

3    that first Mr. Sitesh Patel responds and provides the certificate

4    of authenticity, and he's providing the records, and the, as to

5    why was this person was chosen, implies in light of all of that

6    testimony is that Mr. Sitesh Patel is behind the scenes hiding

7    things, all right, and why didn't he come forward and produce

8    these records, and that's the explanation to that, I think, that

9    just opens up the door for him to be truthful about what the

10   explanation was as to why --

11         THE COURT:  Well, I understand the argument.  The

12   problem, I mean, one problem I see is that Witness Patel was

13   obviously to be, at least, and probably to the jury, so

14   incompetent to actually produce documents, number one, you know,

15   barely spoke English, this was not his job; he, the records were

16   actually obtained from other people.  The main thing he said was

17   that there was a crash of a computer which lost a lot of records,

18   and he doesn't know anything about that, and he agrees that the

19   IT person would be the proper person to explain about that, and

20   so that's my concern.  Let me hear from what Mr. Ramseyer --

21   Mr. Ramseyer, what do you intend to get into?  I mean, I do think

22   this is a ticklish issue here because of the constitutional

23   immunity issue.

24         MR. RAMSEYER:  What I would intend to ask, did you

25   provide the records to Witness Patel to be produced pursuant to

Patel - Direct

1    the subpoena?  Are you the one that found them, and did you give

2    them to him?  Why were certain documents produced, other

3    documents not produced?  And then I would like to ask him out of

4    the 60 some people that worked at the factory did you pick a

5    chemist to come as the custodian of records?

6            THE COURT:  Any objection to any of those questions?

7            MR. HALL:  The why question, Your Honor, is because the

8    why is I would have done it had I not had a Fifth Amendment right

9    and been advised by my counsel not to do it.  That's the why.  I

10   mean, what we're doing is in hindsight we're second guessing his

11   judgment as to who he picked, and the truth is the decision was

12   influenced by the assertion of the Fifth Amendment, not in

13   hindsight having watched him, having read his grand jury

14   testimony, and if I had been counsel for him I think we might

15   have come to a different conclusion, but the inference, the

16   relevance of all of that is there is some type of obfuscation, as

17   Your Honor said, that's intentional on the part of Sitesh Patel,

18   and I don't think that's what it was.

19           THE COURT:  Well, I understand that's the defense's

20   position but, you know, I believe there's a different inference

21   that can be drawn.  However, I'm going to, to direct the

22   Government not to ask him why the Witness Patel was chosen to

23   present the records because there is at least a possibility that

24   he would need to get into his waiver, or his assertion of his

25   right not to testify before the grand jury.

Patel – Direct

```
 1              MR. HALL:  Thank you, Your Honor.

 2              THE COURT:  Anything further?

 3              MR. RAMSEYER:  Your Honor, the jury instructions, does

 4    the court want to do that?  I know the jury has been waiting --

 5              THE COURT:  I'd rather go ahead with the jury.

 6              MR. RAMSEYER:  I would like to present to the court

 7    just a case, we don't believe that mail fraud requires an overt

 8    act, I know the indictment alleged overt acts, but we don't

 9    believe we're required to prove that as to conspiracy.  That's a

10    case that stands for that.

11              THE COURT:  All right.  All right.  Are we ready for

12    the jury?  Mr. Patel, if you'll retake the stand, and you're

13    still under oath, sir.

14              THE DEFENDANT:  Yes, Your Honor.

15              THE COURT:  We'll have the jury in.  And I'm going to

16    briefly explain to the jury why we're starting late, too.

17         (The jury entered the courtroom and was seated in the jury

18    box.)

19              THE COURT:  Ladies and gentlemen, good afternoon.

20    We're ready to go again.  First, I want to explain to you and

21    apologize for us getting started later.  I know that you came

22    here at 10:00 expecting to start, and it's all my fault, and I

23    want to explain.  The lawyers and parties didn't have anything to

24    do with it.  I think I told you at the beginning that I had had a

25    knee operation several weeks ago, I think I was sympathizing with
```

Patel - Direct

1    the juror who was getting ready for a hip operation.  So, I went

2    to the doctor, I had an appointment to check my situation, and I

3    had some swelling of my leg, and so he made me have an ultrasound

4    just to make sure that there weren't any problems.  So, as you

5    can imagine, that took a little while.  So, that's the whole

6    story, the whole truth, and all the truth.  And again, I want to

7    apologize that we kept you waiting, but that's the story.  We'll

8    hopefully move along here.  Mr. Patel is back on the stand, and

9    he's still under oath, and we're continuing in direct

10   examination.

11          MR. HALL:  Thank you, Your Honor.

12   BY MR. HALL:

13   Q    Good afternoon, Mr. Patel.  We'll -- there was, or was there

14   a time that S.K. Laboratories, Incorporated received a subpoena?

15   A    We did.  It was in December of 2012.

16   Q    And was, what was the, what was that subpoena seeking?

17   A    It was seeking all documents related to Competitive Edge

18   Labs, Serious Nutrition Solutions, Steve Wood, anything related

19   to those parties.

20   Q    And did S.K. Laboratories have corporate counsel at that

21   time?

22   A    We did.

23   Q    Who was that?

24   A    It was Mr. Joseph Davis.

25   Q    And did the, did Mr. Davis represent the company in

Patel – Direct

1    responding to this subpoena?

2    A    He did.

3    Q    Now, there were three productions, actually, I think four

4    productions Mr. Ramseyer talked about.  The first production, who

5    was involved in putting together the first production?

6    A    I was.

7    Q    And that first production did not cover all of the documents

8    that were referenced in the grand jury subpoena; is that right?

9    A    It did not.

10   Q    Can you tell the jury why it is that all of the documents

11   were not produced at that time?

12   A    Yes.  So, in 2012 when we received the subpoena, the

13   subpoena was sent to Mr. Joseph Davis.  Mr. Joseph Davis had a

14   conversation with Mr. Randy Ramseyer, and Mr. Ramseyer actually

15   sent Mr. Davis a letter narrowing what was requested in the

16   subpoena.

17   Q    I'll approach you with what we've pre-marked as Defendant's

18   Exhibit 76.  It's out of order.  I apologize, Madam Clerk.  Have

19   you ever seen that before?

20   A    Yes.  This is an e-mail from Mr. Randy Ramseyer to

21   Mr. Joseph Davis, and it's narrowing what's requested from the

22   subpoena down to five items.

23   Q    How did you receive that?

24   A    It was e-mailed to Mr. Davis, and Mr. Davis then gave it to

25   us, not company.

Patel – Direct

1   Q    And is that the e-mail that you were responding to in the

2   first production?

3   A    Yes, it was.

4   Q    All right.  Mr. Patel, up on the screen now is, is the

5   e-mail -- can we call up the body, paragraphs one through five of

6   that e-mail?  All right.  Mr. Patel, so, in the first five

7   paragraphs there, is there a reference to production of e-mails

8   there?

9   A    No, there is not.

10  Q    Do you recall if any e-mails were produced in the first

11  production?

12  A    Not in the first production.

13  Q    And in putting together the documents for the first

14  production, did you rely upon this, this e-mail for guidance as

15  to what you needed to produce?

16  A    I did.

17          MR. HALL:  Move admission of 77.

18          THE CLERK:  Seventy-six.

19          THE COURT:  It will be admitted.

20      (Defendant's Exhibit No. 76 was received in evidence.)

21  BY MR. HALL:

22  Q    Subsequent to that were there communications with corporate

23  counsel about follow up productions?

24  A    There were.

25  Q    And how many productions were there total?

Patel - Direct

```
 1    A    In total in response to the subpoena there were three.
 2    Q    So, this first one, in referencing this e-mail that was the
 3    first one S.K. got, just two more after that or three more after
 4    that?
 5    A    There were two more after that.
 6    Q    That you were responsible for?
 7    A    Right.
 8    Q    And so in putting together the other productions were you
 9    involved in that process?
10    A    I was.
11    Q    Did you have further communications about other limitations
12    on the scope of the grand jury subpoena?
13    A    We did.
14    Q    And who were those communications with?
15    A    They were with my attorney at the time, who was Mr. Joseph
16    Davis.
17    Q    What were you told?
18    A    Mr. Davis had advised that Mr. Ramseyer was asking for
19    e-mails then related to M-Drol, H-Drol, Inhibit.
20    Q    Was that in the second or third production?
21    A    That was in the second production.
22    Q    In the third production what were the limitations?
23    A    That was a request for the e-mail and invoices that
24    Mr. Willy Ramos had sent for the production of H-Drol.
25    Q    Did there come a time -- and so you were assembling the
```

Patel - Direct

1    records in connection with these productions?

2    A    Correct.

3    Q    And did there come a time when there was another grand jury

4    subpoena served on S.K.?

5    A    There was.  It was in 2015.

6    Q    And who is it that was responsible for putting together the

7    records for that one?

8    A    I was.

9    Q    And did you produce a larger batch or group of records on

10   that occasion?

11   A    I did.  Our attorney at that time advised that Mr. Ramseyer

12   wanted everything in the universe of e-mails.  So, we produced

13   all the e-mails that we had from Competitive Edge Labs and

14   Serious Nutrition Solutions.

15   Q    In 2000 -- was it 2015 or 2016?

16   A    2015.

17   Q    Was it the same attorney, Joseph Davis?

18   A    No.  At this time it was Mr. Joseph McMullen.

19   Q    When he described to you the -- what was the phrase you

20   used?

21   A    Universe of e-mails.

22   Q    All right.  And did that mean every e-mail by the company,

23   or was there some limitation even on that?

24   A    No, it was every e-mail that we had.

25   Q    About?

Patel - Direct

```
 1    A    In regard to Competitive Edge Labs, Steve Wood and Serious

 2    Nutrition Solutions.

 3    Q    Did you put those e-mails together?

 4    A    I did.

 5    Q    Were those then provided to the U.S. Attorney's Office?

 6    A    They were.

 7    Q    That was bigger than the productions that had previously

 8    been provided, correct?

 9    A    Much larger.

10    Q    Were you attempting to, to hide anything in those

11    productions?

12    A    No, I was not.

13    Q    I'm going to come back to e-mails, but certain of the

14    Government's e-mails as we've seen as exhibits here between Steve

15    Wood and you were not in those productions, right?

16    A    Correct.

17              MR. RAMSEYER:  I'm sorry, I didn't understand.  What

18    was the question?

19              THE COURT:  Would you repeat the question, please?

20    BY MR. HALL:

21    Q    Some of those e-mails, including the Government's exhibits,

22    were not in those productions by S.K., correct?

23              THE COURT:  Wait a minute.  Some of those e-mails?

24    What some?

25              MR. HALL:  I was trying to avoid going through -- let
```

Patel – Direct

```
 1   me see if I can ask it this way.  It's not very clear.
 2   BY MR. HALL:
 3   Q    Mr. Patel, you saw some e-mails beginning approximately
 4   December 7th or December 8, 2010 between Steve Wood and yourself,
 5   and also with Willy Ramos that the Government introduced as
 6   exhibits in this trial, correct?
 7   A    I did.
 8   Q    All right.  And of those e-mails those were not included in
 9   the production to the Government in 2013 or 2015, correct?
10   A    Correct, they were not.
11   Q    Let's go back.  So, in 2011 or 2000 -- well, 2011, was there
12   a time when there was a transition in computer systems at S.K.?
13   A    There was.  We had just moved into a new building, and when
14   we moved into that new building we established a new server.
15   Q    When was it that you moved to the new building?
16   A    It was between April and May of 2011.
17   Q    Prior to, prior to that how were the computer records for
18   S.K. kept?
19   A    They weren't actually on a server.  We had individual
20   e-mails, individual computers that were networked together, but
21   we didn't have a central server that was the central location for
22   all the information.
23   Q    And after the move was a server added to the system?
24   A    It was.  We had a large space where we can actually build a
25   proper server system, so we did.
```

Patel – Direct

1   Q    Did you continue to use individual, you know, computers and

2   lap tops, or was it all linked to a server?

3   A    It was all linked to a server.

4   Q    At some time was there an effort to upload e-mails from the

5   individual computers into the server?

6   A    There was, but it didn't go so well.  It didn't manage to

7   transfer everything over.

8   Q    So, was there some time that there were some e-mails that

9   were lost?

10  A    There was.

11  Q    Who did the transfer, by the way?

12  A    It was our IT person.

13  Q    Who was your IT person at the time?

14  A    Kitan Patel (phonetic).

15  Q    I'd like to continue on with the explanation as to what was

16  involved here, but let me jump ahead.  Was there some point where

17  you deleted some e-mails from your personal computer?

18  A    There was.

19  Q    And when was that?

20  A    It was around April of 2011.

21  Q    And what kind of e-mails were you deleting?

22  A    I was deleting the e-mails that I had with Steve Wood

23  originally talking about his wanting to produce M-Drol and H-Drol

24  products.

25  Q    Why were you deleting them?

Patel – Direct

1  A    I didn't want to be involved with him.

2  Q    And is that the reason why those e-mails were never produced

3  to the Government?

4  A    Correct.  We didn't have them.

5  Q    From the time that the grand jury was, grand jury subpoena

6  was served in 2012, I think you said December of 2012 until the

7  second grand jury subpoena in 2015, were any other e-mails

8  deleted?

9  A    No.

10 Q    I want to come back to that, but I think I'll forget some

11 things if I don't do it.  Yesterday we heard Mr. Wood testify

12 about some, doing some standard operating procedures with you.

13 Do you remember that?

14 A    I do.

15 Q    Were you and Mr. Wood at some point talking about creating

16 standard operating procedures for Serious Nutrition Solutions?

17 A    We were.  He expressed interest, some interest and some lack

18 of understanding on what GMPs and SOPs were, and so I was

19 discussing those with him.

20 Q    At some point did you agree to help him?

21 A    I did.

22 Q    How was it you helped him?

23 A    In order for you to have GMPs in your facility, which is

24 good manufacturing practices, you need to have SOPs which are

25 standard operating procedures.  Your SOPs are kind of like your

Patel – Direct

```
 1   bible, your encyclopedia.  So, I agreed I would help him create

 2   SOPs for his business.

 3   Q    How were you doing that?

 4   A    I went through existing SOPs that we had internally at S.K.,

 5   and I was modifying them and editing them so they would fit the

 6   business of Serious Nutrition Solutions.

 7   Q    And did you modify them and edit them?

 8   A    I did.

 9   Q    Did you send them to Mr. Wood?

10   A    Yes, several times.

11   Q    I'm going to show you what's been pre-marked as Exhibits 29,

12   30, 31 and 32, and ask you if you recognize these documents.

13   Have you had a chance to take a look at that?

14   A    I have.

15   Q    And what is 29?

16   A    Twenty-nine is an e-mail from myself to Steve Wood sent on

17   Monday, July 11th of 2011.  It has an attachment which is SOP

18   Manual TOC dot dot.  TOC stands for table of contents.

19   Q    So, first of all -- all right.  Is that an e-mail -- I'm

20   probably the, the wrong person to be focusing this, but can you

21   read that, Mr. Patel?

22   A    Yes, I can.

23   Q    Is that an e-mail from you to Steve Wood?

24   A    Yes.  Yes, sir.

25   Q    Is that relating to these, these standard operating
```

Patel – Direct

```
 1    procedures?
 2    A    Yes, it's me giving him instructions on how to start
 3    creating his GMP manual.
 4    Q    All right.  The, attached to that e-mail was something
 5    called SOP Manual TOC doc, right?
 6    A    Right.
 7    Q    And is this page that I have up on the screen that is what
 8    you sent him?
 9    A    That is what I sent him.
10    Q    And then there's a table of contents, as well, right?
11    A    Yes, there is.
12    Q    And that accurately depicts what you sent to him?
13    A    Yes, sir.
14    Q    In fact, 30, 31 and 32 are all e-mails relating to these
15    standard operating procedures, right?
16    A    Yes, sir.
17    Q    Now, were these just copies of yours, or were these
18    specifically tailored for serious nutrition?
19    A    No, these were specifically tailored to Serious Nutrition.
20    Q    I'm going to show you page three of that e-mail.  Where did
21    you get that information from?
22    A    Mr. Wood had provided that to me.  I sent him an e-mail
23    asking him, "Who is your emergency list so we can have contacts
24    listed in your SOP manual?"  And he told me it was just himself
25    and John Dodd.
```

Patel – Direct

1   Q    On that page it looks like you've got Danville Police

2   Department, but also the Anaheim Fire Department.  Do you see

3   that?

4   A    Yeah, it looks like I forgot to edit out Anaheim and change

5   that to Danville, but the phone number on there is a 434 phone

6   number, which is for Danville.

7   Q    Were you getting information from him about what to put into

8   these?

9   A    Not so much.  I requested some certain information from him,

10  some information on employee structure, and so forth, but

11  Mr. Wood didn't know anything about SOPs, he didn't know anything

12  about GMPs, so, I was creating them from scratch.

13  Q    Take a look at 30, 31 and 32.  Are those also e-mails you

14  sent to Steve Wood?

15  A    Yes, sir, they all are.

16  Q    And do some of them include standard operating procedures

17  attachments?

18  A    Yes.  Number 31 contains six standard operating procedures.

19  Q    And what about 32?

20  A    Thirty-two doesn't state what the attachments were, but

21  there's a response from Steve Wood that says, "QA13 wouldn't

22  open."  So, it would be another set of standard operating

23  procedures I sent him.

24  Q    That's a response back from Mr. Wood at least confirming --

25  what did that mean to you?

Patel – Direct

1   A    There's a problem with the attachment, and the e-mail before

2   that, it says, "Here's the next set.  I will have to train you

3   guys on this one so let's set up a time when you are free."  So,

4   when I say next set, meaning I sent him another set of standard

5   operating procedures.

6           MR. HALL:  I would move admission of 29 through 32 at

7   this time.

8           THE COURT:  It will be admitted.

9    (Defendant's Exhibit Nos. 29 through 32 were received in

10   evidence.)

11   BY MR. HALL:

12   Q    How much time do you think that you expended creating these

13   documents?

14   A    So far from what it looks like, I'd say at least five hours.

15   Q    All right.  Did Mr. Wood ultimately agree to pay you for

16   that?

17   A    He did.  I outlined how much work it was going to be, how

18   many procedures I'd have to create and set up, and we agreed upon

19   $5,000 for that, creating these.

20   Q    Did he pay you that?

21   A    He did send me $500, and that was supposed to be a deposit

22   toward working on these.

23   Q    How did he send the $500?

24   A    He sent it in cash.

25   Q    Did he send it in a bottle or envelope?

Patel – Direct

1   A    I believe it was in an envelope.

2   Q    Do you remember when it was that that was sent?

3   A    It was $500.

4   Q    No, when.

5   A    I think it was in June of 2011.

6   Q    If I can show you what's been previously marked as

7   Defendant's Exhibits 33 through 49.  I'm going to retrieve these

8   other exhibits from you.  Glance through the entire package.

9   A    Okay.

10   Q    Can you tell us what that entire package represents?

11   A    These are all e-mails from Bryan speaking about either SNS

12   or Steve Wood, or Bryan forwarding e-mails from Steve Wood.

13   Q    You heard me ask a bunch of questions of Mr. Wood, and I

14   don't want to go through the individual e-mails, but are those

15   examples of the types of e-mails you would get from Bryan talking

16   about SNS and Steve?

17   A    I think these are a portion of them.

18   Q    Focusing specifically on -- can you pull out number 42

19   there?

20   A    Yup, 42.

21   Q    May I retrieve that from you?  I'll put 42 up on the screen

22   here.  The top of that is -- what is that very top e-mail there?

23   A    It's an e-mail from Steve at Serious Nutrition Solutions

24   sent to myself, April of 2009, says, "Stamped today but I will

25   get your form to you this week for set up purposes," and it has

Patel – Direct

1    his address and phone numbers.

2    Q    Is that one of the first e-mails you received where Steve is

3    talking about setting up business for SNS?

4    A    I think that was probably, that was actually the first one.

5    Q    Thank you.

6           MR. HALL:  I would move admission of Defendant's 33

7    through 49 at this time.

8           THE COURT:  It will be admitted.

9     (Defendant's Exhibit Nos. 33 through 49 were received in

10   evidence.)

11          THE COURT:  Why don't we do this.  Why don't we make

12   sure we don't mix things up, get the exhibits that have been

13   admitted, just admitted if you're finished with them.

14   BY MR. HALL:

15   Q    Mr. Patel, looking at Exhibit 50, what is that?

16   A    This is the first e-mail conversation with Bryan back in

17   June of 2008.

18   Q    All right.  And in -- is that an e-mail that you produced at

19   some point to the Government?

20   A    It was.

21   Q    And if I may approach and retrieve that, sir.  I'll focus

22   your attention on the middle of that paragraph beginning, "Not a

23   problem," and there's a number one there.  And this is an e-mail

24   to you from Bryan, correct?

25   A    Correct.

Patel - Direct

1  Q    And in it can you read that number one for us real quickly?

2  A    Sure.  It says, "Insurance.  I remember speaking to you

3  briefly about this before, but can your company add S.K. Labs as

4  an additional insured on to your policy?  Our insurance does not

5  cover these pro-hormone products, so in order for us to continue

6  producing them we need to be added as additional insureds."

7  Q    Did he respond to that?

8  A    He did.

9  Q    What did he say?

10 A    He said, "Yes.  I forwarded this information to the company

11 owner today to have you added."

12 Q    To your knowledge did, did he have S.K. added to the

13 insurance policy for CEL for the production of pro-hormones?

14 A    He did.

15        MR. RAMSEYER:  Objection, Your Honor.  That would be

16 based on hearsay.

17        THE COURT:  Yes, sir.  I'll sustain the objection.  I

18 mean, how do you know that?

19        THE WITNESS:  His insurance sent us a certificate with

20 us added on as an additional insured.

21        THE COURT:  So, the only way you know is a piece of

22 paper that you saw?

23        THE WITNESS:  Right.

24 BY MR. HALL:

25 Q    Well, we heard some testimony from Mr. Wood about how the

Patel – Direct

1   Noopept insurance companies wouldn't insure something that wasn't

2   lawful.  Back then --

3            MR. RAMSEYER:  Your Honor, I object.  I'm not sure

4   that's the characterization.

5            THE COURT:  Yes, sir.  If you would, I'll sustain the

6   objection.

7   BY MR. HALL:

8   Q    To your knowledge did the insurance company insure S.K. Labs

9   for the production of hormones back in 2008?

10  A    They did.

11  Q    And was there any hesitation -- I'll withdraw that.

12           THE COURT:  Well, I'll overrule the Government's

13  objection.  I think this goes to a question of intent, and not as

14  to the truth of the matter.

15           MR. HALL:  Thank you, very much.

16           THE COURT:  In other words, the, the testimony of the

17  witness is hearsay, would be hearsay because it comes from a

18  different person or source, but it's admitted not for the truth

19  of the matter; that is, not whether, in fact, there was

20  insurance, but what Mr. Patel, the defendant, thought.

21  BY MR. HALL:

22  Q    Did you think S.K. was then getting insured through

23  Competitive Edge Laboratories' policy?

24  A    I thought we were getting insured through the policy.

25           MR. HALL:  I move admission of Exhibit 50 at this time.

Patel – Direct

```
 1              THE COURT:  It will be admitted.

 2         (Defendant's Exhibit No. 50 was received in evidence.)

 3   BY MR. HALL:

 4   Q    So, let's go back.  I think we kind of left off explaining

 5   what you were doing with things, and take you back to the time

 6   frame of December, 2010.  In 2010 were, just foundational, the

 7   business that you were doing with SNS, was it a small amount,

 8   large amount?

 9   A    It was a pretty significant amount.

10   Q    And when you were communicating with anybody at SNS was it

11   always Steve Wood?

12   A    It was always Steve Wood.  Occasionally John Dodd would

13   contact us.  That was only in regard to shipments and labels,

14   but, but outside of that it was always Steve Wood.

15   Q    Did Steve Wood, on other occasions, contact you and ask you

16   for help, a referral for somebody else that could help you?

17   A    He did.

18   Q    Do you do that by phone or by e-mail?

19   A    He had requested on phone and e-mail.

20   Q    I'll show you what's been marked as Defendant's 72.  I'd ask

21   you to take a look at that.  All right.  Have you had a chance to

22   look at that?

23   A    I have.

24   Q    Is that an e-mail you got from Steve Wood?

25   A    Yes.
```

Patel – Direct

```
 1   Q     And what's the subject of that e-mail?

 2   A     The subject is Question and Follow Up.

 3   Q     And what was the, what were you talking about in that

 4   e-mail?

 5   A     Steve Wood had requested somebody that could do protein

 6   products for him in large containers, and we had a phone

 7   conversation on this, and while S.K. could produce protein

 8   products for them, the fact that Steve Wood was located in

 9   Virginia made it very expensive for freight.  So, in this follow

10   up e-mail I respond and I recommend a company called All The Way,

11   which is in Pennsylvania.

12   Q     And what's the date of that e-mail?

13   A     This is January 13, 2010.

14   Q     So, about in the same time frame as your first contact --

15              THE COURT:  Yes, sir, Mr. Ramseyer?

16              MR. RAMSEYER:  Again, I'm just going to object on

17   relevancy grounds.  This seems pretty far afield.

18              THE COURT:  Yes, sir.  What's the relevance?

19              MR. HALL:  The relevance is to show the nature of the

20   relationship between Mr. Wood and Mr. Patel at that time.

21              THE COURT:  Well, I'll allow it, but I don't think we

22   really need to --

23              MR. HALL:  It's the only one in that area, Your Honor.

24              THE COURT:  All right.  We need to move along.

25              MR. HALL:  We would move in Defendant's 50 at this
```

Patel – Direct

1    time.

2                    THE COURT:  It will be admitted.

3                    THE CLERK:  You've already got 50.  You've already

4    admitted 50.

5                    MR. HALL:  Oh, it is 72.

6                    THE COURT:  All right.  Seventy-two will be admitted.

7          (Defendant's Exhibit No. 72 was received in evidence.)

8    BY MR. HALL:

9    Q    Mr. Patel, let's go back, December of 2010, you've talked

10   about a phone call with Mr. Wood.  In that first phone call, so,

11   it's the first phone call talking about PHs or pro-hormones, was

12   there some discussion in that phone call about who the customer

13   was that Steve Wood was doing this for?

14   A    There was.

15   Q    Who did he tell you it was?

16   A    He didn't give me much detail, but he said it was all for

17   his overseas clients.

18   Q    Did he have much discussion with you, or had you in the past

19   talked with him about who the overseas clients were?

20   A    No, I never went into detail on who his actual customers or

21   clients was, but when we were discussing the initial set up with

22   Ramos one of the things he did bring up was it was for overseas.

23   Q    All right.  And did he talk about, at some later time did

24   Mr. Wood talk about his South American clients with you?

25   A    Yes.

Patel - Direct

```
 1   Q     Was that, was that significant to you that he was talking
 2   about overseas or other countries?
 3   A     It was.
 4   Q     Why?
 5   A     In my rationalization if he's shipping from the United
 6   States out of the country, it's not intended for domestic
 7   distribution.  So, as far as I know it's not meant for consumers
 8   in the United States, it's not meant for stores in the United
 9   States.  Everything he was producing was going out of country.
10   Q     And you've become since, you're somewhat familiar with the
11   Code, and you gave us the definition yesterday of dietary
12   ingredients.  Is there something in there about exported
13   products?
14         MR. RAMSEYER:  Objection, Your Honor.  He's asking
15   about what he was thinking back in 2010, and that doesn't seem to
16   me it's relevant what he's saying now as to that.
17         MR. HALL:  I'm asking for --
18         THE COURT:  Well, yeah, you're asking him what he, what
19   he knows now about that.  I'll sustain the objection.
20   BY MR. HALL:
21   Q     Back then did you have some knowledge of the Code, as well?
22   A     I did.
23   Q     And was there some significance to products for export under
24   the Code, knowing what you knew back then?
25   A     Yeah.  The guidelines state that you can produce a product
```

Patel - Direct

1    that is not, it's, that is meant for out of country distribution

2    in the United States even though it may not fall within the law

3    of the United States.  So, if something, for example, a label

4    doesn't comply with U.S. standards but it complies with England's

5    standards then it's okay for you to produce in the United States

6    as long as that product is going to that country.

7          MR. RAMSEYER:  Your Honor, again, I assume this is just

8    for his intent; it's not whether that's true, or not, correct?

9          THE COURT:  Yes, sir.

10   BY MR. HALL:

11   Q    Now, did you really think that what Steve Wood was doing was

12   going to comply with that Code section?

13   A    I did.

14   Q    Did that affect your state of mind, or was that on your mind

15   when you were having this phone call with him about getting

16   somebody to help him with pro-hormones?

17   A    Absolutely.

18   Q    But at that time frame -- I mean, I think we covered this

19   yesterday -- did you think that it was lawful for S.K. to be

20   manufacturing H-Drol or M-Drol back in December of 2010?

21   A    I, I knew the ingredients, themselves, were not compliant,

22   they were not legal dietary ingredients, so whether S.K. was

23   producing them or Human Tech was producing them I knew for the

24   United States they weren't compliant.

25   Q    So, why did you refer him to -- I mean, we talked about what

Patel – Direct

1  you did, but why did you refer him to Willy Ramos?

2  A    It, frankly, came down to money.  I mean, I was hoping for,

3  you know, more business down the line with Wood, and eventually

4  lead to money, and I, I picked up the phone and I called Ramos,

5  and it was probably the dumbest decision of my life, and I set

6  myself up for something that was clearly illegal.  And not only

7  that, it comes down on the fact that I, that me getting involved

8  in illegal activity, it punishes my character, it hurts the

9  company, hurts my family, it ruins everything that I've worked

10  for.  And it's, it's hard for me to sit here, even as my mom, mom

11  and dad are there, and I know their hearts are sinking, and

12  they're looking at me, and I dragged them all the way out here,

13  and it's a very tough pill to swallow.

14  Q    Do you regret that decision?

15  A    Absolutely, 100 percent.

16  Q    We talked a little bit about what you did after that.  And I

17  think as we left off yesterday we were talking about there was a

18  second and a third delivery of product to, to your home, correct?

19  A    There was.

20  Q    And I think we're in the time frame -- did we talk about

21  what you did with that second and third delivery?

22  A    Yeah.  The second delivery was H-Drol, and the third

23  delivery was Alpha-1.  So, I waited for both deliveries.  Steve

24  Wood told me he was sending me a second product.  I took both

25  boxes, told Willy Ramos that, "Hey, your product for Steve Wood

Patel – Direct

```
 1    is here," and we met again at the mall, and I gave him that
 2    product.
 3    Q    Do you remember if Willy gave you any money at that time?
 4    A    Not at that time.
 5    Q    And what time frame is this?
 6    A    This is in the middle of January.
 7    Q    And what happened with, after you gave him that box?
 8    A    He went back and he made the product.
 9    Q    Did he send it to you for delivery this next time?
10    A    No, that was just the first time.
11    Q    Let me go back, and I think we talked about this yesterday,
12    but this, the e-mail was talking about M-Drol, talking about
13    capsule sizes.  Alpha-1 is not the same thing as M-Drol, is it?
14    A    No, it's not.
15    Q    It's another type of pro-hormone?
16    A    It's another pro-hormone.
17    Q    The second delivery, then, did that have anything to do with
18    M-Drol?
19    A    No.
20    Q    But it did have something to do with H-Drol and Alpha-1,
21    right?
22    A    Correct, H-Drol and Alpha-1.
23    Q    After, so you delivered to Willy.  What's the next thing
24    that happens?  What do you hear about next?
25    A    After that it was silent for quite a bit.  Willy was
```

Patel – Direct

1  producing product, and he was shipping it directly to Steve Wood.

2  Q    Did Steve Wood send, send you some money?

3  A    He did.

4  Q    When did that happen?

5  A    It was also in the middle of January.  I came home one day

6  and there was, I mean, he told me he was sending me a package,

7  and I came home one day, there was a small box sitting on my door

8  step.  I opened it up, and inside was a bottle, and inside the

9  bottle was cash.

10  Q    Do you remember how much cash it was?

11  A    It was $1,000.

12  Q    How big was the bottle?

13  A    It was one of his smaller size bottles, capsule sized

14  bottle, similar to what Ms. Lester referred to before, three or

15  four inches in height, smaller diameter.

16  Q    What did you do with the cash?

17  A    I kept it.

18  Q    After you got that, when is your next communication with

19  Wood or Ramos about making H-Drol or M-Drol?

20  A    Wood had contacted me in the beginning of February, it was

21  actually February 3rd, and I know that because it's one of my

22  best friend's birthdays, and we go out for dinner every year for

23  his birthday.

24  Q    Did you have a phone call or an e-mail about that?

25  A    First he sent me an e-mail, and the e-mail was saying

Patel - Direct

```
 1   something to the extent that, hey, I really need to talk to you,
 2   when are you available for a call?  Later that night, while I was
 3   out for dinner, he started sending me text messages, and he was
 4   pretty aggressive saying, hey, when can we talk, when can we
 5   talk, when are you free?
 6   Q    I'll show you what I'll have marked as Defendant's 73.
 7          MR. HALL:  I'm going to retrieve 72 from you and hand
 8   that to you, Madam Clerk.
 9   BY MR. HALL:
10   Q    Do you recognize 73?
11   A    I do.
12   Q    What is that?
13   A    It's an e-mail sent from Steve Wood on, it initially starts
14   on February 2nd regarding one of his products called PCT
15   Assist -- I'm sorry, it's an actual e-mail from me to Steve Wood
16   regarding PCT Assist, and I'm asking him to send the final PO
17   with the counts.
18   Q    Is that it up on the screen?
19   A    That is.
20   Q    Can we go to the last paragraph in the e-mail from Mr. Wood?
21   Go up further.  All right.  What does that say, Mr. Patel?
22   A    It says, "I would like to speak with you tonight if
23   possible.  Can I please give you a call?  If you are busy, it's
24   okay.  Just had a few things I wanted to go over with you that
25   were very important."
```

Patel – Direct

```
 1   Q    What's the date of that e-mail?

 2   A    It's February 3, 2011.

 3             MR. HALL:  I would move admission of Defendant's 73 at

 4   this time.

 5             THE COURT:  It will be admitted.

 6        (Defendant's Exhibit No. 73 was received in evidence.)

 7   BY MR. HALL:

 8   Q    Mr. Patel, did you end up talking to Mr. Wood?

 9   A    I did.  I came back from dinner that night, and I gave him a

10   call.

11   Q    What did you talk about?

12   A    Steve Wood wanted to send me more pro-hormone products, he

13   wanted to send them to me so I could give them to Willy.

14   Q    Did he say what kind?

15   A    I don't remember him saying which ones.

16   Q    And what did you say?

17   A    I told him no.  I told, "Hey, Steve, listen.  I never wanted

18   to be in the middle.  I told you from the beginning I would set

19   you guys up, but after that you have to go straight to Ramos,

20   Mr. Willy Ramos and deal with him directly."

21   Q    And what did he say in response?

22   A    He, he understood.  He asked me if I could help him by

23   setting up a call between the three of them so they could get the

24   proper introduction.

25   Q    Did you set up such a call?
```

Patel – Direct

```
 1   A     I did.

 2   Q     And after that phone call did you get any more raw materials

 3   or H-Drol or M-Drol delivered to your house?

 4   A     No.

 5   Q     Did Willy Ramos make payments to you at some point?

 6   A     He did.

 7   Q     And tell us about that.

 8   A     He came by my office one day, and he gave me $500, and he

 9   said it was just for introducing him to Wood.

10   Q     And do you remember when that was?

11   A     It was some time in February of 2011.

12   Q     And was, was there a second time that he came by to give you

13   money?

14   A     No, that was the only time.

15   Q     Did, after he gave you that money -- or let me go back.  Was

16   this before or after the February 3rd telephone call with Steve

17   Wood?

18   A     This was after the February 3rd call.

19   Q     He came by your office and gave you $500.  What did you say

20   to him?

21   A     I, well, I took the money, and I told him thank you, but I

22   also told him that, that I had a conversation with Wood, and I

23   was no longer involved, and Steve Wood was going to be calling

24   him directly and, "You don't have to pay me."

25   Q     You've heard Mr. Ramos's testimony about possibly there was
```

Patel - Direct

 1    two or three payments.  How many payments did you get from Willy

 2    Ramos?

 3    A    For M-Drol and H-Drol it was two.  The first time was

 4    actually him buying bottles from us.  The second time was when he

 5    came by my office.  It was some time in February, and gave me the

 6    cash.  That was, he wasn't buying anything; he was just giving me

 7    cash for the referral.

 8    Q    So, after -- was in the beginning of February, end of

 9    February, whereabouts?

10    A    It was after the phone call, so it would have been somewhere

11    between middle to end of February.

12    Q    And after the middle of February did you have further

13    conversations with Willy Ramos about making M-Drol or H-Drol?

14    A    No.

15    Q    From, say, February through March were you still getting

16    checks from Steve Wood's office on behalf of Willy?

17    A    No.

18    Q    So, at some point did that change?

19    A    It did.

20    Q    Tell me, first of all, when did it change and what happened?

21    A    It was in April of 2011.  I was actually at a friend's

22    wedding in Baltimore getting ready, I was a groomsman, and I

23    remember Steve Wood called me, and he said that there's some

24    financial dispute going on between him and Willy, and he said

25    that he's going to send me a couple of checks to hand on to, and

Patel – Direct

```
 1    he told me, "Just hang on to them.  When Willy ships me product,
 2    I'll ask you to release the checks to him."
 3    Q    And did they send you some checks?
 4    A    They did.
 5    Q    And do you remember when that was?
 6    A    It was some time toward the end of April.  So, it was after
 7    I came back from the wedding, so it was at the end of April.
 8    Q    Did they also send you some cash with that?
 9    A    There was cash.
10    Q    Was it in a bottle, an envelope?
11    A    It was in an envelope.
12    Q    How much was that?
13    A    $500.
14    Q    What was that for?
15    A    I guess it was just a thank you for taking in the checks.
16    He sent me, it may have been Ms. Lester, but one of them sent me,
17    it was like a UPS envelope, and inside there were two smaller
18    envelopes.  One were the checks for Ramos, the other was cash
19    that was addressed to me.
20    Q    In April -- I think we talked about this a little bit.  In
21    April there was a change of the company's location, right?
22    A    There was.
23    Q    Do you remember what day that was?
24    A    Well, actually, while I was at the wedding we had movers
25    moving us from 1173 North Grove Street to La Palma.
```

Patel - Direct

1   Q    Was this -- so, let me talk about this in April.  Is this a

2   plan?  I mean, this didn't happen overnight, did it?

3   A    The move?

4   Q    Yes.

5   A    Oh, no.

6   Q    How long had it been in the planning?

7   A    Since 2010.

8   Q    And, say, in December of 2010 did you know that -- well, let

9   me ask some questions.  Was this a facility that was built

10  specifically for S.K.?

11  A    It was.  It was actually a mattress manufacturing company,

12  our old building was a building we leased and this was a building

13  that we bought.  So, we had construction come in, they tore down

14  the insides, and we built the facility from scratch.

15  Q    How long did that take?  How long did the process take?

16          MR. RAMSEYER:  Your Honor, again, I would object to the

17  relevancy.

18          THE COURT:  Yes, sir.  I'm not sure where we're going

19  with construction of the building, and so on.

20  BY MR. HALL:

21  Q    In April, though, there was a move into the new building,

22  correct?

23  A    We moved into the new building.

24  Q    I've shown some photographs to the jury in opening.  I'll

25  show you a stack of what's 51 through 71, and ask you to take a

Patel – Direct

1   look at those real quick.  Are those photographs of the new

2   facilities?

3   A     They are.

4             MR. RAMSEYER:  Your Honor, again, I'm going to object

5   on relevancy.

6             MR. HALL:  I've shown them to the jury in my opening,

7   Your Honor.  I think we can go through them real quickly.

8             THE COURT:  I'll let you introduce them, but I don't

9   know that you need to go through them.  I don't know what

10  difference it makes.  The Government doesn't contend that this,

11  that the manufacture place assisted.  Again, you've shown them to

12  the jury, and you can show them when, but what goes where, and

13  where the process starts, and things like that, I just don't

14  think are relevant.  And again, because, particularly because of

15  my delay we really need to move along.  So, let's not take the

16  time for Mr. Patel to explain --

17  BY MR. HALL:

18  Q     Fifty-one through 71 represent photographs of the new

19  facility?

20  A     They do.

21            MR. HALL:  I would move their admission.

22            THE COURT:  They will be admitted.

23       (Defendant's Exhibit Nos. 51 through 71 were received in

24  evidence.)

25

Patel – Direct

```
 1   BY MR. HALL:

 2   Q     In the time frame of April were there other changes going on

 3   with, with you?

 4   A     There were.

 5   Q     What was the change going on with you?

 6   A     When we were moving into our new facility I was going to

 7   start my new position at the company, which was vice president.

 8   Q     So, at the time that you got the checks from Steve Wood, or

 9   from his offices, were you already vice president?

10   A     I was just become vice president.

11   Q     Were those sent to the new facility or old facility?

12   A     No, the checks were sent to my home address.

13   Q     So, let's go back from February 3rd through this telephone

14   call in April.  Had you received any materials or checks before,

15   or in this, or in that time frame before you got the phone call?

16   A     No.

17   Q     And so had you had any communications with either Wood or

18   Willy in that time frame about helping them make M-Drol or

19   H-Drol?

20   A     No, sir.

21   Q     Were you still talking to Wood, though?

22   A     I was.  Wood was becoming a bigger and bigger customer of

23   ours, and he was sending me lots of different, quote,

24   opportunities, new project opportunities.

25   Q     Were you talking to him at all about M-Drol or H-Drol in
```

Patel – Direct

1   that time frame?

2   A    Not about M-Drol or H-Drol.

3   Q    What about Willy?  Were you talking with him in that time

4   frame, too?

5   A    No, sir.

6   Q    So, in April after you got these checks, did you ultimately

7   give those to Willy?

8   A    I did.  Steve Wood called me and said, "Hey, they're okay to

9   give to Willy."

10  Q    And after you -- well, how did you get them to Willy?

11  A    Willy came by our office, and it was our new location, so he

12  came by the new plant.

13  Q    And when you gave the checks to Willy did you have a

14  conversation with him?

15  A    I did.  I told him, "These are the checks that Steve Wood

16  told me to give to you."

17  Q    In the phone call going back to when you were still at the

18  wedding, did Mr. Wood describe why it was that you were going to

19  get these checks instead of Willy?

20  A    He did.  I mean, he told me there was some money dispute,

21  Willy had a product of his, said he owed him money, Wood had his

22  money.  But said, "Hey, you owe me product," and some clash

23  between the two.

24  Q    After you gave the checks to Willy what did you do?

25  A    I gave the checks to Willy, and I remember going back, back

Patel - Direct

1  into my office.  I was, well, I was pretty annoyed that I even

2  had to get the checks.  I didn't want the checks.  I was in the

3  middle of the wedding, and I was a groomsman, and here Wood's

4  calling me with these problems.  So, I was pretty annoyed.

5  Q     Did you do anything as a result of that?

6  A     I did.  I started doing some research on line.  I saw a

7  recall notice that Steve Wood had put out, or Competitive Edge

8  Labs had put out regarding M-Drol.  I started going on line, I

9  was looking on forums, and on forums Competitive Edge Labs was

10 saying they've discontinued all pro-hormone products back in 2009

11 or ten.  I mean, they made a pretty big statement saying they

12 were no longer producing pro-hormone products.  But when I went

13 to retailer websites all the retailers still had stock of the

14 pro-hormone products, and I started getting a lot of anxiety

15 thinking about it.  Wait a second, I introduced Willy to Steve

16 Wood, I helped them assemble their products, I'm getting these

17 checks in the mail, raw materials, and I was starting to freak

18 out.

19 Q     Well, what did you do at that point?

20 A     I called Steve Wood and I vented on him.  And I said, "You

21 know, I was supposed to just set you up.  I wasn't supposed to be

22 involved.  I told you once I'm not involved.  Here you are

23 sending me checks again."  And I told him, "I'm out.  I'm not

24 involved with it.  Delete your e-mails, and I'm deleting mine."

25 And I just had it.  It was enough.  I was getting these checks,

Patel - Direct

```
 1    and he was putting me back into it.

 2    Q    Why did you delete your e-mails?

 3    A    It was really just a freak out moment.  It was something

 4    where I was, I was involved and I didn't want to be involved.

 5    Q    What did Steve Wood tell you?

 6    A    Steve Wood agreed.

 7              MR. RAMSEYER:  Objection, Your Honor, as to hearsay.

 8              THE COURT:  I'll sustain the objection.

 9    BY MR. HALL:

10    Q    And after you had that conversation did you ever talk to

11    Steve Wood about manufacturing M-Drol or H-Drol?

12    A    Not about M-Drol or H-Drol.  We had several conversations.

13    He was still a good customer of ours.

14    Q    What types of things were you talking about?

15    A    All about his legitimate products, his legitimate line, and

16    he was still sending us quite a few orders, or we had a lot of

17    production.

18    Q    Did you have any communication with Willy after this time?

19    A    No, I actually told Willy that, "Hey, I cannot help you guys

20    anymore.  I'm not involved.  You go to Steve."

21    Q    You heard Mr. Ramos talk about after Steve Wood got

22    arrested, if there were, about a telephone call.  Did you call

23    Willy Ramos and tell him Steve Wood had been arrested?

24    A    No, nothing regarding Steve Wood or his arrest.

25    Q    Did you tell him to destroy powders that he had?
```

Patel – Direct

```
 1   A     Absolutely not.

 2   Q     I think, Mr. Patel, the jury needs to hear from you --

 3           MR. RAMSEYER:  Objection, Your Honor.

 4           THE COURT:  Just ask him a question, if you would,

 5   please.

 6           MR. HALL:  Thank you.

 7   BY MR. HALL:

 8   Q     After this April phone call with Steve Wood did you have

 9   anything to do with helping Wood or Ramos make M-Drol or H-Drol?

10   A     Absolutely not.

11   Q     Did you have anything to do with giving them money?

12   A     Absolutely not.

13   Q     Do you have any regrets about your involvement with Mr. Wood

14   and Mr. Ramos?

15   A     I do.  I have nothing but regrets about it.  I wish from day

16   one I had never picked up that phone.  But, in hindsight I do

17   look at it as a learning lesson, and it's important for us to

18   note that our company has gone through a lot of changes since

19   then.  We do, we do real due diligence, we don't go on the

20   internet anymore and search and Google products --

21           MR. RAMSEYER:  Object to relevance.

22           THE COURT:  I'll overrule the objection.  Go ahead.

23   BY MR. HALL:

24   Q     Finish.

25   A     We have lawyers, we have counsel, we have people that we
```

Patel – Direct

1    consult with.  If there's a question for a raw material we don't

2    just take it in.  We consult with lawyers, we get their approval

3    first, and then we move forward with it.  We do our work and we

4    take pride in what we do.

5            MR. HALL:  May I have one moment to confer with

6    counsel, Your Honor?  I have no further questions.

7            THE COURT:  All right.  Well, let's take a short break

8    before cross examination.  Ladies and gentlemen, if you'll follow

9    the bailiff out, please.

10       (The jury retired to the jury room, after which the

11   following occurred:)

12           THE COURT:  All right.  We'll be in recess.

13       (Recess from 2:51 p.m. to 3:03 p.m.)

14           THE COURT:  Are we ready for the jury?

15           MR. RAMSEYER:  Yes, Your Honor.

16           THE COURT:  We'll have the jury in.

17       (The jury entered the courtroom and was seated in the jury

18   box.)

19           THE COURT:  You may proceed.

20                       CROSS EXAMINATION

21   BY MR. RAMSEYER:

22   Q    When did you say you destroyed all the e-mails concerning

23   M-Drol and H-Drol?

24   A    April of 2011.

25   Q    How did you do that?

Patel - Cross

```
1    A    I went on to my computer and hit delete.

2    Q    Hit the delete button as to all the e-mails?

3    A    Uh-huh.

4    Q    So, when your company was issued the subpoena all the

5    e-mails from M-Drol and H-Drol were already gone?

6    A    Concerning the e-mails with Steve Wood during that time

7    frame.

8    Q    Concerning M-Drol and H-Drol?  And anything to do with

9    those?

10   A    Right.

11   Q    When the subpoena was first issued the company didn't comply

12   right away, correct?

13   A    We -- are you speaking about the 2015 --

14   Q    2012.

15   A    In 2012 we received a subpoena, and the subpoena was sent to

16   Mr. Davis, and he had communicated with yourself, Mr. Ramseyer,

17   on the subpoena.

18   Q    Right.  You didn't comply by the date on the subpoena.  It

19   had to be continued.  You said the company needed more time?

20   A    Right.

21   Q    And then we started off with just some certain items, like

22   you said in the e-mail, correct?

23   A    Correct.

24   Q    But you knew that you had to fully comply with the subpoena

25   at some point, correct?
```

Patel – Cross

```
 1    A      No.

 2    Q      No, you did not?

 3    A      I did not.

 4    Q      By the time Ajay Patel came to testify in the grand jury in

 5    March of 2012 -- excuse me -- March of 2013, you knew that you

 6    were supposed to produce all the e-mails concerning H-Drol and

 7    M-Drol, right?

 8    A      No, we knew that we were supposed to produce all the e-mails

 9    or all the instructions that you had given us from Section One to

10    Five, and we were supposed to produce e-mails for M-Drol and

11    e-mails --

12    Q      That's what I asked.  At the time Ajay Patel came in March

13    of 2013 you knew all the e-mails from M-Drol and H-Drol were

14    supposed to be produced?

15    A      Correct.

16    Q      You're saying when you got the subpoena and first knew about

17    the subpoena, all of the e-mails concerning H-Drol and M-Drol

18    were already deleted, correct?  From 2010 forward, correct?

19    A      That's correct.

20    Q      So, you were specifically asked at some point for a receipt,

21    correct?

22    A      A receipt?

23    Q      You got information there was a receipt from Willy Ramos

24    that was supposed to be produced?

25    A      Correct.
```

Patel – Cross

```
 1  Q    And you did, right?

 2  A    Correct.

 3  Q    And that's Exhibit A3, right?  Correct?

 4  A    Correct.

 5  Q    And the reason you produced it was the Government

 6  specifically asked for the invoice, so you knew the Government

 7  knew about the invoice, right?

 8  A    Right.  At the time when we were searching we didn't find

 9  the e-mail.

10  Q    How did you produce it?

11  A    When Mr. Davis had contacted us to search up an invoice from

12  Human Tech that's when we went back, and we went back and found

13  the invoice from Human Tech.

14  Q    What you found was an e-mail for H-Drol, right?

15  A    Correct.  It was labeled for HD.

16  Q    And the attachment to the e-mail was for H-Drol?

17  A    Yes, for H-Drol.

18  Q    So, you didn't destroy this e-mail?

19  A    No.

20  Q    In 2011 like you said you did?

21  A    We didn't destroy --

22          MR. HALL:  Objection.  I believe that misstates what

23  his testimony was, Your Honor.

24          THE COURT:  I'll overrule the objection.  Go ahead.

25
```

Patel – Cross

1  BY MR. RAMSEYER:

2  Q    You didn't delete this e-mail in 2011, did you?

3  A    I did not.

4  Q    Okay.  Now, why didn't you produce the documents that you

5  had in your possession that concerned H-Drol and M-Drol?

6  A    I produced everything that I could find regarding M-Drol and

7  H-Drol from that time period.

8  Q    All right.  And you knew, I mean it was clear in your mind

9  what the Government was investigating, right?

10 A    I knew they were investigating Competitive Edge Labs, Steve

11 Wood and serious Nutrition Solutions.

12 Q    You knew it was for H-Drol and M-Drol?

13 A    No.

14 Q    The subpoena asked for records concerning H-Drol and M-Drol?

15 A    Right.  When Mr. Davis spoke with yourself and you sent over

16 the e-mail to us, then I realized it's for M-Drol and H-Drol.

17 Q    When you saw the subpoena you realized it was for M-Drol and

18 H-Drol?

19 A    No, when I saw the e-mail.

20 Q    Did you get the subpoena?

21 A    I received the subpoena.

22 Q    Okay.  And the subpoena dated November 19, 2012, and the

23 attachment, you see right there it says, "For example, H-Drol,

24 M-Drol"?

25 A    Yes.

Patel – Cross

1    Q    You knew it was about H-Drol and M-Drol?

2    A    Yes.

3    Q    Okay.  And you knew you were in trouble potentially, right?

4    A    Not at that time.

5    Q    Well, you knew you had been involved in making H-Drol and

6    M-Drol?

7    A    Correct.

8    Q    And you knew you had this deal you worked out where you

9    hooked up Willy Ramos and Steve Wood, right?

10    A    Correct.

11    Q    Were you worried about that?

12    A    Somewhat.

13    Q    Well, a lot, right.  You knew you might end up here in court

14    some day?

15    A    This was my fear.

16    Q    And isn't it true you destroyed e-mails then?

17    A    I didn't destroy any e-mails then.  The e-mails that were

18    deleted were deleted in the spring of 2011.

19    Q    Were they deleted off the server?

20    A    They were deleted off my computer.

21    Q    Okay.  Did you make sure they got deleted from everywhere?

22    A    At that time we were actually operating on individual

23    computers, so, we didn't have the server up until we moved into

24    the new building.

25    Q    All right.  Now, at some point later on another subpoena was

Patel – Cross

```
 1    issued for the exact same stuff, right?

 2    A    Correct.

 3    Q    That was in 2015, right?

 4    A    Correct.

 5    Q    And you had different people involved, and you weren't

 6    involved in the production, right?

 7    A    We had multiple people involved.

 8    Q    You had what?

 9    A    Multiple people involved.

10    Q    And at that point two e-mails were produced that had to do

11    with the H-Drol and M-Drol deal, right?

12    A    I would have to see the e-mails to verify.

13    Q    I'll show you, it's part of Government's Exhibit A4, the one

14    marked D01190.  That has to do with the H-Drol deal, doesn't it?

15    A    It does.

16    Q    Okay.  You didn't produce it in 2013, did you?

17    A    No.  Likely when I searched in 2013 I was searching H-Drol

18    and M-Drol.

19    Q    Why didn't you search Steve Wood?

20    A    I didn't search the letter.

21    Q    All right.  And in A4 there's Exhibit D, 01225, there's an

22    e-mail there that "says, Received the bottle.  Thank you, very

23    much.  It is very appreciated."  That was the payment for you

24    setting up Steve Wood and Willy Ramos for this H-Drol M-Drol

25    deal, right?
```

Patel – Cross

1   A     That was the payment.

2   Q     Didn't produce that in 2013, did you?

3   A     That e-mail also, again, didn't state H-Drol and M-Drol.

4   When I searched that that wouldn't come up.

5   Q     But you knew you had gotten a bottle for Steve Wood?

6   A     I did.

7   Q     You knew that was payment for H-Drol and M-Drol?

8   A     I did.

9   Q     You didn't produce that, did you?

10  A     When I was searching I was searching H-Drol and M-Drol.

11  Q     Now, I want to ask you about H-Drol and M-Drol.  These are

12  Exhibits A1 and A2.  When you -- let me ask you this.  When you,

13  did you know Ajay Patel was going to sign the certificate for the

14  subpoena in 2015?

15  A     Not at that time.  Not when we received the subpoena.

16  Q     But did you know he was going to sign it?  Did he sign it?

17  A     Correct.

18  Q     Did you know he was going to?

19  A     I'm sure at some point I did.

20  Q     Did you ask him to?

21  A     I didn't ask him to.

22  Q     Well, okay.  Did you, because one of the things on there, he

23  said, he certified the a number of records sought by the subpoena

24  hadn't been destroyed.  Do you remember that?

25  A     He signed a paper provided to our counsel.

Patel – Cross

1   Q     Did you tell him, "Ajay, that's not true.  I did destroy

2   some of the e-mails"?

3   A     No, I didn't tell him anything.

4   Q     Okay.  Government's Exhibits B1 and B2, you're familiar with

5   both of them?

6   A     Right.

7   Q     Made them at the old factory, S.K. Labs, not the fancy ones

8   you've got pictures about?

9   A     Correct, sir.

10  Q     And did they look just like that when you did them?

11  A     Very similar.

12  Q     What's different?

13  A     The label does look a little different in art work.  The

14  bottle, I think, was bigger.  So, it may have been -- it was the

15  same product.

16  Q     Same product, same label?

17  A     Similar label.

18  Q     They both said H-Drol, both said M-Drol, right?

19  A     Correct.

20  Q     And had the same indications, yes?  Correct?

21  A     Yeah, they appear to be the same.

22  Q     Same warnings?

23  A     I, I wouldn't know.  I can't remember the labels sent to us

24  versus these bottles.

25  Q     Is there anything on there that you can tell is different

Patel – Cross

```
 1    than when you made them?

 2    A     The art work appears to be completely different art work.

 3    Q     You're talking about the Drol part, H-Drol part?

 4    A     Yes.

 5    Q     And M-Drol?

 6    A     Yes.

 7    Q     The product you made said Competitive Edge Labs on it, too,

 8    didn't it?

 9    A     Yes, sir.

10    Q     So, you knew that the people, the Competitive Edge Labs that

11    you made the product for in 2008/2009 were the same people who

12    were making the product when you had Willy do it, right?

13    A     No, I did not.

14    Q     Knew they were both Competitive Edge Labs, right?

15    A     I knew they were the same company.

16    Q     Right.  You knew they were both Competitive Edge Labs.  2008

17    and 2009 when you made it, it was Competitive Edge Labs, right?

18    A     It was Competitive Edge Labs.  The company was the same, but

19    the people were not the same.

20    Q     I understand.  In 2010 and 2011 it was Competitive Edge

21    Labs, right?

22    A     In 2008 and 2009 it was Bryan Riddle at Competitive Edge

23    Labs.  In 2010 it was Steve Wood at SNS who was handling projects

24    for Competitive Edge Labs.

25    Q     You knew they worked together?
```

Patel - Cross

1   A     I knew they were in the same building, and they helped each

2   other out.

3   Q     Right.  So, these products that you were making -- let me

4   ask you this.  Those bottles that Willy bought from you, were

5   those from M-Drol and H-Drol?

6   A     They wouldn't have been for M-Drol.  He bought them at the

7   time he had a production run of H-Drol.

8   Q     Were those bottles you had left over from when you made

9   H-Drol?

10  A     No, they were not.

11  Q     The same kind of bottle?

12  A     Same kind of bottles.

13  Q     And that, where did that take place where he came and met

14  you and got 3,000 bottles?

15  A     At our company.

16  Q     At the S.K. Labs location?

17  A     Yeah.

18  Q     The old location or new one?

19  A     New, old location, new location.

20  Q     What did the old one look like?

21  A     The old one was 1,500 square feet, and we had a warehouse

22  next to him.

23  Q     That's where you met him, in a small warehouse?

24  A     Yeah, that's where we keep storage of bottles.

25  Q     You gave him these empty bottles?

Patel – Cross

1   A     Right.  He purchased the bottles from us.

2   Q     You said he purchased them for $200?

3   A     Right.

4   Q     You said there were 3,000?

5   A     No, there was, the purchase was 1,000 bottles at 15 cents a

6   bottle, and we charged him $200, so there was a little markup on

7   the bottle.

8   Q     There was what?

9   A     A little markup.

10  Q     Where did the other 2,000 come from?

11  A     We didn't give him 2,000.

12  Q     You're saying, you testified that there was 1,000 bottles

13  you got?

14  A     It was a thousand bottles.

15  Q     It was 15 cents a bottle, and you charged him $200?

16  A     Right.

17  Q     And he paid you with cash?

18  A     He paid me in cash.

19  Q     What did you do with the cash?

20  A     We put it into petty cash.

21  Q     Put it into petty cash?

22  A     Uh-huh.

23  Q     At S.K. Labs?

24  A     Correct.

25  Q     Did you put down it was for the receipt and payment of 1,000

Patel – Cross

 1    bottles?

 2    A    No.  I, at the time we were just, we got a drawer that had a

 3    mini safe in there.

 4    Q    I mean, you talk about how you had this company where

 5    everything was very precise, organized, everything was done

 6    right.  I mean, wouldn't you have to account for the 1,000 pill

 7    bottles that left the warehouse?

 8    A    We did.

 9    Q    And you'd have to account how it was paid for?

10    A    Myself, we deducted it from inventory and we had $200 that

11    we added into petty cash.

12    Q    But there's no match up, nothing in a ledger or anything

13    that shows what happened to that money?

14    A    I couldn't tell you.  I wasn't handling accounting.

15    Q    Okay.  Did you tell somebody to do that?  Did you say, "This

16    is $200 for sale of the bottles"?

17    A    Yes.

18    Q    Who did you tell that to?

19    A    I told that to my dad.

20    Q    To Bansi Patel?

21    A    To Bansi Patel.

22    Q    Was he running the show?

23    A    He was the president.

24    Q    He was okay with getting cash for bottles with Willy?

25    A    They were empty bottles.

Patel - Cross

```
 1  Q    He was okay with cash?  That was fine?

 2  A    Cash or check, wire transfers, COD.  I mean, any acceptable

 3  payment is payment.

 4  Q    It was fine, as far as your dad was concerned if you got

 5  cash?

 6  A    Right.

 7  Q    Okay.  Now, these products, M-Drol and H-Drol, and you tell

 8  me if there's anything different, they're both anabolic steroids,

 9  correct?

10  A    They are both classified now as anabolic steroids.  They

11  were not at the time.

12  Q    As a fact, they were an anabolic steroid now and they were

13  then?

14  A    No, I disagree.  H-Drol, itself, is a pro-hormone.  It goes

15  into the body and has to convert through enzymatic processes into

16  an anabolic steroid.

17  Q    It's listed as an anabolic steroid, correct?

18  A    Not in 2011.

19  Q    It's listed as an anabolic steroid right now?

20  A    It is today.

21  Q    It is an anabolic steroid.  It was not, it wasn't listed, it

22  wasn't a controlled substance under the DEA, but it was an

23  anabolic steroid, correct?

24  A    It was not defined as an anabolic steroid in 2011.  It is

25  today, though, an anabolic steroid.
```

Patel - Cross

1    Q    You knew these were pro-hormones, right?

2    A    Right.

3    Q    Knew they were drugs?

4    A    Correct.

5    Q    You knew they were drugs in 2008, didn't you?

6    A    Not in 2008.

7    Q    Well, let me ask you a couple of questions.  You went to

8    pharmacy school for six years?

9    A    That's right.

10   Q    At Rutgers University, right?

11   A    Correct.

12   Q    Good pharmacy school?

13   A    Very good.

14   Q    Very high reputation?  And in that six years you were taught

15   the law, right?

16   A    I was taught pharmacy, therapeutics, and if there was

17   anything regarding the law, the law was regarding pharmaceuticals

18   and prescriptions.

19   Q    Drugs, right?

20   A    Prescription drugs.

21   Q    Prescription drugs, which anabolic steroids are prescription

22   drugs, correct?

23   A    I disagree with you.  There are anabolic steroids that are

24   prescription drugs, but if it hasn't gone through the process,

25   the FDA ruling process to become a prescription drug you can't

Patel – Cross

 1   classify it as a prescription drug.

 2   Q    Right, because that's illegal?

 3   A    There's several different classifications.

 4   Q    When you got these drugs in 2008/2009 was your factory

 5   certified to manufacture drugs?

 6   A    We were not.

 7   Q    Were you registered to manufacture drugs?

 8   A    We were not registered.

 9   Q    Has your company ever been registered to manufacture drugs?

10   A    We have not.

11   Q    Did you provide the Department of Health and Human Services

12   with a list of the drugs you were manufacturing at your plant?

13   A    We did not.

14   Q    And Willy Ramos, was he registered with HHS as a drug

15   manufacturing facility?

16   A    I wouldn't know.

17   Q    Did you ask?

18   A    I did not ask.

19   Q    Did you ask if he listed the manufacturing of drugs he was

20   going to make with HHS?

21   A    No, I didn't know if he had, what his registrations were.

22   Q    Didn't care, did you?

23   A    It wasn't my diligence to do.

24   Q    It wasn't your what?

25   A    My diligence.

Patel – Cross

1   Q    Okay.  But you set him up, right?

2   A    Correct.

3   Q    And the product, this label, it's false, right?

4   A    Can you explain what's false?

5   Q    Well, you tell me, what's false on B1 and B2?

6   A    If the reference to dietary supplement, their not being a

7   dietary supplement, I entirely agree.

8   Q    Was it a dietary supplement in 2008?

9   A    It was not, because I know that now, it's not a dietary

10  supplement.  Back in 2008 I was under the impression that these

11  were supplements.

12  Q    Okay.  So, B1 and B2 is H-Drol and M-Drol.  It says dietary

13  supplement.  That's false, correct?

14  A    As my understanding now, yes.

15  Q    And you knew back then it was false, didn't you?

16  A    I didn't know that in 2008.

17  Q    Well, what's the active ingredient of M-Drol?

18  A    M-Drol is 2 alpha, 17 alpha di methyl etiocholan 3-one,

19  17b-ol.

20  Q    You're probably the only person in the courtroom that can

21  pronounce that.  It's methasterone, right?  It's methasterone,

22  correct?

23  A    Right.

24  Q    Methasterone, everybody knew methasterone was illegal in

25  2008, didn't they?

Patel – Cross

```
 1            MR. HALL:  Objection to what everybody knew.

 2            THE COURT:  I'll overrule the objection.

 3            THE WITNESS:  No, methasterone, M-Drol, actually at one

 4    time there were 62 different products that contained the same

 5    ingredient as M-Drol.

 6    BY MR. RAMSEYER:

 7    Q    The main name was Super-Drol?

 8    A    Super-Drol was a brand name.

 9    Q    It was a brand name.  M-Drol and Super-Drol are the same

10    product, right?

11    A    They contain the same ingredient.

12    Q    Right.  And just to show you one of the boards that was

13    around, it shows March 8, 2006, "Super-Drol just got banned"?

14            MR. HALL:  Objection as to hearsay, Your Honor, and

15    lack of foundation that this witness has ever seen this.

16            THE COURT:  He's asking him a question.  What is your

17    question?

18    BY MR. RAMSEYER:

19    Q    My question is did you remember seeing things like that?

20    A    No.  FDA didn't ban Super-Drol in 2006.

21    Q    Okay.

22    A    It wasn't until 2012.

23    Q    Okay.  You see here where on here it says, "Super-Drol just

24    got banned," and the reference is an FDA warning letter?  Do you

25    see that?
```

Patel – Cross

```
 1              MR. HALL:  Again, objection.  He's testified he's never

 2   seen this before.

 3              THE COURT:  Well, yes, that's true.  I'll sustain the

 4   objection.

 5              MR. RAMSEYER:  Okay.

 6   BY MR. RAMSEYER:

 7   Q    Now, you can find warning letters on line, can't you?

 8   A    Yes, sir.

 9   Q    You can find them for anybody?

10   A    You can find them for ingredients.

11   Q    This is a warning letter from 2006 for the product Anabolic

12   Extreme Super-Drol?

13              MR. HALL:  Again, same objection, Your Honor.  It's not

14   addressed to him.

15              THE COURT:  Well, he hasn't asked him the question yet.

16              MR. HALL:  May I ask, before it's published to the

17   jury, that it be shown to the witness to see if he recognized it

18   or has seen it?

19              THE COURT:  Yes, sir, if you'll do that.

20              MR. RAMSEYER:  I'll do that, Your Honor.

21   BY MR. RAMSEYER:

22   Q    I'm going to ask if you'll look at that.  Do you see that?

23   A    Yes, sir.

24   Q    So, a warning letter from 2006 about the, saying Super-Drol

25   is a drug, correct?
```

Patel — Cross

```
 1   A     Correct.

 2            MR. HALL:  Objection as to foundation, as to whether

 3   he's seen it.  He just presented him an exhibit and asked him

 4   what it says.  What's the relevance?

 5   BY MR. RAMSEYER:

 6   Q    Mr. Patel, you could have gone on line in 2006 or 2008 and

 7   found that right?

 8   A     Correct.  If you were searching for Anabolic Extreme

 9   Super-Drol.

10   Q    You searched for Super-Drol, right?

11   A     Search for Super-Drol.

12   Q    In 2008 you knew M-Drol and Super-Drol were the same thing?

13   A     Super-Drol was the brand name.

14   Q    I understand you knew M-Drol and Super-Drol had the same

15   product in it?

16   A     According to the label, it may have had the same ingredient.

17   But this warning letter even goes over the claims the product are

18   making.

19   Q    It claims it builds up body mass, right.

20   A     Right.

21   Q    That's the same claim made for M-Drol, correct?

22   A     I would have to review what M-Drol's claims were in 2008.

23   Q    All right.  You made M-Drol and M-Drol in 2008, correct?

24   A     I did.

25   Q    You knew who the market was, right?
```

Patel – Cross

1   A    Correct.

2   Q    What was the intended use of M-Drol and H-Drol in 2008 and

3   nine when you were manufacturing the drug?

4   A    For muscle building.

5   Q    Right.  That makes it a drug, right?

6   A    Not necessarily.

7   Q    All right.  So, did you do due diligence?  Did you go and

8   look and see if Super-Drol was, was a product that was a drug?

9   A    I wasn't searching Super-Drol.  The diligence I did was I

10  searched Competitive Edge Labs, and I searched M-Drol and their

11  H-Drol products.

12  Q    Did you search methasterone?

13  A    No, I did not.

14  Q    Do you keep up with the dietary supplement business?

15  A    I do now.

16  Q    Did you in '08?

17  A    I did not in '08.

18  Q    Let me ask you this.  1f you had seen this would you have

19  made M-Drol and H-Drol in 2008?

20  A    Not if I had seen that.

21  Q    Why not?

22  A    Because it states what the FDA, what their opinion is.

23  Q    That it's a drug, right?

24  A    It's a drug.

25  Q    So, you agree that if you had seen it you wouldn't have made

Patel - Cross

```
 1    it, and you could have seen it by just looking on the internet
 2    for Super-Drol, right?
 3    A    Right.  But I was given M-Drol.  Super-Drol is a different
 4    brand name and a different product.
 5    Q    It's not a different product; it's a different brand name.
 6    A    It's a different brand name but it is a different product
 7    because it's a different product on the shelf.
 8    Q    You knew who made Super-Drol, right?
 9    A    I see it now.
10    Q    You knew before that, didn't you?
11    A    I don't remember.
12    Q    Who is it?
13    A    Anabolic Xtreme.
14    Q    And you knew about it because when you were talking to Steve
15    Wood in one of the e-mails that's been introduced, remember when
16    he was worried that you had sent him to AOE as the manufacturer?
17    Do you remember in e-mails when he was concerned that the invoice
18    he got from Willy Ramos looked like it might have come from AOE?
19    A    I do.
20    Q    Do you remember you responded back?  Do you remember that?
21    A    Correct.
22    Q    And do you remember that, you said AOE manufactured all of
23    Anabolic Xtreme's line?
24    A    That's right.
25    Q    You meant because you knew Anabolic Xtreme manufactured
```

Patel – Cross

1    Super-Drol?

2    A    No, that was in reference to the product Slim Xtreme which

3    was caught in 2009 being spiked with other ingredients.  So, I

4    couldn't distinguish Slim Xtreme to Super-Drol.  That was in

5    reference to that.

6    Q    Now, the product -- first let's go to '08 and '09.  In that

7    time period H-Drol and M-Drol was not a food, correct?

8    A    Correct.

9    Q    And it was intended to affect the structure of any function

10   of the body of man, correct?

11   A    That depends on the label claim of the product.

12   Q    Well, you saw the label, and you also said it was marketed

13   to body builders for them to build up muscle mass, correct?

14   A    That's correct, but there's lots of products, there's

15   actually an entire industry that companies marketing products to

16   body builders to build muscle mass.

17   Q    Right, and if it's a drug it's illegal.  If it's not, it

18   goes through the drug approval process?

19   A    Correct.  If it doesn't fall within the definition of a

20   dietary ingredient, then it's not a legal dietary ingredient.

21   Q    B1 and B2 are not dietary ingredients?

22   A    That's correct.  I agree with you.

23   Q    You agree in 2008/2009 when you were manufacturing H-Drol

24   and M-Drol it was an article other than a food intended to affect

25   the structure or any function of the body of man, correct?

Patel – Cross

```
 1   A    Not in 2008, and 2008 I did think that they were legal to

 2   sell.

 3   Q    That's not my question.  My question was in 2008 when you

 4   were manufacturing H-Drol and M-Drol is it true that it was an

 5   article other than food intended to affect the structure or any

 6   function of the body of man?

 7   A    I would have to see the label claims of the product.

 8   Q    I'll show you the label.  But to be clear, it doesn't even

 9   matter what's on the label.  It's the intended use, correct?

10   A    The intended use will depend on what's on the label.  So, if

11   a company says this product promotes or it supports, then it's

12   not creating intended use.  If the product is saying, and even in

13   reference in that warning letter, this product will build muscle,

14   then the FDA will view that as a drug.

15   Q    So it says H-Drol and M-Drol, M-Drol is a pro-anabolic, do

16   you see that?

17   A    Correct, I see that.

18   Q    H-Drol is a pro-anabolic, it's commonly used by those

19   looking to build muscle and lose body fat as part of a lean

20   muscle building or body recomposition cycles; is that correct?

21   A    Correct.

22   Q    They're drugs, correct?

23   A    These are both drugs, but the label claims they're making in

24   2008/2009, I'd have to see if they are making label claims that

25   equate to them being drugs.
```

Patel - Cross

| | |
|---|---|
| 1 | Q    In 2009 body building dot com announcement comes out, right? |
| 2 | A    Correct. |
| 3 | Q    And you're aware of that? |
| 4 | A    Yes, sir. |
| 5 | Q    Because you're up in the industry by that time? |
| 6 | A    Yes, sir. |
| 7 | Q    And in 2009 body building dot com case comes out, and talks |
| 8 | about these drugs, these pro-hormones, correct? |
| 9 | A    Correct. |
| 10 | Q    And M-Drol is actually listed as one of the products that's |
| 11 | a problem, correct? |
| 12 | A    That's correct. |
| 13 | Q    And after you see that, and after you know that you helped |
| 14 | Steve Wood and Willy Ramos make H-Drol and M-Drol? |
| 15 | A    I did. |
| 16 | Q    Let's move to that time period.  Well, back in '08 and '09, |
| 17 | the products you made, you put a label on them that said H-Drol |
| 18 | and M-Drol like these, correct? |
| 19 | A    Yes, I did. |
| 20 | Q    And you shipped them in interstate commerce, correct? |
| 21 | A    I did. |
| 22 | Q    And the labels said they were dietary supplements.  If |
| 23 | they're drugs it was false, correct? |
| 24 | A    Correct. |
| 25 | Q    Now, go to the 2010 time period.  First let me ask you, from |

Patel – Cross

1   2008 -- excuse me -- 2009/2010 and up to Wood's arrest in 2011 he

2   paid you about a $1,000,000, didn't he?

3   A    I don't know the amount that he paid but he was a good

4   client of ours.

5   Q    He paid you a lot of money, right?

6   A    He paid us quite a bit.

7   Q    And even after the arrest he paid you a lot of money,

8   correct?

9   A    He did.

10  Q    He's been a good paying customer for you?

11  A    Yes.

12  Q    He comes to you in December of 2010 and says, "I need

13  pro-hormones made," correct?

14  A    That's correct.

15  Q    Knew it was illegal, because you had seen body building dot

16  com?

17  A    That's right.  Yes, sir.

18  Q    No question at this point it's all illegal, right?

19  A    Right.

20  Q    It's going to be a misbranded drug, right?

21  A    That's correct.

22  Q    It's going to be shipped in interstate commerce, correct?

23  A    Correct.

24  Q    It's going to have a label on it, says H-Drol or M-Drol,

25  right?

Patel - Cross

```
 1   A     That's correct.

 2   Q     And you just do it, you go ahead and help make it happen?

 3   A     Unfortunately I did.

 4   Q     And you did it because you wanted to make money, right?

 5   A     It was, what it ultimately came down to was money.

 6   Q     Now, Willy testified, you saw him, he told the truth when he

 7   testified that you approached him about making pro-hormones,

 8   right?

 9   A     I did.

10   Q     And he told the truth when he testified that he met you in a

11   mall parking lot so you could take these steroid powders to him,

12   correct?

13   A     That's right.

14   Q     He told the truth when he testified that you provided powder

15   to him on two occasions, right?

16   A     That's correct.

17   Q     And he told the truth when he said he paid you, correct?

18   A     He did give me a finder's fee.

19   Q     Okay.  And he told the truth when he said there was some

20   problem between Steve Wood and him about the product, correct?

21   A     There was, that's correct.

22   Q     He told you the truth about that?

23   A     Correct.

24   Q     And isn't the truth you got it worked out, and got Willy to

25   go ahead and make the rest of the product?
```

Patel - Cross

1  A    Correct.  Steve Wood called me and said, "Hey, I'm sending

2  you a couple checks, and I want you to hold on to them."

3  Q    The checks you held on to, what were those checks?

4  A    They were payments that were due to Human Tech.

5  Q    How much were they?

6  A    I think one was $23,000, the other may have been, I think it

7  was $32,000.

8  Q    One was $23,000 and one was $32,000?

9  A    Correct.

10  Q    So, you got those made payable to Human Tech, and you held

11  on to them until Willy made the product?

12  A    Until Steve Wood told me to release them to him.

13  Q    How did you get the money to Willy?

14  A    Willy came by our office and picked them up.

15  Q    The old office?

16  A    No, it was in the new building.

17  Q    The new building, when was that?

18  A    This was at the end of April, 2011.

19  Q    Both checks at the same time?

20  A    Both checks at the same time.

21  Q    You gave him $55,000 at one time?

22  A    Yes, that's right.

23  Q    Now, if I could, you were meeting Willy on various occasions

24  during the same time period, right?

25  A    We were.  Willy was quite frequently buying flavors from us.

Patel – Cross

```
 1   Q    Willy was a good customer, too, right?
 2   A    I wouldn't define him as a good customer.  He had bought
 3   flavors from us from time to time, probably every single month,
 4   I'd say, at some times.
 5   Q    When Willy bought flavors from you, just in your general
 6   practice in your business, if somebody wants to buy flavors, how
 7   do they do that?
 8   A    That just, to define so somebody understands what the
 9   flavors are, flavors were Willy basically accepting, "Yeah, I
10   want a watermelon flavor that's sweetened with acids."  If Willy
11   wanted that, we'd keep watermelon flavors in stock, so we'd keep
12   them in stock, blend them, and depending on how much he needed
13   that's what we would produce at the time.
14   Q    When people wanted to buy flavors from you how was that
15   done?  Was there a purchase order?
16   A    Generally there's a purchase order.
17   Q    The purchase order and people would write a check?
18   A    That's correct.
19   Q    To S.K. Labs?
20   A    Correct.
21   Q    Let me show you Exhibit 50.  Do you recognize this as checks
22   from Willy Ramos that he gave you?
23   A    Yes, that's correct.
24   Q    And these checks are for May 26th of 2011, June 15th of
25   2011, June 23rd of 2011, July 22nd of 2011, and August 12th of
```

Patel - Cross

```
 1   2011.  Do you see those?  When he met with you each time he wrote

 2   one of those checks, didn't he?

 3   A     He did.

 4   Q     Where did he meet you?

 5   A     At our office.

 6   Q     And where did you meet him at the office?

 7   A     Usually in the shipping room.

 8   Q     In the what area?

 9   A     Shipping area.

10   Q     Did you give him his flavors?

11   A     Correct.

12   Q     When -- did he ask you what you wanted on the check?

13   A     He had asked me before.  Usually he paid cash.

14   Q     Usually paid cash?

15   A     He was usually a cash paying customer.

16   Q     Okay.  But this time he had collection, right?

17   A     Sometimes did he have checks.

18   Q     This is all during the same time he's doing the H-Drol and

19   M-Drol deals with Steve Wood?

20   A     Correct.

21   Q     And he's writing checks, and he asked you, "How do you want

22   the checks made out?"  And you said what?

23   A     I said, "Just leave it blank."

24   Q     Leave them blank.  And then did you fill in S.K. Labs as the

25   company that was going to get the checks?
```

Patel - Cross

1   A    No, we would do business with Willy because he paid cash,

2   and it was helpful to us for petty cash.  We have quite a few

3   different vendors we work with, we have guys that come by to pick

4   up boxes, and when they pick up boxes we pay them cash.  We have

5   guys that come by and give us pallets.  They want cash.  We have

6   vendors that only accept cash.

7   Q    So, you wanted cash?

8   A    We needed cash so we didn't have to keep going to the ATM.

9   We used petty cash.

10  Q    One way to get cash was to have the check made payable to

11  S.K. Labs?

12  A    Correct.

13  Q    Go to the bank, deposit it in S.K. Labs' account?

14  A    That's correct.

15  Q    And withdraw cash?

16  A    Correct.

17  Q    That's how a legitimate business would do it?

18  A    Yes, sir.

19  Q    But you had it made out to Bansi Patel, and it was cashed?

20  A    Yeah.  Bansi Patel was the president of the company.  He

21  deposited the checks.

22  Q    He didn't deposit the checks; they're cashed.

23  A    He cashed them and we put them in petty cash.

24  Q    That happened every time?  You gave them to him, he put his

25  name on them, he took it to the bank, he cashed them.  Is that

Patel – Cross

1   right?

2   A    Majority of the times from what I see in the collection you

3   have.

4   Q    Look at them.  You're familiar with Bansi Patel's

5   handwriting, right?

6   A    Yes, sir.

7   Q    So, were those all signed by Bansi Patel?

8   A    Yes, sir.

9   Q    Is that his handwriting?

10  A    It looks like it, yes, sir.

11  Q    His handwriting here, where it says who it's made payable

12  to?

13  A    The payable, yes, that's his handwriting.

14  Q    Pardon?

15  A    That's his handwriting.

16  Q    The payable to and the signature on the back.

17  A    And signature, as well.

18  Q    Did you ever get any of that money?

19  A    No.

20  Q    And who else did you get cash from during that time period?

21  A    Well, you could count Steve Wood's cash payments he sent me.

22  Q    Right.

23  A    Outside of that it was Willy Ramos.

24  Q    The only people during the whole time period we're talking

25  about in this case that you got cash from either way or any way

Patel - Cross

```
 1   was Willy Ramos and Steve Wood?

 2   A    That's all I can remember.

 3   Q    You had no other cash customers?

 4   A    I don't remember any other cash customers.

 5   Q    So it was a good thing that you had Willy Ramos do these

 6   because otherwise you wouldn't have had any cash for the petty

 7   cash, right?  Because this was it, the only petty cash you had

 8   was what Willy Ramos gave you?

 9   A    Correct.

10   Q    Now, you heard Sherrie Lester testify?

11   A    I did.

12   Q    Focus XT is one of the products you made for Competitive

13   Edge, correct?

14   A    Yes, sir.

15   Q    She said the cash she sent you came in one of those, do you

16   remember that?

17   A    She described two containers.

18   Q    Right.  One of them was Focus XT.  She said one was Focus XT

19   and one was a bottle that was taller?

20   A    Correct.  She said one was Focus XT; the other one was a

21   four inch bottle with a three inch diameter.

22   Q    The Focus XT, would you agree that's what the cash came in?

23   A    Not to me.

24   Q    You didn't get cash in Focus XT?

25   A    No, sir.
```

Patel – Cross

1  Q     She was lying about that?

2  A     She said --

3          MR. HALL:  Objection as to argumentative.

4          THE COURT:  I'll overrule the objection.

5  BY MR. RAMSEYER:

6  Q     You're saying what was sent in the Focus XT bottle, she was

7  lying, you didn't get cash in the Focus XT bottle?

8  A     She didn't send me cash.

9  Q     She also testified that it was thousands of dollars, and you

10 said it was $8,000, correct?

11 A     No, I said it was $1,000.

12 Q     That's what I meant to say.  You said it was 1,000; she said

13 it was thousands?

14 A     Right.

15 Q     How much did you make last year?  What was your income?

16 A     2016?

17         MR. HALL:  Objection to relevance, Your Honor.

18         THE COURT:  Yes, sir.  What's the relevance?

19         MR. RAMSEYER:  We asked Steve Wood about how much money

20 he was making.  Seems relevant how much he was making.

21         THE COURT:  I don't see what the relevance is.  I'll

22 sustain the objection.

23         MR. RAMSEYER:  All right.

24 BY MR. RAMSEYER:

25 Q     The business that Steve Wood brought you, in part did that

Patel - Cross

```
 1   help you increase your lifestyle?

 2   A    Not so much my lifestyle; it helped the company grow.

 3   Q    Did you make more money because of the business you brought

 4   in from Steve Wood?

 5   A    I did make more money.

 6   Q    And you moved up in the company?

 7   A    I moved up in the company.

 8   Q    Okay.  Now, you say that the time -- when did you call Steve

 9   Wood and tell him to destroy the e-mails?

10   A    That was in the, in April of 2011.

11   Q    April of 2011?

12   A    Correct.

13   Q    Steve Wood testified that you told him to destroy the

14   e-mails.  That's the truth, right?

15   A    That's correct.

16   Q    And the e-mails, as you've seen, the e-mails stop?

17   February, 2011 concerning this stuff, correct?

18   A    That's correct.

19   Q    So what happened between February and April?  How were you

20   communicating with him?

21   A    Well, in February, February 3rd because when Mr. Hall was --

22   Q    My question is just how you were communicating with him

23   between February and April?

24   A    Phone calls, e-mails.

25   Q    Phone calls and texts right?
```

Patel — Cross

```
 1   A     Phone calls and e-mails.
 2   Q     Isn't it true you told him to quit communicating by e-mail
 3   before you told him to destroy them?
 4   A     I didn't tell him anything like that.
 5   Q     You never told him to quit using e-mails for H-Drol and
 6   M-Drol?
 7   A     No.
 8   Q     Now, these drugs, M-Drol and H-Drol, they cause liver
 9   damage, right?
10   A     They have a potential to, yes.
11   Q     They do, correct?  People have gotten liver damage from
12   using them, correct?
13   A     There have been cases.
14   Q     Who referred you to Willy Ramos?
15   A     I don't remember.
16   Q     You don't remember?
17   A     No.
18   Q     It was somebody that was in the anabolic steroid business,
19   wasn't it?
20   A     I can't remember who it was.
21   Q     Knew people that made anabolic steroids, didn't you?
22   A     There were several companies in 2008, there were several
23   companies that were making pro-hormone products.
24   Q     But this is December of 2010 we're talking about.
25   A     Right, but I knew Willy Ramos back in 2008.
```

Patel – Cross

1   Q    Okay.  So, you don't remember who referred you to Willy

2   Ramos?

3   A    I don't.

4   Q    You knew the way these drugs worked, H-Drol and M-Drol, you

5   took an anabolic steroid, and tweaked the molecule, correct?

6   A    Correct.  They're different compounds.

7   Q    And you knew that most of this was done in China?

8   A    As far as I know there are producers in China.

9   Q    And so you knew that H-Drol and M-Drol was somebody taking

10  an anabolic steroid in China, tweaking a molecule, and selling it

11  as a dietary supplement, right?

12  A    The way I knew H-Drol and M-Drol were pro-hormones.  So

13  H-Drol was a compound that was supposed to convert over to

14  whatever the active substance is.

15  Q    Okay.  Did you know that there was some chemist in China, it

16  was a designer steroid basically?

17  A    I've never sourced ingredients.

18  Q    You never sourced ingredients?

19  A    We source ingredients, but I never sourced pro-hormones.

20  Q    I thought you said you never sourced ingredients.

21  A    I sourced ingredients.

22  Q    Do you get ingredients in from China?  Do you have contacts

23  in China?

24  A    I have a few.

25  Q    Who are your contacts?

Patel – Cross

```
 1   A    We go with a company called Vita Joy.  Vita Joy operates in
 2   the United States as well as China.
 3   Q    Is that the only person you know in China, the only
 4   supplier?
 5   A    There may be others, but I can't think off the top of my
 6   head.
 7   Q    Now, whether a drug is banned, or not, has anything to do
 8   with whether it's a drug, correct?
 9   A    Correct.
10   Q    You're a pharmacist, so you've seen package inserts for
11   drugs, right?
12   A    I have.
13   Q    Can you tell the jury what a package insert is for a drug?
14   A    Package insert is what they call a pharmaceutical monograph,
15   it's going to go through the dosing, it will go through how many
16   milligrams, the side effects, the reasons, indications to take
17   it.
18   Q    It's usually like seven or eight pages long.
19   A    Several pages long.
20   Q    Would you agree that H-Drol and M-Drol did not have a
21   package insert?
22   A    They did not.
23   Q    Would you agree that they were required to if they were a
24   drug?
25   A    If they were prescription drugs or over the counter drugs,
```

Patel - Cross

```
 1   they would.

 2   Q     Or any drug, any legal drug?

 3   A     They weren't registered drugs.

 4   Q     Right.  That's the point, isn't it?

 5   A     Right.  But if you need a package insert for a drug, it

 6   needs to go through the FDA approval process.

 7   Q     What should have happened is H-Drol and M-Drol, you should

 8   have contacted FDA and said, "Look, these people want to make

 9   this drug called M-Drol and M-Drol.  We want to submit a new drug

10   application."  It's going to be tested, it's going to be

11   reviewed, it's going to make a decision as to whether it's safe

12   and effective, decision is going to be about what schedule it

13   should be, there's going to be a decision about the package

14   insert and what warnings need to be in there.

15   A     The brand holder would need to do that.

16   Q     Did Steve do that?

17   A     He didn't do that.

18   Q     In 2008 you knew he hadn't done that.  You certainly knew

19   that in 2010?

20   A     Correct.

21   Q     You said, you said the reasons you didn't have the powder

22   shipped to your work was because if it came to your work it would

23   have to run through your GMP process?

24   A     There were two reasons, actually.

25   Q     I'm just saying isn't that what you said earlier?
```

Patel - Cross

```
 1    A    That was one of the reasons.

 2    Q    That's the only reason you gave, right?

 3    A    No.  I said the other reason, I said, was they weren't

 4    illegal dietary ingredients.

 5    Q    You were trying to hide them, right?

 6    A    I wasn't trying to hide it.  It was, it was not for S.K.

 7    Labs' production.

 8    Q    So, you weren't hiding from anyone the fact that you were

 9    helping make these illegal products?

10    A    No.  If a raw material arrived at S.K. Labs it would have to

11    go through a complex procedure.

12    Q    What if it said, "Attention Ajay Patel.  Do not open except

13    Ajay Patel"?

14    A    Receiving department would still open it.

15    Q    Disregard the instructions?

16    A    Only if it's a small sample.

17    Q    Let me ask, did your dad know?

18    A    He didn't know.

19    Q    Did you hide it from him?

20    A    I did.

21    Q    You didn't want him to know?

22    A    Correct.

23    Q    You knew it was criminal?

24    A    I knew it wasn't legal.

25    Q    That's the real reason it was sent to your house?
```

Patel – Cross

```
 1   A    The real reason I had it sent, I knew it wasn't --

 2           THE COURT:  Counsel, we have to be careful when we say

 3   was and wasn't, make sure that is accurately reported and the

 4   jury understands it.

 5           THE WITNESS:  Yes, Your Honor.

 6           THE COURT:  Let's repeat that colloquy.

 7   BY MR. RAMSEYER:

 8   Q    So, you knew H-Drol and M-Drol in the raw powders was, was

 9   being shipped to you was an illegal ingredient, correct?

10   A    Correct.

11   Q    That's why you wanted it shipped to your house, correct?

12   A    That was one of the reasons.

13   Q    And the reason you met Willy Ramos in some parking lot in

14   the mall to pass off this illegal powder was because you knew it

15   was illegal, correct?

16   A    No.  The reason I met Willy Ramos at a mall was because it

17   was half way between the two of us, we're about an hour drive

18   from my location to his location.

19   Q    But he was the one doing the deal, right?

20   A    He was the one that was assembling the product.

21   Q    Why didn't you just make him come to your place?

22   A    I didn't want him to know where I lived.

23   Q    Didn't want him to know where you lived?

24   A    Correct.

25   Q    Why?
```

Patel – Cross

1    A    I barely know Billy Ramos.  He's a customer, but I wouldn't

2    have him come to my house.

3    Q    Why didn't you have him meet you at your business?

4    A    I had the, the materials, it was during Christmas shopping

5    season, I was going to the mall.  We decided since the mall was

6    in the middle, that's where we would meet.

7    Q    Both times?

8    A    Both times.

9    Q    Christmas shopping both times?

10   A    It was Christmas shopping the first time.  The second time

11   he just met me at the same location.  It was in between the both

12   of us.  It made sense.

13   Q    Now, do you remember telling Willy that you were upset about

14   being in the middle of it, trying to negotiate this last

15   shipment?

16   A    I did.

17   Q    And do you remember that you told Willy, "Just go ahead and

18   ship it"?

19   A    No, no, sir.

20   Q    That's what happened, isn't it?

21   A    The last, the last time I was upset with being in the middle

22   was when Steve Wood sent me those two checks.

23   Q    Okay.

24   A    Steve Wood pretty much put me in the middle, and I wasn't

25   happy about that.  I was pretty upset about it.

Patel – Cross

1   Q   Isn't it true in August of 2011 you told, you told Willy

2   Ramos, "Just ship the last batch and be done with it"?

3   A   No, sir.

4   Q   You knew he still had a product, right?

5   A   I didn't know what Willy Ramos was doing.

6   Q   Isn't it the truth you did contact him after Steve Wood was

7   arrested?

8   A   No, sir.

9   Q   Have you talked to him since Steve Wood was arrested?

10   A   I talked to him many times.  He was still a customer of

11   ours.

12   Q   Okay.  So, but you said you just didn't talk to him about

13   Steve Wood being arrested?

14   A   I never talked to him about Steve Wood.

15   Q   It wasn't of interest to you?

16   A   No.  I mean, I, I hadn't really heard much about it since

17   probably months.

18   Q   Well, let's be clear about it.  He was arrested on

19   September 14th.  You knew that week he was arrested, didn't you?

20   A   I read a blog maybe a week, two weeks after he was arrested.

21   And also I didn't hear from him at all within the company.  So, I

22   didn't know what was going on.

23   Q   You saw a blog that said he had been arrested right?

24   A   Right.

25   Q   Didn't you think, "Oh, crap"?

Patel – Cross

```
 1   A     No.

 2   Q     Okay.  You had been involved with him with this illegal

 3   stuff.  You weren't worried about it?

 4   A     When I read the blog it talks about how he was laundering

 5   money.  That's what I thought he was arrested for.

 6   Q     Did you talk to Willy about it?  "Willy, what's going on?"

 7   A     No.  No, sir.

 8   Q     I want to just go back, because we had that situation where

 9   it was unclear if you were saying was or was not.  Let's be clear

10   about all that.  Each time you were saying that you knew that

11   H-Drol and M-Drol was an illegal, I-L-L-E-G-A-L, product?

12   A     That's correct.

13   Q     You say you were deceived about Bryan.  Nobody deceived you

14   about these products, did they?

15   A     No, they did not.

16   Q     Knew they were pro-hormones, and that's what they told you,

17   right?

18   A     Correct.

19   Q     What really happened was in '09 you got worried somebody

20   might find out about you making H-Drol and M-Drol, didn't you?

21   A     No, sir.

22   Q     That's why you got out of it, right?

23   A     No, I got out of it because there were statements being made

24   by the FDA that they didn't consider pro-hormones dietary

25   ingredients.
```

Patel – Cross

1    Q    Right.  So, you thought you might get caught?

2    A    It wasn't about getting caught.  The FDA had taken a

3    position, and we were going to take, follow the FDA's position.

4    Q    Okay.  And you admit you got Willy and Steve together to

5    commit illegal acts, right?  That's why you got them together?

6    A    I wasn't thinking about it like that at the time, but that

7    is what happened.

8    Q    Well, you were thinking about it at that time because you

9    indicated you got somebody that made anabolic steroids?

10   A    I was rationalizing it.  Steve Wood had told me these were

11   for out of country use.  I wasn't the manufacturer; Wood was the

12   brand holder, Wood had the raw materials.  Willy Ramos was the

13   one manufacturing the product, assembling it.  So, unfortunately

14   I rationalized in my head and said, "Oh, it's not me doing

15   illegal activity," but I realized that was wrong.

16   Q    And because of you setting them up, Steve Wood continued to

17   be a customer of yours, correct?

18   A    I don't think Steve Wood would have left, and quite frankly,

19   the reason I did set them up was to gain Steve Wood's loyalty.

20   That's what it came down to.  And it came down to money, the

21   company making money.

22   Q    And basically every dollar you got from Steve Wood after

23   that was, in part, because you, you helped him out, right?

24   A    No.  Steve Wood was, in December of 2010 Steve Wood was a

25   significant customer of ours, and this was prior to Willy or

Patel – Cross

```
 1   M-Drol or H-Drol.  Steve Wood had become a good customer.  He was

 2   making good profits for the company, and he seemed to be a pretty

 3   legitimate person, legitimate client.

 4   Q    Well, you knew he wasn't legitimate.

 5   A    I do now.

 6   Q    Well, you did then?

 7   A    I did not then.

 8   Q    Well, he comes to you in December of 2010 -- when you go

 9   through the e-mails he says, "Do you know anybody that makes

10   PHs?"  Pro-hormones.  You know those are illegal at that point?

11   A    Yes, sir.

12   Q    But you think he's legitimate?

13   A    The products that were legitimate that he was giving us were

14   legitimate products.  He was sending us several legitimate

15   products.

16   Q    You said Steve Wood was legitimate.  He wasn't legitimate,

17   was he?

18   A    He turned out not to be.

19   Q    You knew that in 2010, didn't you?

20   A    I didn't know that in 2010.

21   Q    If somebody comes to you and asks you to make illegal

22   products, doesn't that tell you they're illegitimate?

23   A    Steve Woods' reason was they were all for out of country.

24   Q    That doesn't matter, does it?

25   A    In my head at the time that did make a difference.  As I sit
```

Patel - Cross

```
 1   here today, he's not a legitimate person.  I will 100 percent

 2   agree with you on that.  But in 2010 when Steve Wood approached

 3   me, I thought he was Steve Wood, I thought Bryan was a separate

 4   person, I thought Competitive Edge Labs was a separate person,

 5   and M-Drol H-Drol were a separate person.

 6   Q    Thought M-Drol and H-Drol were a separate person?

 7   A    Belonging to a separate company.

 8   Q    M-Drol and H-Drol were all Competitive Edge the whole time,

 9   correct?

10   A    That's correct.

11   Q    Okay.  So, now you're getting cash through the mail.  Do you

12   think that's legitimate, a legitimate business practice?

13   A    No.  I, it was much unexpected.  I've never received cash in

14   the mail.

15   Q    It wasn't unexpected because they told you they were sending

16   the package, right?

17   A    He said he was sending a package.  He didn't say what was in

18   the package.

19   Q    Well, you knew what it was, right?

20   A    No.  He said I'm sending you a package, and the e-mail said

21   that inside there's a bottle, and just please don't throw it

22   away, look inside the bottle.

23   Q    Okay.  You got the bottle, right?

24   A    That's right.

25   Q    Were happy about the bottle, right?
```

Patel - Cross

```
 1   A      I was.  I was shocked.

 2   Q      You e-mail back to him, "Got the bottle.  Thank you.  Much

 3   appreciated."

 4   A      That's right.  Much appreciated, yes, sir.

 5   Q      Kept on dealing with him?

 6   A      In the legitimate products, yes.

 7   Q      And the illegitimate?

 8   A      I told him shortly after I didn't want to be involved.

 9   Q      You got another shipment four months later, three months

10   later of cash?

11   A      That's correct.

12   Q      So, all that time you knew it was illegitimate?

13   A      In February I told him I didn't want to be involved.  He

14   sends me the checks in April.  I didn't ask him to send them to

15   me.  He sent them to me.

16   Q      You didn't tear them up?

17   A      No.

18   Q      Didn't send them back, did you?

19   A      No, I didn't.

20   Q      Didn't ask him to quit making M-Drol and quit making H-Drol?

21   A      I didn't.

22   Q      You didn't tell him to stop, did you?

23   A      I didn't tell him to stop.

24   Q      You didn't tell him, "You're hurting people"?

25   A      I did not.
```

Patel – Cross

```
 1   Q     Did you care?

 2   A     To tell you the truth, it wasn't my business.

 3   Q     You didn't care if you hurt people, did you?

 4   A     I do care if he hurts people.

 5   Q     But it wasn't your business?

 6   A     What Steve Wood was doing with Willy Ramos I wanted to stay

 7   out of.  I did not want to be involved in it.

 8   Q     You wanted to stay out of it, but you're the one that set it

 9   up?

10   A     That's right.

11   Q     Now, you said when he sent that to you you didn't know that

12   he was going to be sending you cash.  That's not true, is it?

13   A     I did not.  All he said was he sent me a bottle.

14   Q     I want to show you what's been marked as Exhibit 13th.  And

15   it says Steve Wood, January 6th to you.  "I just want to make

16   sure it is fair to you, as well.  I don't really know how to put

17   a figure on that.  I will send you a package, and hopefully you

18   will find it fair."  What did you think the figure was going to

19   be other than money?

20   A     It could have been anything.  The way he said it it's a very

21   ambiguous message.  For all I know, it could have been a bottle

22   of whiskey.

23   Q     Now, to be clear, you didn't just set them up, did you?

24   A     I did not.

25   Q     You made everything go, didn't you?
```

Patel – Cross

```
 1  A    I got involved.
 2  Q    And you, this never would have happened without you, would
 3  it?
 4  A    It's possible it may have, but I was definitely the one that
 5  got them started.
 6  Q    They didn't know each other?
 7  A    They did not.
 8  Q    And, again, I hesitate to go through all the e-mails, but
 9  you got into the weeds big time, right?
10  A    I'm sorry?
11  Q    You got into the weeds big time; you got into the details of
12  the manufacturing?
13  A    I did.
14  Q    Because you knew how to do it, right?
15  A    Steve Wood had asked me, "Can you oversee it" --
16  Q    Excuse me?
17  A    Steve Wood had asked me to oversee it.
18  Q    Right.  And you had done it before, so you knew how to make
19  it?
20  A    Correct.  I was in manufacturing.
21  Q    Now, you got an invoice from Sitesh -- actually, you sent
22  the invoice to Steve Wood.  You remember the invoice you got from
23  Human Tech?
24  A    I do.
25  Q    How come there were no more invoices?
```

Patel – Cross

1    A    I don't know.

2    Q    Did you want any more invoices?

3    A    No.

4    Q    Okay.  Was this a typical thing for you to, like, get powder

5    shipped from China to you, have it sent to your house, go to the

6    mall, meet somebody?

7    A    No, absolutely not.

8    Q    Did you ever do it with anybody else?

9    A    I did not.

10   Q    Anything like that?

11   A    No, sir.

12   Q    Have products shipped to your house?

13   A    No, sir.

14   Q    Why not?

15   A    At the time when I got involved with Steve Wood I

16   rationalized in my head, I made myself think it was okay, and I

17   quickly figured out it was not.

18   Q    All right.

19            MR. RAMSEYER:  Your Honor, could we possibly have a

20   break at this time?

21            THE COURT:  Yes, sir.  Ladies and gentlemen, if you'll

22   follow the bailiff out, we'll take a break.

23       (The jury retired to the jury room, after which the

24   following occurred:)

25            THE COURT:  All right.  Yes, sir?

Patel - Cross

1           MR. HALL:  I was going to ask if Mr. Patel could step

2  down.

3           THE COURT:  All right.  We'll be in recess.

4        (Recess from 4:10 p.m. to 4:28 p.m.)

5           THE COURT:  Are we ready for the jury, Mr. Ramseyer?

6           MR. RAMSEYER:  Yes, Your Honor.

7           THE COURT:  All right.  We'll have the jury in.

8        (The jury entered the courtroom, and was seated in the

9  jury box.)

10 BY MR. RAMSEYER:

11 Q    Mr. Patel, are you a truthful person?

12 A    Yes, sir.

13 Q    Are you familiar with certificates of authenticity?

14 A    Certificates of authenticity?  Yes, sir.

15 Q    What are those?

16 A    They are certificates that basically state what the

17 manufacturer's specifications are, and what their lab results may

18 be.

19 Q    What the what?

20 A    What the lab results may be.

21 Q    What the lab results may be?

22 A    Right.

23 Q    When a product is shipped it's supposed to go with it,

24 right?

25 A    Correct.

Patel – Cross

1   Q     When you buy a product from somewhere you get a certificate

2   of authenticity that says what that product is, correct?

3   A     A certificate of analysis.

4   Q     Certificate of analysis?

5   A     Yes.

6   Q     Says what that product is, correct?

7   A     Correct.

8   Q     And those are important, right?

9   A     They are.

10  Q     Because you want to know what it is that you're putting into

11  these substances that you're making for people?

12  A     Correct.

13  Q     All right.  Have you ever altered any of those?

14  A     I have.

15  Q     You've altered certificates of analysis?

16  A     Yes, sir.

17  Q     Why did you alter them?

18  A     There may have been times in the past I just made a mistake,

19  and I changed something in the certificate of analysis.

20  Q     Wait a minute.  You don't do the certificate of analysis, do

21  you?

22  A     I do not.

23  Q     They come from the, where you bought it from?

24  A     Right.  That's correct.

25  Q     How can you change their certificate of analysis?

Patel – Cross

```
 1   A    I don't remember.

 2   Q    Explain that.

 3   A    I'm sorry?

 4   Q    Explain that.  You, you get a shipment of a product from

 5   someplace else, they give a certificate of analysis that says

 6   what it is, and you're saying you're changing it?

 7   A    I'm sorry, there are two sets of certificates of analysis.

 8   There's a certificate of analysis for raw materials, and there's

 9   a certificate of analysis of a finished good.

10   Q    And I'm talking about certificate of analysis for the

11   shipped raw materials.

12   A    For a certificate of analysis of raw materials.

13   Q    You're not supposed to change those, are you?

14   A    No, sir.

15   Q    You've done that, haven't you?

16   A    I 8on't remember.

17   Q    You don't remember?

18   A    No.

19   Q    Why would you have ever changed one?  What would be a

20   legitimate reason to change a certificate of analysis for a raw

21   powder?

22   A    I don't know, sir.

23   Q    There is no legitimate reason, is there?

24   A    No, sometimes you get a certificate of analysis, and we've

25   had this multiple times in the past, where there's spec errors,
```

Patel - Cross

1   there's language translation problems, and if that happens then

2   usually we send it back to the supplier and they'll fix it.

3   Q    Have you ever asked to have a COA doctored?

4   A    I have said that before.

5   Q    Yes.  That's sort of fraud, isn't it?

6   A    It's difficult to say.  I don't think it's fraud.  If, if

7   there's a C of A, and I'm saying it jokingly, it's meant in a

8   joking manner.

9   Q    Okay.

10        MR. RAMSEYER:  If I may approach the witness, Your

11   Honor?

12        THE COURT:  Let me, before you do that, I got a note,

13   Ms. Sykes, you have a doctor's appointment?

14        JUROR SYKES:  Hair appointment.

15        THE COURT:  Here's the only thing.  We want to

16   inconvenience you as little as possible.  On the other hand, we

17   want to get this case finished, and it would be nice, I think

18   we're coming to the end so that we hopefully can get this

19   finished by tomorrow, and I know Mr. Ramseyer has a few more

20   questions, and there may be a few more questions, would it be a

21   problem for us to stay, or would you lose your appointment?

22        JUROR SYKES:  If I could get out of here by 5:00.

23   I'll be a little bit late.

24        THE COURT:  Thanks a lot.  Let's do that.  Hopefully

25   that won't inconvenience you.

Patel - Cross

```
 1                 MR. RAMSEYER:  Thank you, Your Honor.

 2     BY MR. RAMSEYER:

 3     Q    I'm showing you an e-mail, and ask you if you are familiar

 4     with that e-mail?

 5     A    Yes, sir.

 6                 MR. RAMSEYER:  I'd have ask to have this marked as

 7     Government's Exhibit -- first I'd like to move for admission of

 8     Government's Exhibits 51 and 52 which were the two e-mails that

 9     were already introduced in D4, but D4 is a CD.  These are just

10     print outs.

11                 MR. HALL:  Your Honor, may I see this e-mail?  I don't

12     think I've seen this e-mail.

13                 THE COURT:  The two exhibits will be admitted and you

14     can show that to counsel.

15         (Government's Exhibit Nos. 51 and 52 were received in

16     evidence.)

17                 MR. HALL:  Can we address something outside the

18     presence of the jury?

19                 THE COURT:  Ladies and gentlemen of the jury, if you'd

20     follow the bailiff out, please.

21         (The jury retired to the jury room, after which the

22     following occurred:)

23                 THE COURT:  All right, Mr. Hall.

24                 MR. HALL:  Your Honor, this is a document that has not

25     been produced --
```

Patel - Cross

1          MR. RAMSEYER:  Your Honor, I'd ask maybe -- oh, I guess

2    the witness can't be excluded.  Never mind.

3          THE COURT:  Go ahead.  It's a document that's not been

4    produced?

5          MR. HALL:  It's not been provided in discovery.  This

6    relates to an e-mail between Mr. Patel and Jacob Geissler

7    regarding Acacia Rigdula, it's at the bottom of it, it appears to

8    be John Doyle to Sitesh Patel, and then there's a quote at the

9    bottom.

10          MR. RAMSEYER:  What's the objection?

11          MR. HALL:  First of all my objection is I haven't seen

12   it; and secondly, it appears to be irrelevant in dealing with use

13   outside the scope of this.  I also have some concerns about

14   whether this is an accurate copy of the e-mail because of the way

15   in the middle of it it says "from our lawyers" in a different

16   font, in a different color ink, and I've got --

17          THE COURT:  In terms of authenticity, you know, the

18   witness is here, is presumably going to opine as to that.  We

19   haven't heard from him yet.

20          MR. RAMSEYER:  Actually, I think he did say he

21   recognized it, Your Honor.

22          THE COURT:  Did you show it to him?  I'm sorry.

23          MR. RAMSEYER:  Yes.

24          MR. HALL:  I did not hear that.  My objection is this

25   relates to things far beyond the scope of this trial.

Patel - Cross

```
 1              THE COURT:  Let me see it.  Mr. Ramseyer, what about

 2    the production of this?

 3              MR. RAMSEYER:  Your Honor, it's impeachment evidence.

 4    He's put his credibility at issue before the jury, and this is

 5    fraudulent conduct.

 6              MR. HALL:  It's the defendant's statement, Your Honor,

 7    and it hasn't been produced.  Secondly, I mean, co-counsel

 8    reminds me we haven't called character witnesses.  He's the one

 9    that asked him if he's an honest person.

10              THE COURT:  Well, he did testify on direct examination

11    how he wants to do things right, and this was just a bad mistake,

12    and so on.

13              MR. HALL:  But I believe the date of that is, I don't

14    have it in front of me, but --

15              THE COURT:  It's in July of 2009.

16              MR. HALL:  So, I mean, I think he has conceded that in

17    '08 and '09 he wasn't doing things right, so this is back in '08

18    and '09.

19              THE COURT:  I don't think he's conceded in 2008 and

20    2009 he wasn't doing things right.  He said from what he knows

21    now, but back then he --

22              MR. HALL:  I believe on direct he did say that.  I

23    think the questions that, back in that time is how Mr. Ramseyer

24    asked the questions, and it's not even clear what time he's

25    referring to.  And so what he testified to on direct is that when
```

Patel - Cross

1    he started in 2008, but by the time, end of 2008 into 2009 he

2    knew it was not, and he did not want to be involved.

3           THE COURT:  Well, I'm going to overrule the objection.

4    I think this is impeachment testimony, and I think there's been,

5    while the character of the defendant has not been directly placed

6    into evidence by the defendant, the, the testimony of the

7    defendant is certain, has certainly been to the effect that he

8    attempts to do things right, and this was, any wrong doing was

9    simply a bad choice at the time which he much regrets, and I

10   believe it's --

11          MR. HALL:  I believe, and I'm certain on this, this

12   e-mail that you're talking about pre-dates what he's talking

13   about doing in 2010 and 2011, and so when he's saying I regret

14   being involved in this, and I made a decision to get out of it,

15   what he did in 2009 isn't relevant to prove what he did in 2011,

16   that it contradicts his testimony in that respect.  And Your

17   Honor, it's so prejudicial I'd ask Your Honor to consider under

18   403 excluding it, do the balancing test on this.  It opens up

19   other issues.  It's simply not relevant.  It's taken out of

20   context.  And there is, I mean there's, there's thousands and

21   thousands of e-mails.  This, obviously, relates to the other case

22   in Texas.  They gave us no notice of this.  We asked for notice

23   under 12(b) previously.  They said they didn't have any of that

24   information, and that obviously wasn't true.  They do have some

25   of that information, they do have that e-mail, and we would have

Patel - Cross

 1  brought a motion previously.  And so it's a defendant's

 2  statement, they didn't produce it to us, it's not simply

 3  impeachment, it's derived from a search of S.K. Laboratories in

 4  2013, and it's not evidence, they didn't give us that information

 5  in this case, and so it's improper for them to now, to deny that

 6  that was an issue or that they had it, and now come forward and

 7  use specific e-mails from it.  I believe that's improper, Your

 8  Honor.

 9          THE COURT:  All right.  Mr. Ramseyer?

10          MR. RAMSEYER:  One, it's not the case-in-chief.  We're

11  not putting this on as evidence in the case.  It's to impeach the

12  witness, to show he's not being truthful, and to show that, you

13  know, he wanted to give the jury the impression that this was a

14  one time bad mistake he made, and he's a truthful person, and

15  this is evidence of him altering documents, falsifying documents,

16  and we think it's relevant.  I don't recall if they asked for

17  records from Texas, or not.  But again, it's not part, it wasn't

18  part of the, part of the Government's case-in-chief.  I'll tell

19  the court when the defense said they were going to call him as a

20  witness, I asked if there might be any documents for when he

21  testified, and they provided these to me.

22          THE COURT:  They?

23          MR. RAMSEYER:  They being the prosecutors in that case.

24          MR. HALL:  I filed, specifically, a notice, 12(b)

25  asking for the Government's intent to use anything specifically

Patel – Cross

1   derived from the search of S.K. Laboratories in 2013.  The

2   response was we don't have any of that evidence.  They get it

3   after the fact, they circumvent the hearing date, and they get it

4   after the fact, and now they're intending to use it.  The e-mail,

5   itself, is simply extrinsic evidence.  If he wants to cross

6   examine him on it, he can ask him about it, but this clearly

7   constitutes extrinsic evidence.  So, if I can't cross examine

8   Mr. Wood, or present that the Noopept was unlawful through Agent

9   Royster, or the Picamilon was unlawful through Mr. Royster, it

10  seems to me that same rule should apply using external e-mails

11  after they arrived trying to impeach Mr. Patel.

12          THE COURT:  Mr. Ramseyer, I'm going to exclude it.  I

13  do think it, I think it, it, on balance, I think it's unduly

14  prejudicial in regard to, to other events, and while I agree with

15  you that the defendant has, to some extent -- well, the

16  defendant's credibility is certainly at issue in this case, a

17  specific fraudulent act is, is, is not, is more character

18  evidence than simply impeachment and, you know, I trust that

19  defense counsel is not going to argue to the jury that Mr. Patel

20  is, is a person who is free of any fault.

21          MR. HALL:  To the contrary, Your Honor.  I think he's

22  testified to his faults.  Our issues are withdrawal from this

23  conspiracy.

24          MR. RAMSEYER:  Your Honor, I understand the court is

25  not going to allow me to use the e-mail.  Am I allowed to ask him

Patel - Cross

1    questions about falsifying documents?

2            THE COURT:  Yes, sir.

3            MR. RAMSEYER:  All right.

4            MR. HALL:  Is that falsifying documents in that other

5    case?  That's opening up that same --

6            THE COURT:  I thought you just said, you said, you

7    agreed that he could ask him about it.

8            MR. HALL:  He's already asked the questions about it,

9    about doctoring the COA to introduce the, the e-mail's extrinsic

10   evidence about it, but to talk to him about fraud in other

11   instances, especially since we're talking about conduct that

12   pre-dates this --

13           THE COURT:  I thought the witness already stated that

14   anything he said like that was a joke, was kidding around.

15           MR. HALL:  I think he did say that with respect to this

16   particular e-mail.

17           MR. RAMSEYER:  I think it was before he saw the e-mail,

18   actually.

19           THE COURT:  Yes, that's right.  Well, I don't know what

20   Mr. Ramseyer is going to ask him.

21           MR. HALL:  May we have a proffer, then, Your Honor,

22   outside the presence of the jury?

23           MR. RAMSEYER:  I'm going to ask him if he's just had

24   people, if he's doctored certificates of authenticity to make

25   them reveal something different than what they were, if he's

Patel − Cross

```
 1    faked them, he's altered them.  To me that goes, that's being

 2    untruthful.  That's the essence of it.  I mean, there's plenty of

 3    cases that talk about somebody takes the stand, they put into

 4    issue their truthfulness, and this goes to his truthfulness, he's

 5    falsifying documents to hide things from the FDA.  That's the

 6    epitome of untruthfulness.

 7              THE COURT:  I'll allow you to ask him that question.

 8    All right.  We'll have the jury back in.  We're going to adjourn

 9    at 5:00, allow the jury to go at 5:00. I'm sorry.

10        (The jury entered the courtroom and was seated in the jury

11    box.)

12              THE COURT:  All right.  You may proceed.

13    BY MR. RAMSEYER:

14    Q    Mr. Patel, we were talking about certificates of analysis,

15    and is it important that they be accurate?

16    A    They are.

17    Q    And did they come from the manufacturer, the person that

18    makes the raw powder, right?

19    A    That's right.

20    Q    That's to show that whatever is in the finished product is

21    what the manufacturer says it is, right?

22    A    That's correct.

23    Q    Also so whoever sells the product is accurately telling the

24    consumer what it is, correct?

25    A    No, the raw materials certificate of analysis stops at the
```

Patel – Cross

1    manufacturer.

2    Q     Okay.  Now, have you altered certificates of analysis that

3    came from manufacturers?

4    A     I don't remember altering any certificate of analysis.  I've

5    said the word, doctored certificate of analysis, and it was in a

6    very jokingly manner.

7    Q     You said you were going to doctor certificates of analysis,

8    but it was a joke?

9    A     I didn't say I was going to doctor certificates of analysis.

10   Q     I thought that's what you just said.

11   A     I said doctor certificates of analysis in a joking manner.

12   Q     You say doctor COAs?

13   A     I've said in the past doctor C of A, and yeah, I've said

14   that, but I said it in a very jokingly manner.

15   Q     What's funny about that?

16   A     Back in 2008/2009, GMPs started for most companies in 2010.

17   In 2008/2009 it was very common for a certificate of analysis to

18   come in with the raw material and be completely off, be missing

19   information.  Lots of time it was in Chinese.  We got

20   certificates of analysis once where it was actually handwritten.

21   So when I said that it was meant more so in a jokingly manner.

22   Q     So, it was just a joke?

23   A     That's correct.

24   Q     That you were going to alter a COA?

25   A     I didn't say I was going to alter.

Patel – Cross

```
 1   Q     You did alter COAs?

 2   A     No, I said China would alter the COA.

 3   Q     Told other people you could get China to alter the COA for

 4   them?

 5   A     If there's a mistake or a correction.

 6   Q     That's what you meant, if there was a mistake?

 7   A     When I said doctor certificate of analysis, I meant it very

 8   jokingly.

 9   Q     Did you ever have a COA sent to you as a Word document so

10   you could alter it?

11   A     I don't remember.

12         MR. RAMSEYER:  May I approach the witness just to

13   refresh his memory, Your Honor?

14         MR. HALL:  I would object.  This is, this is other

15   people in this e-mail, and without showing the e-mail it's hard

16   to articulate.

17         MR. RAMSEYER:  Your Honor, it's him on the e-mail.

18         THE COURT:  Beg your pardon?

19         MR. RAMSEYER:  It's him on the e-mail.

20         MR. HALL:  Objection to that, Your Honor.  Also, it's

21   not on the portion that --

22         THE COURT:  Wait a minute, counsel.  Ladies and

23   gentlemen, I'm going to let you go now.  It's nearly 5:00.  It

24   will be necessary for you to return tomorrow.  If you could be

25   here promptly at 9:00.  And remember my instructions to you about
```

Patel - Cross

1   not discussing the case, permitting anyone to discuss it with

2   you.  Don't do any research on the case, any books or internet,

3   or anything like that.  And if you'll follow the bailiff out, you

4   can leave your notebooks in the jury room.

5        (The jury retired to the jury room, after which the

6   following occurred:)

7             MR. HALL:  Your Honor, my difficulty is this.  That we

8   litigated a motion in front of Judge, Magistrate Judge --

9             THE COURT:  If you wouldn't mind coming to the lectern.

10            MR. HALL:  We litigated a motion in front of the

11  magistrate judge asking if they had any documents from the hard

12  drive that was seized from S.K. Laboratories.  And he said he

13  didn't have it.  All right?  And this is clearly derived from

14  that hard drive.  And so he has misrepresented to us what he has.

15  We have not had an opportunity to prepare e-mails in response to

16  this because we didn't know that he had this, and this particular

17  e-mail is a statement saying, "Can you convert this COA to a Word

18  document or editable form so Sitesh can edit?"  And it appears to

19  be Jacob saying that to Matt.  Sitesh is CCed on the e-mail, but

20  the editable -- that's a hard word for me to even say -- it looks

21  like these are words of other people, and they are trying to

22  impeach him with the words of other people, and I just believe

23  it's improper for multiple reasons.  It's, one, that he has

24  misrepresented to us what he had; two these are the words of

25  other persons talking about editing a document from Word; and

Patel - Cross

```
 1   it's, you know, these purport, there's no statement here -- well,
 2   there is a statement here from Sitesh Patel, all right, and it's
 3   not given to us.  So, how can he not give us these defendant
 4   statements?
 5            THE COURT:  Well, just to make sure the record is
 6   clear, when you talk about the, the request you made, if the
 7   prosecutor here in this case had the documents seized -- you're
 8   talking about the seizure in the case in which the defendant is
 9   involved in in the Northern District of Texas?
10            MR. HALL:  That's correct, Your Honor.  There was a
11   search warrant executed in November of 2013.  The point of the
12   motion, and unfortunately I think it's back in my hotel room, but
13   the point of the motion was specifically whether we needed to
14   address a motion to suppress with respect to that, and
15   Mr. Ramseyer represented that he didn't have it.  And so we
16   didn't address the issue of trying to bring a motion to suppress
17   with respect to that, because they don't have it, there's nothing
18   to suppress.  But it's clear now that they do have it, and
19   they're picking e-mails out of that that they're trying to use in
20   this case to attack his credibility.  And in front of the jury to
21   be -- I think that he can cross examine him regarding these
22   things, if he wants to cross examine about truth and honesty, but
23   I don't think that we can necessarily put that issue in, we
24   haven't put his character in, and this is just identical to the
25   other situation --
```

Patel - Cross

```
 1          THE COURT:  Let me back up.  I've been sort of thinking
 2  about this as we go along.  It seems to me that Mr. Ramseyer can
 3  cross examine the defendant who has voluntarily taken the stand
 4  about past incidents that cast doubt on his credibility.  And I
 5  assume you agree with that.  But he has to accept the witness's
 6  answer.  In other words, extrinsic evidence about it unless,
 7  again, character is pulled into the case by the defendant.
 8          MR. HALL:  But if it's --
 9          THE COURT:  Is that not correct?
10          MR. HALL:  With this caveat, I believe, Your Honor.
11  That if it's past instances of misconduct that they're attempting
12  to cross examine him regarding --
13          THE COURT:  Past instances of untruthfulness, of
14  incidents that reflect on his, his ability or likelihood to tell
15  the truth -- I mean, not that he's robbed a bank, or something --
16          MR. HALL:  Right.
17          THE COURT:  So, Mr. Ramseyer, if that's true, isn't,
18  then you can ask him about it, and I earlier said you could
19  question him about these things, and you have, but --
20          MR. RAMSEYER:  I didn't move to admit it.  I was asking
21  if I could use this to refresh his memory.  I think I'm allowed
22  to refresh his memory.  Any witness, you can show them to refresh
23  their memory.
24          MR. HALL:  I don't, I, I'm not certain he said he
25  didn't remember.  He asked to approach him.  He asked to lay a
```

Patel - Cross

 1    foundation -- I don't remember, but I think Mr. Ramseyer was

 2    trying to get this up there and wave it around in front of the

 3    jury, to give them, wave it in front of the jury --

 4         THE COURT:  Let's be fully professional.  We're

 5    advocates fighting hard on both sides, and I'm just trying to

 6    find the correct legal decision here.

 7         MR. RAMSEYER:  I just want to be sure the record is

 8    clear.  We did not have materials from the hard drive in the case

 9    other than we subpoenaed defense counsel to get the e-mails that

10    were produced as A4.  It's my understandings those actually came

11    from the hard drive.  They got a copy back from the search, so

12    they provided that to us.  So, they presumably have the hard

13    drive themselves.

14         MR. HALL:  I think we went through the same confusion,

15    Your Honor.  We did not provide them that hard drive.  What we

16    provided them --

17         MR. RAMSEYER:  No, I'm, let me get it clear.  I'm not

18    trying to create a problem here.  During the search computers

19    were taken, or at least images of computers were taken at S.K.

20    Labs.  From that the Government extracted certain things that

21    were called for in the search warrant, whatever they got, and

22    then they provided to defense counsel hard drives, is my

23    understanding, of what was taken.  And then we subpoenaed defense

24    counsel for S.K. Labs to give us the records that were produced

25    in A4 that we think that they got off of those hard drives.  So,

Patel - Cross

1    that's kind of the chronology.  We did not get any other records

2    from those hard drives that we subpoenaed from them.  Now, after

3    they indicated Mr. Patel was going to testify, after we had

4    finished, now it's going to be for, to impeach the witness, I did

5    contact the prosecutor and asked if there was material that would

6    be helpful for cross examination, just so that is clear.  We did

7    not use this in our case-in-chief.

8         MR. HALL:  But then that made their response back when

9    we filed the motion asking for notice, that made that response

10   false.  They got it after the fact.  Don't they have a duty now

11   to tell us that that position has changed, and that the position

12   that we were taking at the time the motion was brought and ruled

13   on has changed?  And they haven't.  That's part of my difficulty.

14   I don't mean to be unprofessional, Your Honor, but my difficulty

15   is I'm very frustrated that we specifically thought we asked this

16   question, addressed this issue in advance of trial, and we got an

17   answer and, and now it's changed.

18        THE COURT:  Well, as Mr. Ramseyer indicates, there's

19   always, who knew whether your client was going to testify, and

20   whether impeaching material might be relevant, and again, as Mr.

21   Ramseyer indicates, and I accept his representation that he

22   didn't have this material until, until that became clear.  And

23   again, it is collateral material, it's not relevant to the case

24   here.  But, you know, when you put your client on the stand you

25   get the good with the bad in terms of impeaching materials.

Patel - Cross

```
 1              MR. HALL:  We recognize that.  But these e-mails are

 2    not admissible, and I object to him, you know -- he certainly can

 3    cross examine regarding material, but to suggest that there's

 4    documents that corroborate or ask to refresh the recollection of

 5    a witness who hasn't said he has a bad recollection of it,

 6    because my recollection --

 7              THE COURT:  I agree with you on all those points.

 8              MR. HALL:  So, I would ask that he be admonished not to

 9    hold up these e-mails, not to put them on the monitor.  He can

10    ask his questions, but I don't believe he can use this

11    demonstrative evidence in front of the jury.

12              THE COURT:  I'm going to rule, Mr. Ramseyer, that you

13    can ask him questions about these things, but not attempt to

14    introduce or show the documents.

15              MR. RAMSEYER:  Yes, Your Honor.

16              MR. HALL:  May we have copies of these documents at

17    this time, Your Honor, that purport to be defendant's statements?

18              THE COURT:  Well, you mean, what he's going to ask him

19    in impeaching testimony so you can --

20              MR. HALL:  If he's going to ask about e-mails --

21              THE COURT:  He's not going to ask him about e-mails.

22    That's what we've gotten into.  So, there's nothing to show him.

23    Nothing for them to show you.

24              MR. HALL:  Thank you.

25              THE COURT:  So, Mr. Patel, you may have a seat back at
```

Patel - Cross

1    counsel table.  I'm sorry.  So, when the jury returns tomorrow

2    we'll continue with Mr. Patel.  Mr. Hall, do you anticipate any

3    further witnesses or evidence?

4         MR. HALL:  We have a stipulation, Your Honor, and we

5    have given a *curriculum vitae* to Mr. Ramseyer of an expert that

6    would, a proffer would be that she would testify that Noopept,

7    the ingredient on Noopept is not a dietary ingredient and that is

8    not a lawful product.  I would anticipate her testimony would

9    take about a half hour at most, but that's who we would call.

10        MR. RAMSEYER:  Your Honor, the reason we object to the

11   admission of those tablets is it's extrinsic evidence of bad

12   conduct by a witness which we don't think that's allowable.

13   That's the same thing he's going to try to do now.  He's going to

14   call an expert witness and say one of those tablets is something,

15   just to impeach a witness.  We don't think it's permissible.

16        MR. HALL:  The distinction is Mr. Wood put his

17   character in issue, he said he was law abiding for the past five

18   years, and that was a false statement.  These are not proper

19   dietary ingredients and this person can testify to that.

20        MR. RAMSEYER:  He asked him if he was a law abiding

21   citizen.  If he can ask that can I ask Mr. Patel if he's been a

22   law abiding citizen for the last ten years, and when he says yes,

23   show him these e-mails and show he's committing fraud?

24        THE COURT:  I think there's a difference with the

25   defendant because of the danger of the, of the jury relying on,

Patel - Cross

1  on other bad acts to convict the defendant of a crime that he's

2  not charged with in the case.

3          MR. RAMSEYER:  Your Honor, if I may, it's not fair to

4  say he put his character at issue because he answered the

5  question the defense counsel asked him.  That would be true in

6  every case.

7          THE COURT:  Yeah, what about that?  Why isn't this

8  impeachment?  The character aspect of this doesn't apply to

9  witnesses.  What's, what's the, what's the theory of the showing

10 of this contradiction?

11         MR. HALL:  I believe the Government put Mr. Wood's

12 character in issue.  They put in his plea agreement, they asked

13 him about testifying truthfully, they did all of that on direct.

14 I didn't ask him, Mr. Patel, any questions --

15         THE COURT:  Well, I know, but the character of a

16 witness is not, you know, is not relevant.  You can impeach a

17 witness by trying to contradict his testimony, or showing --

18         MR. HALL:  I think that's what we're trying to do, Your

19 Honor.  But there's a secondary point to this, and the secondary

20 point is that it appears that there was a letter to, from the FDA

21 addressed to, you know, Mr. Wood, that was pending, and was being

22 held at the time of the phases of his cooperation, and so one of

23 the benefits that he apparently indirectly received by

24 cooperating with the Government in this case is that he did not

25 get a warning letter from, for Serious Nutrition Solutions

Patel – Cross

```
 1   regarding this Picamilon product, and it's something we didn't
 2   know about the existence of the letter at the time we
 3   cross-examined Mr. Wood, we weren't properly -- well, we didn't
 4   know about it.  So, we didn't ask questions about the existence
 5   of these letters out there, but it's now been provided to us.
 6   And so the significance of this expert's testimony is she can
 7   also talk about that Picamilon and the warning letters that were
 8   out in existence at the time regarding the products that Mr. Wood
 9   was manufacturing, and it's something we didn't cross examine him
10   on because we didn't have the information at the time.  And I'm
11   not faulting the Government for it, because I don't think they
12   knew we were going this direction, but since then they now have
13   given us evidence that a letter was, was being sent to Steve Wood
14   by Food and Drug Administration, a warning letter talking about
15   this particular product.  So, we weren't in a position to cross
16   examine regarding that at the time.
17          THE COURT:  Well, I'm going to think about this.  It
18   does seem to me we're getting a little far afield in bringing in
19   an expert to testify about the testimony of a witness, but in any
20   event, I'm not making a ruling on that now.  I want to think
21   about that.
22       Has counsel had an opportunity to review the jury
23   instructions?  Can we make progress in that regard?
24          MR. HALL:  We have, Your Honor.  We have one requested
25   amendment and that would be to instruction number 16.  This is
```

Patel - Cross

1  almost verbatim what I had filed with the court.  Sixteen is

2  withdrawal from the conspiracy.  What I neglected to add was the

3  effect of that on counts three, four and five of the indictment.

4  So, I think as they are written, that it's confusing to the jury

5  if he withdrew, and what they do with respect to the mail fraud

6  counts that are all after that.  So, if it's true that he has

7  withdrawn, we would simply ask in the very first paragraph of

8  instruction 16 the second sentence should be modified to say if

9  you find that the defendant, Mr. Patel, has proved that he

10  withdrew from the conspiracy as charged in the indictment prior

11  to July 26, 2011, then you must find him not guilty of counts

12  one, two, three, four and five.

13        MR. RAMSEYER:  We object, Your Honor, because counts

14  three, four and five are not conspiracy counts.  So, one of the

15  theories of the Government's case is the *Pinkerton* liability, and

16  as to that that would be correct, and that's what the court's

17  charge says, but as to counts three, four and five, actually

18  that's one objection we have to the instruction as to three, four

19  and five, we believe it should include that he aided and abetted

20  or caused the fraud to take place, and the jury could find that

21  he wasn't in the conspiracy, but they could find that he aided

22  and abetted and caused counts three, four and five to occur.

23        MR. HALL:  Your Honor, they have not alleged, they

24  haven't, they have not, they have not alleged Section Two; it's

25  simply Section 1341.

Patel – Cross

```
 1            THE COURT:  Well, in regard to your first objection,
 2   Mr. Hall, instruction 20 contains the language that you
 3   requested.  You look at the last paragraph in instruction 20.
 4            MR. HALL:  I recognize that, Your Honor.  I'm simply, I
 5   think it may be confusing, it's in two different places, and it
 6   appears to be --
 7            THE COURT:  I mean, is all, is what you're saying is
 8   you want something like that in the, in the earlier conspiracy
 9   withdrawal?
10            MR. HALL:  Right.  I simply would want the reference to
11   counts three, four and five there as well, simply so that when
12   they read instruction 16 and they're not confused about three,
13   four and five, and what it means to withdraw from a conspiracy.
14            THE COURT:  Well, but instruction 20 talks about, as I
15   understand the Government agrees -- well, maybe not.  I thought
16   the Government's theory was purely that *Pinkerton* doctrine as to
17   the defendant's guilt as to three, four and five.
18            MR. RAMSEYER:  It's not, Your Honor.  We think, I mean,
19   there's been sufficient evidence that the jury could find that he
20   aided and abetted or caused these events to happen by the actions
21   he took.  We would ask that the *Pinkerton* instruction be revised,
22   that last paragraph would say you can't find him guilty under
23   that theory, the conspirator liability theory if you find that he
24   has withdrawn.  But we do think, and there's no requirement that
25   we charge him under U.S. Code Section Two to get the aid and abet
```

Patel – Cross

1    and cause.  That's in every case.  So, we would ask that the mail

2    fraud instruction include cause, aid and abet, and the *Pinkerton*

3    instruction indicate that, that they can't use the *Pinkerton*

4    liability to find him guilty of three, four and five if they find

5    that he withdrew from the conspiracy prior to July 26th.

6             THE COURT:  All right.  Any other issues?

7             MR. KOWALCZUK:  Judge, just one issue.  I haven't

8    gotten to talk in court for a while, Judge, so I thought it would

9    be a good time to.  Your Honor, the court had mentioned earlier

10   during one of our discussions outside the presence of the jury

11   that it was the court's intention to send a copy of the

12   indictment back with the jury.

13            THE COURT:  Right.

14            MR. KOWALCZUK:  We would respectfully object to that,

15   Your Honor.  The indictment, first several pages of the

16   indictment, indeed the first four pages of the indictment is

17   essentially a running narrative of the Government's theory of the

18   case.

19            THE COURT:  What if we just sent the counts?

20            MR. KOWALCZUK:  Judge, that would certainly be

21   preferable.  The introduction is what's most objectionable.  So,

22   that would, I think that would probably be good.  I don't know

23   they need the notice of forfeiture, either.  I don't think that

24   has anything to do with anything.  If the court is willing to do

25   that, that would be fine, Your Honor.

Patel – Cross

```
 1              THE COURT:  What about that, Mr. Ramseyer?

 2              MR. RAMSEYER:  Your Honor, that's obviously totally at

 3    the court's discretion.

 4              THE COURT:  Well, I mean, the introduction does contain

 5    a lot of evidence, some of which is, I'm not sure that all of it

 6    has been introduced.  It seems to me that the jury does need to

 7    see the counts, frankly, and so what I intend to do is to send a

 8    portion of the indictment that contains the substantive counts,

 9    and, and, and I'll leave off the forfeiture at the request of the

10    defendant.  Anything else?  I'm going to think about these

11    instruction questions, and we can talk about that tomorrow.

12              MR. KOWALCZUK:  Your Honor, I'm sorry, there is one

13    other issue on instructions.  I don't know if this was an

14    oversight.  It may be I just don't get it.  The instruction

15    dealing with --

16              THE COURT:  Do you have a number?

17              MR. KOWALCZUK:  I'm trying to find it, Judge.  It has

18    to do with, I think it's instruction 20 -- excuse me --

19    instruction number 17.  It says counts three, four and five

20    charge that on each specified occasion, and I don't know if we

21    want to put the specified occasions in there?  I guess the jury

22    could reference the indictment, but I just point that out to the

23    court.  Thank you, Your Honor.

24              THE COURT:  All right.  Well, if there's nothing else,

25    we're going to adjourn.  I hope we can finish tomorrow.
```

Patel – Cross

```
 1            MR. HALL:  I believe so.

 2            THE COURT:  But that will require moving along, seems

 3    to me.  But if there's nothing else, we'll stand in adjournment.

 4        (Proceedings concluded at 5:23 p.m.)

 5

 6                            CERTIFICATE

 7

 8            I certify the foregoing is an accurate transcript

 9    from the record of proceedings in the above-entitled

10    matter.

11

12

13    3/23/17                  /s/ Bridget A. Dickert
      Date                     U.S. Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```