```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                     WESTERN DISTRICT OF VIRGINIA
 2                       Abingdon Division

 3    --------------------------x
                                :
 4    UNITED STATES OF AMERICA, :
                                :
 5         Plaintiff,           :
                                :
 6    v.                        :   1:16CR34
                                :
 7    SITESH BANSI PATEL,       :
                                :
 8         Defendant.           :   Abingdon, Virginia
                                :   March 10, 2017
 9    --------------------------x   9:02 a.m.

10              JURY TRIAL - TESTIMONY OF SITESH PATEL
                 BEFORE THE HONORABLE JAMES P. JONES
11             UNITED STATES DISTRICT JUDGE, and a jury

12    APPEARANCES:

13         S. RANDALL RAMSEYER, Esquire
           Assistant U.S. Attorney
14         P.O. Box 1098
           Abingdon, Virginia 24212
15             For the United States of America.

16         PATRICK Q. HALL, Esquire
           1350 Columbia Street, Suite 601
17         San Diego, California  92101
           and
18         CHRISTOPHER K. KOWALCZUK, Esquire
           P.O. Box 11971
19         Roanoke, Virginia  24022
               Counsel for the Defendant.

20

21    Proceedings recorded by Stenography, transcript
      produced by computer.
22                    BRIDGET A. DICKERT
                 UNITED STATES COURT REPORTER
23              180 WEST MAIN STREET, ROOM 104
                  ABINGDON, VIRGINIA 24210
24                    (276) 628-5116

25
```

1      (Proceedings commenced at 9:02 a.m.)

2          THE COURT:  Good morning, ladies and gentlemen.  Are

3    we ready for the jury?

4          MR. RAMSEYER:  Yes.  Has the court made a decision

5    about the expert witness for the defense?

6          THE COURT:  I have.  I believe it should be excluded,

7    and the reason is as follows.  Under the Collateral Matter

8    Doctrine the parties are prohibited from using extrinsic

9    evidence to contradict testimony on, on a collateral matter,

10    and I believe this is, is a collateral matter and is not, and

11    is not relevant to the issues in the case, but solely to be

12    introduced to attack the credibility of the witness.

13        In addition, I think the law is clear, certainly in the

14    Fourth Circuit, that a witness cannot be asked about questions

15    as to collateral matters just to attack his credibility.  I

16    don't remember how this came up, but in any event, I believe

17    the extrinsic evidence from this expert, who I understand's

18    purpose is to show the illegality of a certain product the

19    witness, Steven Wood, was manufacturing, and said a legal

20    product is prohibited.

21          MR. HALL:  Your Honor, not to dispute that, may I

22    lodge her *curriculum vitae* with the court indicating who it was

23    I intended to call, and also a short proffer that she would

24    have testified, in essence, that the Noopept and also the

25    Picamilon that Mr. Wood has, in the past, marketed, and was the

Patel - Cross

1    subject of the letter that was never sent by FDA, and also the

2    Noopept, is not a dietary ingredient for a proper nutritional

3    supplement?

4            THE COURT:  Yes, sir, you may proffer that, and that

5    will be marked as an exhibit and excluded.

6            THE CLERK:  Defendant's Exhibit 77 marked.

7            THE COURT:  All right.  Are we ready for the jury,

8    then?

9            MR. RAMSEYER:  Yes, Your Honor.

10           THE COURT:  So, Mr. Patel, if you'd retake the stand,

11   I believe you're still being cross examined, and you're still

12   under oath, sir.

13       (The jury entered the courtroom and was seated in the jury

14   box.)

15           THE COURT:  Good morning, ladies and gentlemen.

16   We're ready to go again.  You may proceed, Mr. Ramseyer.

17           MR. RAMSEYER:  Thank you, Your Honor.

18   BY MR. RAMSEYER:

19   Q    Mr. Patel, you graduated from Rutgers University?

20   A    I did.

21   Q    When you graduated as a pharmacist you took an oath as a

22   pharmacist; is that right?

23   A    That's correct.

24           MR. RAMSEYER:  I'd like to mark this as Exhibit 55.

25

Patel — Cross

1    BY MR. RAMSEYER:

2    Q    I'll show this here to you.  Do you see that oath?

3    A    Yes, sir.

4    Q    Do you remember taking that?

5    A    I do.

6    Q    And you swore that you'd do these things; is that right?

7    A    That's correct.

8    Q    And that was in 2007; is that right?

9    A    Correct.

10          MR. RAMSEYER:  Move for admission of Government's

11   Exhibit 55.

12          THE COURT:  It will be admitted.

13      (Government's Exhibit No. 55 was received in evidence.)

14   BY MR. RAMSEYER:

15   Q    You testified that you were more or less a gofer in 2008.

16   Do you remember testifying to that?

17   A    Yes, sir.

18   Q    In fact, you were having substantive conversations with

19   customers, weren't you?

20   A    I was.

21   Q    They were, for instance, big customers that China can just

22   doctor us a COA stating it's an extract, didn't you?

23   A    That was a conversation I had, and the way you're

24   portraying it is twisting it.  It was a conversation in regard

25   to China and the fact that China was very behind the times.  We

1    treated China as a joke.  They were very behind the United

2    States in terms of paperwork.

3    Q     But you admit that you told the customers China could just

4    doctor us a COA stating it's an extract, correct?

5    A     I said those words.

6    Q     And in 2008, again, when you say you were just a gofer,

7    did you agree with a customer that if you kept the amounts low

8    in each shipment of questionable powder from China that would

9    keep off of the FDA radar?

10   A     Sorry, can you repeat that?

11   Q     Yes.  Did you agree with a customer in 2008 that if you

12   kept the amounts low in each shipment of questionable powder

13   from China that it would keep off of the FDA radar?

14   A     In 2008 --

15   Q     Did you say that?

16   A     In 2008 China was not up to the standards that the United

17   States was.  So, yes, shipments were coming in, and if you

18   wanted to keep them out of problems because they couldn't

19   create the documents, or they couldn't create the paperwork,

20   then, yeah, it was better to have a smaller shipment than a

21   larger shipment.  If a customer is investing a lot of money in

22   a larger shipment it gets tied up in Customs and it gets stuck

23   there.  In 2008 where China was, was very far behind the times.

24   Q     It's correct you talked about how to keep it off the FDA's

25   radar, correct?

Patel – Cross

```
 1   A    It's in terms of Customs.  When I'm saying that, I mean
 2   it's so raw materials don't get stuck when they're coming into
 3   the port.
 4   Q    All right.  You mentioned there was somebody in China you
 5   referred people to.  Back in 2008, again, when you were
 6   supposedly a gofer, you helped set up a customer with a Chinese
 7   manufacturer to synthesize a new designer steroid, didn't you?
 8   A    Could you repeat that?
 9   Q    Yeah.  In 2008 a customer asked you to set him up with a
10   Chinese manufacturer to synthesize a new designer steroid.  Do
11   you remember that?
12   A    In 2008, if we were selling the pro-hormones, I may have
13   began referrals to other vendors.  It was quite common that we
14   would receive e-mail blasts from China all the time, and when
15   this happened Chinese vendors would send us e-mails and say,
16   "We have these pro-hormones in stock.  We have these
17   pro-hormones in stock."
18   Q    But this is a customer in the U.S. that you were giving
19   this information to, right?
20   A    Right.  It would have been a customer in the United
21   States.
22   Q    One of your big customers, right?
23   A    It may have been.
24   Q    Probably your biggest customer, right?
25   A    May have been.
```

Patel - Cross

```
 1   Q    Customer that paid you eight, $9,000,000?
 2   A    It's possible.
 3   Q    Do you know Vincent Zhou of Beijing Smart Chemicals in
 4   China?
 5   A    Yes.
 6   Q    Did you refer that customer to them?
 7   A    I referred him for legitimate dietary ingredients.
 8   Q    You referred him to synthesize a new designer steroid,
 9   didn't you?
10   A    It's possible for pro-hormones.  If you're talking about
11   2007/2008, it's hard for me to say exactly what it was.  But
12   yeah, it's possible if they were pro-hormones they were looking
13   for I may have referred them.
14   Q    It is not fair to say you were a gofer, is it?
15   A    I did consider myself a gofer.  I was learning the
16   industry in 2007/2008.  2007 in the summer is when I started.
17   Q    Did you tell one of the clients that, well, for one of
18   your clients you had had them buy a bunch of synthetic product,
19   and then you were worried because you wanted to make it look
20   like it was an organic product?
21   A    No.
22   Q    Okay.  Did you, do you remember a time when you said,
23   "We're going to have to go back through all the COAs that China
24   has ever sent us and edit"?
25   A    Again, it's, in 2008 C of As that came in from China were
```

Patel — Cross

```
 1   very inaccurate.  That's the best way I can put it.  And yeah,

 2   it's possible that we had to go back and we had to edit them

 3   because they needed corrections.  It happens all the time.  We

 4   make out C of As, they send us templates, we make edits,

 5   sometimes if they don't send us a template we request from the

 6   vendor, "Hey, your C of A is wrong.  You need to correct it.

 7   Q    You remember at some point in the future after a bunch of

 8   product had gone out you were going to go back and change all

 9   the COAs in the products you already sold?

10   A    It's possible we discovered an error in the C of As, then

11   if you discover an error you go back and fix it.

12   Q    That's not what you do, do you?  You tell the FDA there's

13   a problem.  You don't go back and make it look like the product

14   was different than what you had in the COAs, do you?

15   A    Absolutely not.  You don't, the FDA has stated in their

16   regulations you're not supposed to rely on a certificate of

17   analysis.

18   Q    But you're not supposed to falsify them, are you?

19   A    It's not falsifying them if there's an error on a

20   certificate of analysis and you need to correct the error.

21   Q    All right.  You mentioned that you had gotten two checks

22   from Steve Wood in April of 2011, and you were supposed to hold

23   them; is that right?

24   A    That's right.

25   Q    How long did you hold them?
```

Patel — Cross

1    A    I don't remember.

2    Q    Was it one day?

3    A    I don't remember.

4    Q    Was it a week?

5    A    I couldn't tell.

6    Q    Was it two months?

7    A    It was a very short time frame.

8    Q    Was it a month?

9    A    No.

10   Q    Okay.

11        MR. RAMSEYER:  If I could retrieve Exhibit 49.

12   BY MR. RAMSEYER:

13   Q    This is a text message that was previously introduced.  Is

14   that from you?

15   A    Yes, sir.

16   Q    And did you send that to Willy Ramos?

17   A    I did.

18   Q    Is that in June of 2014?

19   A    That's right.

20   Q    Did you ask him if he could encapsulate 11-oxo?

21   A    Yes, I did.

22   Q    Is 11-oxo a pro-hormone?

23   A    First we need to define what a pro-hormone is.  You can

24   have several different variations of pro-hormones.  The

25   pro-hormones in this case are muscle building hormones.

Patel - Cross

1   Cholesterol is also a, is a hormone.  It converts into other

2   hormones.  There's also legal hormones on the market today.

3   The other is DHEA, which stands for dehydro --

4   Q    What I'm asking is is 11-oxo a pro-hormone?

5   A    It's a hormone in the sense that it converts into other

6   hormones, just like cholesterol converts into other hormones.

7   Q    Is it a dietary supplement?

8   A    If you look at the dietary supplement definition it fits

9   within the dietary supplement guidelines.

10  Q    Why didn't you just make it yourself?

11  A    Eleven-oxo, like I said, is a hormone.  It's not a muscle

12  building hormone, but it is a hormone.  In 2014 S.K. Labs was

13  enrolled in a program that prohibited any hormone-like

14  substance in its facility.  That program was, it was called

15  Informed Choice.  Informed Choice was a program to protect

16  athletes.  So, we were producing high profile products, and we

17  didn't want any level, even in the parts per billion, of

18  contamination.

19  Q    These are questionable products, right?

20  A    I don't think anything is questionable about 11-oxo.

21  Q    Think it's perfectly fine?

22  A    I do.

23  Q    You could make it in your factory?

24  A    I could if we didn't have the Informed Choice program.

25  Q    Mr. Patel, you never quit communicating with Steve Wood,

Patel – Cross

```
 1   did you?

 2   A     No.

 3   Q     You never quit communicating with Willy Ramos, did you?

 4   A     No, I did not.

 5   Q     Never quit doing business with Steve Wood, did you?

 6   A     Up until 2014 I did not.

 7   Q     You never quit doing business with Willy Ramos, did you?

 8   A     I did not.

 9   Q     And you never reported them to law enforcement, did you?

10   A     I'm sorry?

11   Q     You never reported them to law enforcement, did you?

12   A     The production that we were doing for both Willy Ramos and

13   Steve Wood were all legitimate products.  I didn't have

14   anything to report on them.

15   Q     Didn't have anything to report?

16   A     No.

17   Q     They were committing crimes, right?

18   A     If you're talking about Steve Wood's conduct in 2010 and

19   2011?

20   Q     Yes.

21   A     Yeah, he was committing a crime.

22   Q     Did you report it?

23   A     No, he got caught.

24   Q     Right.  Did you report it before he got caught?

25   A     No, I did not.
```

Patel - Cross

1  Q    Did you report him after he got caught?

2  A    No.  I had no reason to.

3  Q    Did you ever report Willy Ramos to law enforcement?

4  A    No, I did not.

5  Q    Did you ever report any of them to the FDA?

6  A    No, I did not.

7  Q    Did you ever tell them to stop making M-Drol and H-Drol?

8  A    No, I did not.

9  Q    And did you ever do anything to stop them from making

10  M-Drol and H-Drol?

11  A    I stepped out of it, and that was it.  I did not want --

12  if I told them to stop, I'm putting myself back into it.

13  Q    Well, my question is you never told them to stop, did you?

14  A    No.

15  Q    And you never did anything to try to stop them, did you?

16  A    Again, that's, it's a little twisted to say that.  I

17  stepped out.  I didn't want to be involved.  I didn't want to

18  get back involved.  If I'm sitting there telling someone, "Oh,

19  you guys should stop what you're doing," I'm inserting myself

20  back into it and I'm not going to do it.

21  Q    Did you send an e-mail to Steve Wood saying, "I don't want

22  to have anything to do with this?"

23  A    No.

24  Q    Did you send an e-mail to Willy Ramos saying that?

25  A    No.  I had conversations with them.

Patel – Cross

1   Q    Did you document in any way that you wanted out of this,

2   and you wanted this over with?

3   A    I had no reason to document it.

4   Q    All right.  And you knew what they were doing was illegal?

5   A    I did.

6   Q    And you knew it was harmful?

7   A    I did.

8   Q    And you were perfectly fine with them making M-Drol and

9   H-Drol as long as they wanted to, correct?

10  A    I was not perfectly fine with it, but I let them do it.

11  Q    All right.  Thank you.

12            THE COURT:  All right.  Any redirect?

13            MR. HALL:  No, sir.  No questions.

14            THE COURT:  All right.  Thank you, sir.  You may step

15  down.

16            THE WITNESS:  Thank you, Your Honor.

17       (Proceedings were had and reported, but not transcribed.)

18       (Proceedings concluded at 2:32 p.m.)

19

20

21

22

23

24

25

```
 1                          CERTIFICATE

 2

 3          I certify the foregoing is an accurate transcript

 4   from the record of proceedings in the above-entitled

 5   matter.

 6

 7

 8   3/23/17                    /s/ Bridget A. Dickert
     Date                         U.S. Court Reporter
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```